# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| **AMTRUST FINANCIAL CORPORATION, et al.,**[1] | ) | Case No. [＿＿＿＿＿＿] |
|  | ) | **(Jointly Administered)** |
| Debtors. | ) |  |
|  | ) | Judge |
|  | ) |  |
|  | ) |  |

## DECLARATION OF PETER GOLDBERG
## IN SUPPORT OF FIRST DAY PLEADINGS

|  |  |  |
|---|---|---|
| STATE OF OHIO | ) |  |
|  | ) | ss: |
| COUNTY OF CUYAHOGA | ) |  |

Peter Goldberg, being duly sworn, deposes and says: I am the President and Chief Executive Officer of Debtor AmTrust Financial Corporation ("AFC"), the parent of each of the other debtors in the above-captioned chapter 11 cases (collectively, the "Debtors") and certain non-debtor subsidiaries (the "Non-Debtor Subsidiaries").[2] As an officer in all of the Debtors,[3] I am generally familiar with their day-to-day operations, businesses and financial affairs. All facts set forth in this Declaration are based upon my personal knowledge, my

---

[1] The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): AmTrust Financial Corporation (3959), AmTrust Real Estate Investments, Inc., (8784), AmTrust Insurance Agency, Inc. (2834), AmTrust Investments, Inc. (9343), AmTrust Properties, Inc. (6359) and AmTrust Management, Inc. (6361).

[2] Non-Debtor Subsidiaries of AFC are AmTrust Bank and its wholly owned subsidiaries, Ohio Savings Capital Trust I, AmTrust Investment Services, Inc., OS Reinsurance, and AmTrust Title Agency, Inc. (dissolved September 15, 2009).

[3] I am the President and CEO of AmTrust Real Estate Investments, Inc. and AmTrust Management Inc., President of AmTrust Properties Inc., Senior Executive Vice President of AmTrust Investments Inc. and Executive Vice President of AmTrust Insurance Agency, Inc. I am also the President and CEO of AmTrust Bank and OS Reinsurance, and Executive Vice President of AmTrust Investment Services, Inc., all of which are not debtors in these proceedings.

-1-

discussion with other members of the Debtors' current senior management, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the operation of the Debtors and the industries in which they operate. While I have made every reasonable effort to ensure that the information contained herein is accurate and complete based upon information that was available at the time of preparation, the subsequent receipt of information may result in material changes to financial data and other information contained herein. If called to testify, I would testify competently to the facts set forth in this declaration (the "Declaration").

1. I submit this Declaration (a) in support of (i) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (collectively, the "Bankruptcy Code") filed on the date hereof (the "Petition Date"), and (ii) the "first-day" relief that the Debtors requested in certain motions and applications filed with the Court (collectively, the "First-Day Pleadings"), and (b) to assist the Court and other interested parties in understanding the circumstances that resulted in the commencement of these chapter 11 cases.

### General Background

2. On the Petition Date, each of the Debtors commenced a case under chapter 11 of the Bankruptcy Code. AFC has its principal place of business at 1801 E. Ninth Street, Suite 200, Cleveland, Ohio 44114 and AFC has been located at such premises in excess of one hundred eighty (180) days.

3. Debtor AFC is the direct or indirect corporate parent of each of the other Debtors and of certain Non-Debtor Subsidiaries. Debtor AFC is parent to Non-Debtor Subsidiary AmTrust Bank, a federal savings bank. AmTrust Bank and its subsidiaries are not

-2-

09-21323-pmc Doc 3 FILED 11/30/09 ENTERED 11/30/09 19:18:35 Page 2 of 48

debtors in these proceedings (collectively, the "Bank Entities").  The Debtors intend that the Bank Entities will continue their business operations.

### The Debtors' Businesses

4.    AFC's principal business consists of acting as a holding company for AmTrust Bank, the Debtors, and the other Non-Debtor Subsidiaries (collectively, the "Companies", and individually, a "Company").  Under AmTrust Bank's charter, it is authorized to accept deposit accounts insured by the Federal Deposit Insurance Corporation ("FDIC") and to make consumer and business loans and certain related investments.  AmTrust Bank and AFC, as its corporate parent, are both subject to oversight and regulation by the Office of Thrift Supervision ("OTS").

5.    AFC was formerly known as Ohio Savings Financial Corporation.  Debtor AmTrust Real Estate Investments, Inc. (fka OSF Properties, Inc.) ("AREI") is a wholly-owned subsidiary of AFC.  All but one class A voting share of Debtor AmTrust Insurance Agency, Inc. (fka Ohio Savings Insurance Agency, Inc.) ("AIAI") is owned by AFC.[4]  Debtors AmTrust Investments Inc., AmTrust Properties Inc., and AmTrust Management Inc. are wholly-owned subsidiaries of AREI.  An organizational chart of the Debtors and the Non-Debtor Subsidiaries is attached as Exhibit A.

6.    Debtor AIAI and non-Debtor AmTrust Investment Services, Inc. ("AISI") both provide services to customers within AmTrust Bank locations in Ohio, Florida, and Arizona.  Wealth management advice is provided through AISI's financial advisors and AIAI's agents.  AISI is registered with the U.S. Securities and Exchange Commission and (a) offers brokerage services, and (b) provides access to investment products, primarily mutual funds and

---

[4]       Robert Goldberg owns one class A voting share of AIAI.

variable annuities. AIAI agents provide access to annuities and other insurance products. Products offered by AISI and AIAI are not FDIC insured.

7. As of September 30, 2009, the Companies recorded annual net revenues of more than $419 million. As of October 31, 2009, the Companies had assets of approximately $11.7 billion and liabilities totaling $11.45 billion. As of the Petition Date, the Companies collectively had approximately 1700 employees.

8. As described in greater detail below, the Debtors' assets generally consist of: (a) approximately $7.27 million in cash in various bank accounts as of October 30, 2009; (b) interests in subsidiaries; (c) accounts receivables; (d) limited partnership, joint venture and other investment interests in real estate and other business entities; and (e) approximately $23.3 million (at book value) in fixed assets, including land, buildings, furniture and equipment.

9. The Debtors hold interests in certain real property. These include AREI's interests in (a) the "515 Euclid Parking Garage," located at 515 Euclid Ave., Cleveland, Ohio 44114; (b) the "Chagrin Office Building," located at 26949 Chagrin Blvd., Beachwood, Ohio 44122; (c) the "Rocky River Office Building," located at 22255 Center Ridge Rd., Rocky River, Ohio 44116; and (d) approximately 880 acres of vacant land in Maricopa County, Arizona.

10. AmTrust Bank branches lease space in both the Chagrin and Rocky River Office Buildings owned by AREI. The other space in these buildings is offered for rent to the public.

11. AREI holds investment interests in more than 50 real estate and business entities (the "Real Estate Investments") in a variety of capacities and locations. In most of these Real Estate Investments, AREI is a member of a limited liability company or limited partner in a limited partnership. In others, AREI is the holder of subordinated debt or is a general partner or

-4-

joint venturer. A complete list of the Real Estate Investments in which AREI is involved is set forth on Exhibit B attached hereto.

<b><u>Debtors' Capital Structure</u></b>

12.     As of September 2, 2009, AFC had outstanding indebtedness for borrowed money totaling approximately $169.5 million, consisting of Amended and Restated Senior Notes (as defined below), Junior Subordinated Debentures (as defined below), and Bond Financing (as defined below).

a.     <u>The Amended and Restated Senior Notes</u>

13.     AFC has approximately $99.49 million of principal indebtedness (including a "Deferred Make-Whole Payment" as defined below) attributable to 11.78% senior notes due October 20, 2012 (the "<u>Amended and Restated Senior Notes</u>")[5]. This amount consists of a current unpaid principal amount of approximately $97.65 million, plus a Deferred Make-Whole Payment of approximately $1.84 million. The Amended and Restated Senior Notes were issued on September 2, 2009 to various senior noteholders ("<u>Noteholders</u>") in exchange for original senior notes dated October 20, 2005 ("<u>Original Senior Notes</u>"). The Original Senior Notes were issued pursuant to a Note Purchase Agreement, dated as of October 20, 2005 (the "<u>NPA</u>"), which was amended by that certain Waiver and First Amendment to Note Purchase Agreement, dated June 23, 2009 ("<u>Waiver and Amendment</u>"), as further amended by that certain Amendment to Waiver and First Amendment to Note Purchase Agreement, dated September 2, 2009 ("<u>Amendment to Waiver and Amendment</u>"). The Waiver and First Amendment required issuance of the Amended and Restated Senior Notes in exchange for the Original Senior Notes.

---

[5]     A substantially more detailed description of the Amended and Restated Senior Notes and transactions related to the Amended and Restated Senior Notes is set forth below in the discussion of the Cash Collateral Motion.

As required by the Waiver and First Amendment, the Amended and Restated Senior Notes increased the interest rate from 5.78% to 11.78%, added a requirement for payment of a "Deferred Make Whole Payment" and made the maturity date three (3) years earlier than the Original Senior Notes (October 20, 2012 in lieu of October 20, 2015), in addition to other amendments.

       b.    <u>The Junior Subordinated Debentures</u>

       14.    AFC has approximately $51.55 million of principal indebtedness attributable to junior subordinated deferrable interest debentures (the "<u>Junior Subordinated Debentures</u>") issued in connection with certain trust preferred equity securities, as of June 3, 1997. The Junior Subordinated Debentures are obligations of AFC only and are not guaranteed by or otherwise obligations of any other Debtor or the Non-Debtor Subsidiaries. The Junior Subordinated Debentures were issued pursuant to an Indenture dated June 3, 1997 with The Bank of New York, as trustee (the "<u>Junior Subordinated Debentures Indenture</u>"). The Junior Subordinated Debentures are subordinate and junior in right of payment to the prior payment in full of all Senior Indebtedness (as defined in the Junior Subordinated Debentures Indenture). The Junior Subordinated Debentures were issued to a special purpose trust, Non-Debtor Ohio Savings Capital Trust I (the "<u>Trust</u>"). The Trust, in turn, issued common securities to AFC (the "<u>Trust Common Securities</u>") and preferred securities to third parties (the "<u>Trust Preferred Securities</u>" and, together with the Trust Common Securities, the "<u>Trust Securities</u>"), to fund the Trust's purchase of the Junior Subordinated Debentures from AFC.

       15.    AFC is responsible for the debts and obligations of the Trust (other than with respect to the Trust Securities) to the extent not satisfied out of the Trust's assets. Furthermore, AFC has guaranteed the payment of (a) distributions required to be paid on the

Trust Securities, (b) the redemption price with respect to the Trust Securities, and (c) upon a voluntary or involuntary termination and liquidation of the Trust (other than in connection with a distribution of the Junior Subordinated Debentures to holders of the Trust Securities), the lesser of (i) the liquidation amount and accumulated and unpaid distributions on the Trust Securities or (ii) the amount of assets of the Trust remaining available for distribution to holders of the Trust Securities, in each case, to the extent the Trust has funds legally available for such payments described in clauses (a) through (c). Furthermore, AFC's guarantee is subordinate and junior in right of payment to Senior Indebtedness[6], including the Amended and Restated Senior Notes.

      c.     The Bond Financing

      16.     In order to construct a multi-level parking facility with 522 parking spaces and approximately 11,000 square feet of ground-floor retail (the "Parking Garage Project") on certain of its real property at 515 Euclid Avenue, Cleveland Ohio (the "Euclid Property"), AREI (then known as OSF Properties) obtained financing in the form of (a) $2,000,000 of tax incentive bonds from the City of Cleveland known as the 2003 City of Cleveland Ohio Economic Development Revenue Bonds (the "2003 City of Cleveland Bonds") and (b) $16,000,000 of municipal bonds for construction costs from the Cleveland-Cuyahoga County Port Authority (the "Port Authority") issued on February 27, 2004 and known as the Cleveland-Cuyahoga County Port Authority Taxable Development Revenue Bonds, Series 2004 (OSF Properties, Inc. Project) (the "2004 Port Authority Bonds"[7] and together with the 2003 City of Cleveland Bonds, the "Bond Financing").

---

[6]     Senior Indebtedness is as defined in, and to the same extent that the Junior Subordinated Debentures are subordinated to Senior Indebtedness under, the Junior Subordinated Debentures Indenture.

[7]     Cleveland-Cuyahoga County Port issued the 2004 Port Authority Bonds under a Trust Indenture naming U.S. Bank National Association as Trustee dated February 1, 2004. Charter One Bank, N.A. was the sole purchaser of the 2004 Port Authority Bonds.

17.     In connection with the issuance of the 2004 Port Authority Bonds, AREI, as lessor, entered into a ground lease of the Euclid Property and the Parking Garage Project to the Port Authority for a term of forty (40) years.  Simultaneously, the Port Authority leased the Euclid Property and the Parking Garage back to AREI on a "triple net" lease (the "Port Authority Lease").  The Port Authority Lease is guaranteed by AFC (the "Lease Guaranty") and payments thereunder are equal to the repayment obligations under the 2004 Port Authority Bonds. Obligations under the Lease and the 2004 Port Authority Bonds are secured by an assignment of the Lease and Lease Guaranty and a mortgage on the Euclid Property and the Parking Garage Project.  At the end of the Port Authority Lease term, AREI has the option to purchase the Parking Garage Project for a payment of ten ($10) dollars.

      d.     Issued and Outstanding Stock

18.     As of the Petition Date, AFC had issued and outstanding 161,421 shares of Common Stock, without par value per share.

19.     The ownership of, commitment to, and involvement in AmTrust Bank by Goldberg family members dates back to the early 1960s when Leo Goldberg acquired the controlling interest of its predecessor Ohio Savings Bank.  For the five decades since then, the Goldberg family has exercised ownership and control of Ohio Savings Bank (now known as AmTrust Bank) and its affiliates.  After Leo Goldberg died in 1971, his sons Robert, David and Gerald succeeded him in the leadership and management of the Bank.  In 1977, Ohio Savings Financial Corporation (now known as AmTrust Financial Corporation (Debtor AFC)) was formed as the holding company for the Bank.  Today, approximately 77% of the common stock of AFC is held by the Goldberg Family.  In 2007 Peter Goldberg, who is Gerald Goldberg's son,  became President of both the AmTrust Bank and AFC and, subsequently in 2009, became

President and Chief Executive Officer of both AmTrust Bank and AFC. Peter, Robert, David and Gerald Goldberg are current members of the Board of Directors of AFC. Other members of the Goldberg family are actively involved in the operations of AmTrust Bank and of various subsidiaries of AFC.

### Factors Precipitating the Chapter 11 Cases

20.     In the past several years, the United States financial and credit markets, including the residential housing market, experienced serious disruptions. A deterioration in mortgage credit quality and availability slowed the pace of transactions and de-valued homes. Mortgage delinquencies sky-rocketed. Unemployment rates rose. Credit markets are/were illiquid.

21.     In this environment, which continues at present, the Debtors have been severely impacted because of significant investments in (a) one to four single family home loans, and (b) land acquisition, development and construction loans. In the past two years, the Debtors have diligently attempted to survive the downturn in the economy. However, the combination of the above factors has led to the need for the Debtors to commence these Chapter 11 Cases in order to reorganize.

### Facts in Support of First Day Pleadings

22.     Concurrently with the filing of their chapter 11 cases, the Debtors also filed a number of First Day Pleadings. The Debtors anticipate that the Court will conduct a hearing soon after the commencement of their chapter 11 cases (the "First Day Hearing") at which the Court will hear and consider First Day Pleadings. The Debtors also anticipate that the

-9-

09-21323-pmc    Doc 3    FILED 11/30/09    ENTERED 11/30/09 19:18:35    Page 9 of 48

Court may consider the remainder of the First Day Pleadings at a later time. Those First Day Pleadings that the Debtors anticipate will be heard at the First Day Hearing are described below.[8]

23. The relief sought in the First Day Pleadings is intended to: (a) allow the Debtors to continue to operate to the extent necessary and appropriate to maximize the value of the Debtors' assets; (b) manage cash flow among the Debtors and non-debtor subsidiaries and affiliates; and (c) minimize potential adverse consequences that might otherwise result from the commencement of these chapter 11 cases. More specifically, the First Day Pleadings seek relief allowing the Debtors to (i) continue business relationships among the Debtors, Non-Debtor Subsidiaries, and regulators; (ii) gain and retain the support of key constituencies — customers, trade vendors, and employees; and (iii) begin certain procedures that will provide for the efficient administration of these proceedings.

24. I have reviewed each of the First Day, including the exhibits thereto, and I believe that the relief sought in each of the First Day Pleadings is tailored to meet the goals described above and, ultimately, will be integral to the Debtors' ability to achieve successful reorganization.

25. I also believe that it is critical for the First Day Pleadings to be heard as soon as possible. If the First Day Pleadings are not heard on an expedited basis, the Debtors may be unable to fulfill their obligations to each other, the Non-Debtor Subsidiaries, their employees, and the public at large. Under such circumstances, I believe that the Debtors will not be able to operate. Such a stoppage could negatively impact the Debtors and the Non-Debtor Subsidiaries, which could create widespread injury to the Debtors' estates, their creditors and the Non-Debtor Subsidiaries. Accordingly, the expedited review of the First Day Pleadings is important to the

---

[8] Capitalized terms used in the descriptions of the First Day Pleadings and not otherwise defined herein have the meanings given in the applicable First Day Pleadings.

continuing viability of the Debtors and the Non-Debtors and therefore I believe it to be in the best interests of all interested parties.

## A.    *The Case Administration Motions*

### a.    Joint Administration

26.    The Debtors have submitted a motion requesting the entry of an order providing for the joint administration, but not the substantive consolidation, of their respective chapter 11 cases.    I believe that such an order would provide a material administrative convenience for the Court, the Office of the Clerk of the Bankruptcy Court and all parties in interest.    Accordingly, I believe that joint administration of the Debtors' respective cases is warranted and will ease the administrative burden for the Court and the parties.

### b.    Extension of Time to File Schedules and Statements

27.    Because of the demands incident to the commencement of these chapter 11 cases, the Debtors were unable to assemble, prior to the Petition Date, all of the information necessary to complete and file the required schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases and statements of financial affairs (collectively, the "Schedules and Statements"). Accordingly, the Debtors have requested that the Court extend the deadline for filing the Schedules and Statements to 45 days from the Petition Date without prejudice to the Debtors' right to seek further extensions of such periods upon a showing of cause therefore pursuant to Bankruptcy Rule 1007.    I believe that the requested extension should provide a reasonable opportunity for the Debtors to complete and file the Schedules and Statements.

c.    Filing Consolidated Lists of Creditors,
      Equity Holders and Top 25 Unsecured Creditors

28.    The Debtors have moved for entry of an order authorizing the filing of a single consolidated list of the Debtors' 25 largest unsecured creditors in lieu of filing separate lists of the largest 20 unsecured creditors for each of the Debtors. I believe that authorizing such a consolidated filing will (a) facilitate the review of creditors' claims and the appointment of an official committee of unsecured creditors (the "Committee") by the Office of the United States Trustee (the "U.S. Trustee"), and (b) promote the efficient and orderly administration of these chapter 11 cases.

d.    Case Management Order

29.    The Debtors have presented a motion requesting that this Court enter an order providing for certain notice, hearing and other case management procedures in these chapter 11 cases. I believe that special hearing procedures would assist in administering the case docket and would avoid constant (and unpredictable) hearings before this Court. Among other things, the Debtors have proposed that such hearing procedures include the designation of regularly scheduled omnibus hearing dates at which the Court, the Debtors and other parties in interest can address several motions at once, thereby avoiding the duplication of time and expense of scheduling separate hearings on each discrete matter. Further, given that the Debtors have a significant number of potential creditors, requiring regular mail service of every motion and response on every creditor would significantly increase the administrative costs borne by the Debtors; accordingly, the Debtors have requested authority to provide electronic mail service to all creditors in these cases. This Motion also seeks authority to limit service of certain motions to only parties with specific interest in the sought relief. The Debtors' motion seeks the establishment of a number of other case management procedures to be utilized in these

-12-

chapter 11 cases for the benefit of the Court and parties in interest, including electronic notice procedures and methods for obtaining copies of filed documents. I believe the requested procedures will increase administrative efficiency and reduce attendant costs.

e. <u>Adequate Assurance of Payment of Utilities</u>

30. The Debtors currently use electric, natural gas, water, sewer, telecommunications and other services provided by approximately 7 utility companies: The Illuminating Company, South Shore Energy Services, Inc. (meter reader), AT&T, Dominion East Ohio, City of Cleveland Division of Water, City of Rocky River Division of Sewer Billing, and the Northeastern Ohio Regional Sewer District (collectively, the "<u>Utility Companies</u>"). I have been advised that the Debtors' aggregate average monthly obligations to the Utility Companies on account of services rendered total approximately $18,500. Uninterrupted utility service is essential to the Debtors' ongoing operations and, therefore, to the success of the Debtors' reorganization. I believe that the temporary or permanent discontinuation of utility services at any of the Debtors' facilities could seriously harm the Debtors' businesses and jeopardize the Debtors' reorganization efforts.

31. I have been advised that pursuant to section 366(c)(2) of the Bankruptcy Code, a utility may alter, refuse or discontinue a chapter 11 debtor's utility service if the utility does not receive from the debtor or the trustee adequate "assurance of payment" within 30 days of the commencement of the debtor's chapter 11 case. To comply with the requirements of section 366 of the Bankruptcy Code, the Debtors have sought an order of this Court authorizing the Debtors to set aside funds sufficient to provide a deposit to any requesting Utility Company in an amount equal to the Debtors' calculation of the cost of one month's worth of utility service and to provide such deposit to a Utility Company upon request. In addition, if any Utility Company believes additional assurance is required, it could request such assurance, pursuant to

-13-

specific procedures set forth in the motion. Moreover, the Debtors have also proposed certain "opt out" procedures to resolve disputes with Utility Companies in the first 30 days of the these chapter 11 cases. I believe the requested procedures will provide a workable alternative for the Debtors and the Utility Companies and will permit uninterrupted utility service to the Debtors' various properties.

      f.      <u>Appointment of Claims and Noticing Agent</u>

      32.      The Debtors recognize that the number of creditors and other parties in interest involved in these chapter 11 cases may impose administrative and other burdens upon the Court and the Clerk of the Bankruptcy Court. To relieve these burdens, the Debtors will seek the entry of an order appointing Kurtzman Carson Consultants LLC ("<u>KCC</u>") as the Debtors' claims and noticing agent in these chapter 11 cases to, among other things: (a) prepare and serve all notices required in the Debtors' chapter 11 cases, including notice of the commencement of these chapter 11 cases and the initial meeting of creditors under section 341 of the Bankruptcy Code; (b) maintain the official claims register; and (c) mail and tabulate ballots in connection with any vote to accept or reject a plan or plans of reorganization proposed in these chapter 11 cases. The Debtors selected KCC based on (i) KCC's experience as a claims and noticing agent, and (ii) its reputation as a provider of quality services. I believe that the appointment of KCC to perform the functions above will facilitate the efficient administration of these chapter 11 cases.

      g.      <u>Cash Management Systems</u>

      33.      The Debtors' cash management system (the "<u>Cash Management System</u>") in its current form is uncomplicated and efficiently collects, transfers, and disburses funds. The Flowchart of Cashflows attached hereto as <u>Exhibit</u> C describes the flow of funds throughout operations. Each of the Debtors maintains one or more separate accounts at PNC Bank. All of the Debtors' Bank Accounts (defined below), including account numbers and balances are listed

on Exhibit D, attached hereto.  Prior to the Petition Date, the Debtors utilized accounts at AmTrust Bank (the "AmTrust Accounts").  However, as required under the Waiver and Amendment, the Debtors recently began, and have substantially completed, transitioning from the AmTrust Accounts to newly opened accounts at PNC Bank (the "PNC Accounts") (the PNC Accounts together with the AmTrust Accounts, the "Bank Accounts").  The Debtors intend to transfer all funds from the remaining AmTrust Accounts to the comparable PNC Accounts.  Following the completion of the transfer of funds from the AmTrust Accounts to the PNC Accounts and the closing of the AmTrust Accounts, all of the Debtors' Bank Accounts will be held at PNC Bank.[9]  PNC Bank is not a creditor of the Debtors.

34.     In the ordinary course of business, the Debtors use the Bank Accounts to collect revenues and to pay each individual Debtor's corresponding operating expenses.  Prior to the Petition Date, the Debtors and Non-Debtor Subsidiaries participated in intercompany transfers as needed.  For example, if AREI did not have funds sufficient to pay utilities, one of the Debtors or Non-Debtor Subsidiaries would advance funds to allow for the payment.  An appropriate entry was recorded on the books of each company.  Cost of payroll for each of the Debtors has been regularly advanced by AmTrust Bank.  After receiving a disbursement of funds for a particular purpose, like payroll, then the disbursing entity records the transfer in its books and records as an intercompany receivable and a corresponding payment has been made.  AFC and AmTrust Bank are the entities that most often advance funds.

35.     I believe that it is in the Debtors' best interest to seek authority to continue to use the Cash Management System consistent with prepetition business practices and procedures.  The Cash Management System is an ordinary course business practice of the

---

[9]     Prior to the Petition Date, the Debtors also had two accounts at ShoreBank.  The Debtors anticipate that the ShoreBank accounts will be emptied and closed prior to the Petition Date; however, if they are not, then the Debtors expect that they will be emptied and closed within the first week of the bankruptcy proceedings.

Debtors and, absent the requested relief, I have been advised that the Debtors would have to significantly alter the Cash Management System to comply with United States Trustee established guidelines (the "UST Guidelines"). It is my understanding that the UST Guidelines require: (a) closing all existing bank accounts and opening new debtor in possession accounts; and (b) maintaining separate debtor in possession accounts for cash collateral and postpetition taxes.

36. I believe that altering the Debtors' Cash Management System at this time would negatively impact the Debtors and these cases. The Cash Management System provides critical benefits to the Debtors, such as enabling the Debtors to: (a) control and monitor corporate funds; (b) ensure cash availability; and (c) reduce administrative expenses by facilitating the efficient movement of funds.

37. Any disruption in the Debtors' Cash Management System will detract from the Debtors' efforts to preserve and enhance the value of their estates. Altering the Cash Management System may disrupt payments to employees, and utility and benefit providers. Therefore, I believe that it is essential that the Court permit the Debtors to continue to use their current Cash Management System.

38. As set forth above, the Debtors utilize certain Bank Accounts on a daily basis. To avoid substantial disruption to the normal operation of their businesses and to preserve a "business as usual" atmosphere, as part of their request to maintain their Cash Management System, the Debtors hereby request that they be permitted to continue to use their Bank Accounts with the same account numbers. Absent this relief, the UST Guidelines would require the Debtors to close all prepetition bank accounts and open new accounts. Allowing the Debtors to

continue to use their prepetition bank accounts will assist the Debtors in accomplishing a smooth transition to operating in chapter 11.

39. To protect against the possible inadvertent payment of prepetition claims, all of the Debtors will immediately advise PNC Bank and AmTrust Bank (collectively, the "Banks") not to honor checks issued prior to the Petition Date, except as otherwise expressly permitted by an order of the Court and directed by the Debtors. The Debtors have the capacity to draw the necessary distinctions between prepetition and postpetition obligations and payments without closing the Bank Accounts and opening new ones.

40. To the extent that any of the motions filed in these cases seek authorization to pay prepetition debt, with respect to such debt, the Debtors seek authority to issue postpetition checks on account of such prepetition debt. As a result of the foregoing, the Debtors request that this Court authorize the Banks to accept and honor all representations from the Debtors as to which checks, drafts, wires or ACH transfers should be honored or dishonored consistent with any order of this Court and governing law, regardless of whether such checks, drafts, wires or ACH transfers are dated prior to, on, or subsequent to the Petition Date. The Debtors also request that the Court order that the Banks will not be liable to any party on account of (a) following the Debtors' instructions or representations as to any order of this Court, (b) the honoring of any prepetition check or item in a good faith belief that the Court has authorized such prepetition check or item to be honored or (c) an innocent mistake made despite implementation of reasonable item-handling procedures. Such relief is reasonable and appropriate because the Banks are not in a position to independently verify or audit whether a particular item may be paid in accordance with a Court order or otherwise.

41.     In the ordinary course of their businesses, the Debtors use a multitude of checks and other business forms.  By virtue of the nature and scope of the Debtors' business operations, it is important that the Debtors be permitted to continue to use their existing checks and other business forms without alteration or change.  To avoid disruption of the Cash Management System and unnecessary expense, moreover, the Debtors also request that they not be required to include the legend "D.I.P." and the corresponding bankruptcy case number on any business forms or checks.  Otherwise, the estates will be required to bear a potentially significant expense, which the Debtors respectfully submit is unwarranted.

42.     As parties that presently conduct business with the Debtors likely will be aware of the Debtors' status as debtors in possession, the alteration of the Debtors' checks and business forms would be unnecessary and unduly burdensome.

43.     In addition, the Debtors seek authority to implement ordinary course changes to their Cash Management System.  Such changes include the closing of bank accounts, and potentially, the opening of new accounts; provided however, that any new domestic account is established at a bank insured with the FDIC and that is organized under the laws of the United States or any State therein.  As these cases move forward, the Debtors may determine that changes in the Cash Management System are beneficial to their business transactions.  To the extent that changes are necessary to preserve the value of the Debtors' assets, if authorized herein, the Debtors intend to make such changes.

44.     As described above, the Debtors' Cash Management System requires funding among the Debtors and the Non-Debtor Subsidiaries.  Thus, to the extent that any of the Debtors or relevant Non-Debtor Subsidiaries require intercompany funding after the Petition Date, the Debtors seek authority to make such payments in the ordinary course through

-18-

intercompany transfers in the same manner as such payments and transfers were made prior to the Petition Date. The Flow Chart of Cashflows, attached hereto as <u>Exhibit</u> C depicts the flow of intercompany transfers and settlements. For example, Debtor AIAI (depicted on Exhibit C as AmTrust Insurance Cash Account) receives funds from third party non-debtor insurance companies (the "<u>Insurance Funds</u>") based upon insurance products sold by employees of both AISI and AIAI. Commission payments to Non-Debtor AISI employees and Debtor AIAI employees are paid out of the Insurance Funds. AIAI transfers the portion of the Insurance Funds allotted for AISI employee commissions to AISI (depicted on Exhibit C as AmTrust Investments). The Debtors maintain, and will continue to maintain, current records of all transfers of cash and can readily ascertain, trace and account for all intercompany transactions, which are periodically trued up and reconciled.

45.     The Debtors respectfully request that, pursuant to section 503(b)(1) of the Bankruptcy Code, the Court grant administrative expense priority to all intercompany claims against a Debtor by another Company (Debtor or Non-Debtor Subsidiary) arising on or after the Petition Date as a result of intercompany transactions through the Cash Management System. Transfers among the Companies represent extensions of intercompany credit. Accordingly administrative expense status to intercompany claims will ensure that each individual Debtor utilizing funds flowing through the Cash Management System will continue to bear ultimate repayment responsibility for such borrowings.

46.     The Debtors respectfully submit that under the circumstances, the maintenance of the Cash Management System in substantially the same form as it existed prior to the Petition Date, is in the best interests of the Debtors' estates and creditors. Preserving a "business as usual" atmosphere and avoiding the unnecessary distractions that inevitably would

be associated with any substantial changes to the Cash Management System will (a) facilitate the Debtors' stabilization of their postpetition business operations and (b) assist the Debtors in their reorganization efforts.

47.     By the Cash Management Motion, the Debtors seek a 60-day extension of time to ensure that they comply with section 345(b) of the Bankruptcy Code.  During the extension period, the Debtors propose to engage the Office of the United States Trustee in discussions to determine what modification to their investment guidelines, if any, would be appropriate under the circumstances.

48.     The Debtors believe that funds, if any, held in the Bank Accounts in excess of the amounts insured by the FDIC are secure and that obtaining bonds to secure these funds would be costly, unnecessary and detrimental to the Debtors' estates and creditors.

49.     I believe that there is good cause for the Court to extend the time for compliance with the requirements of section 345(b) of the Bankruptcy Code because:  (a) the Debtors' Banks are federally or state chartered banks subject to supervision by banking regulators, (b) the Debtors retain the right to remove funds held in the Bank Accounts and to establish new Bank Accounts, if needed, (c) the cost associated with satisfying the requirements of section 345 is burdensome, and (d) the process of satisfying these requirements would lead to needless inefficiencies in the management of the Debtors' businesses.

**B.**     ***The Cash Collateral Motion***

50.     The Debtors have an urgent need for the immediate use of cash, in the possession of the Debtors as of the Petition Date or received by the Debtors thereafter (the "Cash Collateral"), that may be encumbered by security interests pursuant to agreements with certain Noteholders (as described more fully below).  The Cash Collateral consists primarily of

dividends from Non-Debtor Subsidiaries, proceeds from the sale of fixed annuities and property and casualty insurance policies products, commissions, income tax refunds, distributions from the Real Estate Investments and revenue from rental of the Chagrin and Rocky River Office Buildings and the 515 Euclid Parking Garage. The Debtors require use of the Cash Collateral to, among other things, pay present operating expenses, including payroll and amounts due to vendors, and ensure a continued supply of goods and services essential to the Debtors' continued viability.

51.     The preservation and maximization of the going concern value of the Debtors' businesses, including the preservation of key business relationships, are among the Debtors' primary goals in their chapter 11 cases. In support of these goals, the Debtors wish to provide seamless and uninterrupted services to the Debtors' business customers and lessees. For these reasons, the Debtors seek to minimize any adverse business effects of their chapter 11 filing to the fullest extent possible. I have been advised that the Debtors are requesting both interim and final orders authorizing the use of such Cash Collateral.

The 5.78% (Amended to 11.78%) Senior Notes Claims

52.     As described above in paragraph [13], pursuant to the NPA, AFC issued the Original Senior Notes in the original principal amount of $105 million to the Noteholders.

53.     AFC was the sole obligor under the NPA and the Original Senior Notes, and its obligations thereunder were unsecured.

54.     The NPA subsequently was amended by the Waiver and Amendment and later by the Amendment to Waiver and Amendment, both of which became effective as of September 2, 2009, the date on which the Security Agreement (defined below) and Guaranty (defined below) became effective.

55. Section 5(c) of the Waiver and Amendment required (as a condition precedent to the effectiveness of the Waiver and Amendment, which became effective only as of September 2, 2009) AFC to issue the Amended and Restated Senior Notes in exchange for all existing Original Senior Notes. On September 2, 2009, as part of the series of transactions which made the Waiver and Amendment effective on that date, AFC did in fact issue to the respective Noteholders a total of twenty-three (23) Amended and Restated Senior Notes in exchange for the twenty-three (23) existing Original Senior Notes. Each of the Amended and Restated Senior Notes was dated September 2, 2009, and reflected the principal balance remaining after application of the September Payments (hereinafter defined) which were also made to the respective Noteholders on September 2, 2009. Each of the Amended and Restated Senior Notes also increased the interest rate from 5.78% to 11.78%, added a requirement for payment of a "Deferred Make Whole Payment" and made the maturity date three (3) years earlier than the Original Senior Notes (October 20, 2012 in lieu of October 20, 2015), in addition to other amendments in favor of the Noteholders.

56. Prior to the effectiveness of the Waiver and Amendment and Amendment to Waiver and Amendment on September 2, 2009, the Original Senior Notes were unsecured obligations of AFC. One of the principal purposes of the Waiver and Amendment was to secure the obligations AFC owed to the Noteholders under the NPA and the Original Senior Notes, as replaced and superseded by the Amended and Restated Senior Notes on September 2, 2009, as aforementioned. Specifically, the Waiver and Amendment (a) provided for the guaranty of AFC's previously unsecured obligations by its following subsidiaries, each of which is a Debtor in these chapter 11 cases (collectively, the "Subsidiary Guarantors"): AREI, AmTrust Investments Inc. ("AII"), AmTrust Properties Inc. ("API"), AmTrust Management Inc. ("AMI")

-22-

and AIAI, and (b) required AFC and the Subsidiary Guarantors to grant the Noteholders, through the Bank of New York Mellon as collateral agent (the "Collateral Agent"), security interests in and liens on all of their right, title, and interest in and to all real and personal property wherever located and whether now or hereafter existing, other than certain excluded collateral.

57. Accordingly, the Subsidiary Guarantors, each of which is a Debtor in these cases, executed and delivered to the Noteholders that certain Guaranty dated as of September 2, 2009 ("Guaranty"). Execution of the Guaranty was required by Section 5(a)(ii) of the Waiver and Amendment, as a condition precedent to the effectiveness of the Waiver and Amendment on September 2, 2009.

58. Additionally, AFC and each of the Subsidiary Guarantors executed that certain Pledge and Security Agreement (the "Security Agreement"), dated as of September 2, 2009, in favor of the Collateral Agent. Pursuant to the Security Agreement, AFC and each of the Subsidiary Guarantors granted security interests in the "Collateral" as defined in such agreement (together with any other collateral pledged to secure the Amended and Restated Senor Notes, (the "Collateral"), consisting of substantially all of their assets.

59. I have been advised that the Noteholders filed UCC-1 financing statements with the Ohio Secretary of State in respect of the Collateral in respect of AFC and the Subsidiary Guarantors, each of which UCC-1 was recorded on September 3, 2009 and listed as collateral as "All assets of the debtor."

60. Also required by Section 5(a)(iii) of the Waiver and Amendment, as a condition precedent to the effectiveness of the Waiver and Amendment on September 2, 2009, was the execution and delivery to the Collateral Agent of (a) share certificates representing Pledged Stock (of AFC's Subsidiary Debtor corporations and certain Non-Debtor Subsidiaries),

-23-

(b) all Pledged Debt Instruments (both intercompany debt instruments and debt instruments from outside parties in favor of AREI, one of the Debtors herein), (c) Mortgages for Real Properties (including a new mortgage given on September 2, 2009, to the Collateral Agent covering Arizona land owned by AREI, and a previous intercompany mortgage given by AREI to AFC, for $30 million covering office buildings and other land in northeast Ohio), and (d) seven (7) Deposit Account Control Agreements (all capitalized terms are as defined in the Security Agreement), together with other conditions precedent, all of which were satisfied on September 2, 2009 as required for the effectiveness of the Waiver and Amendment on that date.

61.     In addition, AFC made payments to the Noteholders of (a) $10,325,138 on September 2, 2009, as required by Section 5(c) of the Waiver and Amendment (the "September Payments") and (b) $1,595,669 on October 20, 2009, as required by the Amended and Restated Senior Notes executed in accordance with Section 5(b) of the Waiver and Amendment (the "October Payments"; which collectively with the September Payments are referred to herein as the "September and October Payments").

62.     The current unpaid principal amount of the Amended and Restated Senior Notes is approximately $97.65 million, plus a "Deferred Make-Whole Payment" of approximately $1.84 million, for a total outstanding balance of approximately $99.5 million owing under the Amended and Restated Senior Notes.

### Avoidability of the Noteholders' Liens and Security Interests

63.     As detailed above, the Debtors granted liens on and security interests in the Collateral on September 2, 2009 (collectively, the "Liens") to the Collateral Agent on behalf of the Noteholders and made the September and October Payments, all within the ninety (90) day period before the Petition Date.

-24-

64.     I have been advised that the granting of the Liens by each of AFC and the Subsidiary Guarantors, the incurrence by the Subsidiary Guarantors of the obligations under the Guaranty and the September and October Payments each constitutes a transfer of an interest of the relevant Debtor's property (the "Transfers").

65.     I have been advised that the Transfers are avoidable under section 547(b) of the Bankruptcy Code. The Transfers were made for or on account of an antecedent debt owed by one or more of the Debtors before such Transfers were made. The Debtors were insolvent when these Transfers were made.

66.     The Transfers enabled the Noteholders and other transferees to receive more than they would have received if the cases were cases under chapter 7 of the Bankruptcy Code, the Transfers had not been made, and the Noteholders and other transferees received payment of their debts to the extent provided by the provisions of the Bankruptcy Code.

67.     I have been advised that, alternatively, if it were to be determined that the Transfers are not avoidable under section 547(b) of the Bankruptcy Code, then the Transfers are avoidable as constructively fraudulent transfers under sections 544(a) and 548(a)(1)(B) of the Bankruptcy Code. The Subsidiary Guarantors did not receive reasonably equivalent value in exchange for incurring obligations under the Guaranty or granting Liens to the Collateral Agent for the benefit of the Noteholders and the other transferees.

68.     I believe avoidance of the Liens, the obligations under the Guaranty and the September and October Payments is beneficial to the Debtors and their creditors and estates. I have been advised that avoidance of the Liens, the obligations under the Guaranty and the September and October Payments is an inevitable certainty and that any effort of the Collateral Agent and Noteholders to contend otherwise is without merit.

-25-

69.     The Debtors have filed an adversary proceeding complaint (the "Avoidance Action") against the Collateral Agent and Noteholders pursuant to sections 544, 547, 548 and 550 of the Bankruptcy Code seeking to avoid and recover the Liens, the obligations under the Subsidiary Guaranties and the September and October Payments.

70.     Should the Debtors prevail on the Avoidance Action, the Noteholders will hold only general unsecured claims in these bankruptcy cases.  As unsecured creditors, the Noteholders would have no right to adequate protection for the use of Cash Collateral.

71.     As further described herein, the Debtors require the immediate use of Cash Collateral, wherever located, to continue operations and preserve the value of the Debtors' assets.

72.     Specifically, the Debtors seek to use Cash Collateral to (a) maintain their operations consistent with prepetition practices, (b) pay certain prepetition obligations, and (c) pay disbursements more fully described in the Budget (as hereinafter defined).

73.     The Debtors seek to use Cash Collateral in an amount consistent with the expenditures described in the Debtors' initial consolidated budget for the period from the Petition Date through March 1, 2010 (the "Budget").  A copy of the Budget is attached to the Cash Collateral Motion.

74.     Subject to the calendar of the Court, the Debtors propose the scheduling of a final cash collateral hearing (the "Final Cash Collateral Hearing") during the week of December 15, 2009.  Based upon such timeframe, approximately $335,000 of Cash Collateral is expected to be used during the period from the date of the filing of this motion to the proposed date of the Final Cash Collateral Hearing, and the Debtors expect to have receipts in the amount of approximately $600,000 during such period.

-26-

75.     I believe that absent the Debtors' use of the Cash Collateral on the terms provided in the Cash Collateral Motion, the Debtors will not have available sources of working capital and financing to carry on the operation of their businesses as going concerns, including the maintenance and preservation of their properties, other facets of the operation of their businesses, the payment of expenses relating thereto, and the costs and expenses of administering these estates.   In the absence of the use of Cash Collateral, the continued operation of the Debtors' businesses, even for a limited period of time, would not be possible, and serious and irreparable harm to the Debtors and their estates would occur.   Consequently, the use of Cash Collateral is critical to preserve and maintain the going concern value of the Debtors and will enhance the prospects for a successful reorganization of the Debtors under chapter 11 of the Bankruptcy Code.

76.     As of the date of this Declaration, the Debtors do not have an agreement with the Collateral Agent or the Noteholders concerning consensual use of Cash Collateral.

77.     The Debtors propose that, to the extent the Court determines that, notwithstanding the avoidability of the Liens, the Noteholders are entitled to adequate protection, the Noteholders receive provisional replacement continuing security interests in and liens (the "Adequate Protection Liens"), and solely to the extent of any diminution in value of the Noteholders' purported interest in Cash Collateral, on all of the right, title and interest of the Debtors in and to all present and after-acquired property and assets of the Debtors of the same kind and nature as the Noteholders now purport to hold a security interest or lien in, and limited to the same validity, perfection, enforceability and priority as of the Petition Date as the original Liens, and the proceeds of all of the foregoing, whether now existing or hereafter acquired (collectively, the "Protection Collateral"); *provided, however,* that for the avoidance of doubt, I

have been advised that the Protection Collateral shall not include the Debtors' claims and causes of action under section 544, 545, 547, 548, 549, 550 or 553 of the Bankruptcy Code.

78.     The Debtors propose that the Adequate Protection Liens and the Protection Collateral should be subject to a Carve-Out (as defined in the Cash Collateral Motion) for the benefit of professionals retained by the Debtors and any official committees appointed in these chapter 11 cases, and for the other purposes described in the Cash Collateral Motion.   The Carve-Out should be provided on a provisional basis in the event that the Court were to determine not to avoid the Liens and other Transfers.

79.     The Debtors proposal to provide Adequate Protection Liens on the Protection Collateral does not constitute an acknowledgement that the Noteholders or Collateral Agent have any interest in the Cash Collateral or are entitled to adequate protection and is without prejudice to the Avoidance Action and the right of the Debtors to seek the avoidance of the Transfers, and any other relief with respect to the Amended and Restated Senior Notes, Liens, Collateral Agent and Noteholders.

80.     I have been advised that the standards for authorizing the Debtors to utilize Cash Collateral can appropriately be found to be satisfied by the terms proposed.  First and foremost, the Noteholders' alleged Liens are very likely to be avoided under the Bankruptcy Code.  Moreover, the  means of providing adequate protection of the Noteholders' interest in the Cash Collateral are customary and appropriate.

81.     The Debtors believe that their proposed provisional adequate protection is reasonable because it protects the Noteholders' interest, if any, in the Cash Collateral to the same extent as the (soon to be avoided) Liens provided in the NPA , Waiver and Amendment and Security Agreement.

-28-

82. Absent authorization from the Court to use Cash Collateral on an interim basis pending the Final Cash Collateral Hearing, the Debtors will be immediately and irreparably harmed. The Debtors' ability to use Cash Collateral is critical to their ability to operate their businesses and preserve value. Without immediate liquidity provided by the use of Cash Collateral, the Debtors will simply be unable to conduct normal business operations, will be unable to satisfy essential expenses, and will suffer a precipitous loss of value to the detriment of all parties in interest. I believe that irreparable harm to the Debtors and their estates would occur, with serious consequences for the Debtors, their estates and creditors. The Interim Order authorizes the use of Cash Collateral only in an amount necessary to sustain the Debtors' operations prior to the Final Cash Collateral Hearing.

**C.** _**The Employee Motions**_

        h. <u>Employee Wages and Benefits</u>

83. At the inception of these cases, it is critical for the Debtors to avoid operational interruptions and to maintain the confidence and morale of the Employees by ensuring the uninterrupted payment of wages, expenses and benefits, as applicable.

84. The Debtors seek entry of an order (a) authorizing, but not directing, the Debtors to pay: (i) prepetition wages, salaries, overtime pay, incentive pay, contractual compensation, sick pay, vacation pay, holiday pay and other accrued compensation (collectively, the "<u>Prepetition Compensation</u>") to employees and officers that continue to be employed by the Debtors (the "<u>Employees</u>"), including compensation for the services that I will provide, (ii) unreimbursed prepetition business expenses (collectively, the "<u>Prepetition Business Expenses</u>") to Employees; (iv) prepetition contributions to, and benefits under the Employees' benefit plans (collectively, the "<u>Prepetition Benefits</u>"); (iii) prepetition payroll deductions and withholdings with respect to the Employees; and (iv) all costs and expenses incident to the

-29-

foregoing payments and contributions including, but not limited to, processing costs, FICA and withholding taxes; (b) continue current Benefit Programs (as hereinafter defined), (c) to undertake the employee related costs attributable to my compensation for pre-petition and post-petition services provided to the Debtors and (d) granting other related relief.[10]

85. As of the Petition Date, the Debtors, by AIAI, employed 3 employees. Currently, the Employees are paid by an integrated internal payroll system through AmTrust Bank, a Non-Debtor Subsidiary and the Debtors reimburse AmTrust Bank pursuant to the Intercompany Agreements. In addition, Non-Debtor AISI employs approximately 56 employees who receive commission payments, through their individual sales of insurance products (*i.e.*, annuities), from Debtor AIAI (as described in the cash management section of this Declaration). While AISI is not a Debtor, AISI's employees are partially funded by and provide value to the Debtors' enterprise. Accordingly, the Debtors intend to maintain the current system of paying commissions to AISI out of Insurance Funds received by AIAI through the current cash management and employee wage system.

86. I am the President and Chief Executive Officer of AFC, the parent of each of the Debtors and certain Non-Debtor Subsidiaries. In the past, I provided senior executive services to Debtor AFC, the other Debtors and certain Non-Debtor Subsidiaries. However, I was compensated solely by AmTrust Bank for the services I rendered to virtually all of the AmTrust Companies. In view of the fact that only certain of the AmTrust Companies are Debtors, it is necessary for the Debtors to employ and compensate me directly and separate and apart from my

---

[10] I have been advised that nothing in this Declaration or in any other motion shall be deemed or construed as: (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise to pay any claim; (d) an implication or admission that any particular claim is a claim for Prepetition Compensation, Prepetition Business Expenses, Additional Workforce Costs, Prepetition Benefits or Prepetition Processing Costs; or (e) a request to assume any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code.

-30-

employment by AmTrust Bank, which is not a Debtor in these chapter 11 cases. Because I was not paid directly by the Debtors pre-bankruptcy, the Debtors are not seeking authority to pay any pre-Petition Date amounts to me. Subject to any required regulatory approval concerning modifications to my employment, the Debtors will employ me, for not less than 45 days, during the administration of these cases, at a rate of $225 per hour (which is roughly the equivalent of the amount that I was paid by AmTrust Bank, after a voluntary substantial reduction in pay taken in early 2009). Initially, I will be the only employee of AFC during these cases and it is contemplated that I will spend the majority of my time working on behalf of the Debtors. Therefore, the Debtors seek authority to pay me directly for my services upon the terms and conditions set forth in the Employee Wage Motion.

<u>Prepetition Compensation, Deductions and Withholdings</u>

87. As of the Petition Date, certain Prepetition Compensation remained unpaid because, among other things: (a) the Debtors commenced their chapter 11 cases in the midst of one or more of their customary payroll periods; (b) checks previously issued on account of such obligations may not have been presented for payment or may not have cleared the banking system; (c) amounts related to prepetition services, while accrued in whole or in part, had not yet become due and payable by the Debtors; and (d) amounts deducted from Employees' paychecks were not then due to be paid to the intended recipient or account, including (i) deductions taken from Employees' paychecks to make payments on behalf of such Employees for or with respect to, among others, the Debtors' Benefit Programs (as such term is defined herein) or amounts due to third parties (collectively, the "<u>Deductions</u>") [11] and (ii) withholdings from Employees' paychecks on account of various federal, state or local income, FICA, Medicare, state disability,

---

[11] Specifically, the Debtors take voluntary and involuntary Deductions from the Employees' pay checks in connection with the Debtors' Benefit Programs (as such term is defined herein) and for various other reasons, including: child support, wage garnishments, and charitable contributions.

workers' compensation and other taxes or fees (individually a "<u>Withholding</u>" and collectively, the "<u>Withholdings</u>") for remittance to the appropriate federal, state, or local taxing authorities (individually an "<u>Authority</u>" and collectively, the "<u>Authorities</u>"). The Withholdings are paid to the applicable Authorities on a periodic basis (monthly, quarterly or yearly), depending on the particular tax or fee. The estimated total amount of unpaid Prepetition Compensation is approximately $11,200, of which approximately $1870 relates to earned and accrued vacation. As of the Petition Date, the total amount of unpaid Deductions and Withholdings is approximately $3,900. Of this amount, $811 is attributable to earned and accrued vacation. For the reasons set forth below, the Debtors seek authorization to honor and pay Prepetition Compensation, Deductions and Withholdings.

88. Certain shareholders (who are not employees or officers of any of the Debtors) are included within the Debtors' health insurance benefit plans (collectively, the "<u>Shareholder Benefits</u>"). These shareholders pay a monthly premium for such coverage and receive Shareholder Benefits. The Debtors estimate that in the aggregate the monthly premiums paid by these shareholders is approximately $7,900 and the aggregate amount of monthly claims is $12,000 per month. The estimated pending claims are approximately $32,000. The Debtors submit that the "cost" to the Debtors to maintain these Shareholder Benefits is *di minimus* compared to the benefits provided and the cost to modify their health and benefit plans to no longer offer these shareholders coverage for what is anticipated to be a limited future duration.

<u>Prepetition Business Expenses</u>

89. The Debtors customarily reimburse and in some cases advance funds to their Employees for a variety of business expenses incurred in the ordinary course of their businesses, including air and ground travel, lodging, meals, telephone charges, business

-32-

entertainment and other miscellaneous business expenses. On average, the Debtors reimburse approximately $200 in such business expenses on a monthly basis.

90. Because Employees may not submit reimbursement forms promptly, however, it is difficult for the Debtors to determine the exact amount of Prepetition Business Expenses outstanding. The Debtors nonetheless estimate that their obligations for Prepetition Business Expenses to Regular Employees amounted to approximately $200. The Debtors seek authorization to reimburse all Prepetition Business Expenses.

### Prepetition Benefits

91. The Debtors maintain or participate in a number of benefit programs (collectively, the "Benefit Programs")[12] for their Employees including, but not limited to, (a) health and welfare programs including medical, dental, life insurance, short and long term disability insurance, accidental death and dismemberment, (b) retirement savings programs, including a 401(k) plan, and (c) incentive plans.

92. The Debtors owed certain Prepetition Benefits pursuant to the Benefit Programs that remained unpaid as of the Petition Date, because, while such Prepetition Benefits accrued, either in whole or in part, prior to the Petition Date, they will not become payable in the ordinary course of the Debtors' businesses until a future date. The Debtors seek authority to pay all Prepetition Benefits that, as of the Petition Date, had accrued pursuant to the Benefit Programs but remain unpaid. The Debtors estimate that the value of the unpaid Prepetition Benefits was approximately $40,000 as of the Petition Date.

### Costs and Expenses Incident to the Foregoing

---

[12] The descriptions of the Benefit Programs contained herein are provided for convenience only and are qualified in all respects by the actual terms of such programs. Nothing contained herein shall have the effect of modifying the terms of the Benefit Programs or altering any party's rights and obligations thereunder.

93. The Debtors incur costs incident to Prepetition Compensation, Withholdings and Deductions, such as the employer portion of payroll-related taxes, as well as accrued but unpaid prepetition charges for administration of the Prepetition Benefits (collectively, the "Prepetition Processing Costs"). The Debtors estimate that the aggregate amount of Prepetition Processing Costs accrued but unpaid, as of the Petition Date, was approximately $850. Payment of the Prepetition Processing Costs is justified because the failure to pay any such amounts might disrupt services of third-party providers with respect to Prepetition Compensation, Deductions and Withholdings and Prepetition Benefits. By paying the Prepetition Processing Costs, the Debtors may avoid even temporary disruptions of such services and thereby ensure that their Employees obtain all compensation and benefits without interruption.

94. The Debtors seek authority to pay Prepetition Compensation, Prepetition Business Expenses, Deductions, Withholdings, Prepetition Benefits and Prepetition Processing Costs. Debtors also seek authority to undertake the employee related costs associated with paying me to continue working with the Debtors.

95. In the instant case, the Debtors believe that the amount of prepetition wages, salaries and contractual compensation owing to or on account of the overwhelming majority of their Employees will not exceed the sum of $10,950 per employee allowable as a priority claim under section 507(a)(4) or section 507(a)(5) of the Bankruptcy Code.[13] Therefore, the payment of these amounts would not deplete assets otherwise available to other unsecured creditors under a plan of reorganization. Likewise, because the Prepetition Processing Costs are

---

[13]     I have been advised that the vast majority of their obligations with respect to compensation and benefits are below the statutory priority limits.

entitled to priority under section 507(a)(5) of the Bankruptcy Code, amounts paid on account of such Prepetition Processing Costs also are not available for distribution to unsecured creditors.

Funds Held in Trust Are Not
Available for General Distribution to Creditors

96.     I am advised that section 541(d) of the Bankruptcy Code provides that "property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest" becomes property of a debtor's estate only to the extent of the debtor's legal title therein.

97.     The Withholdings are held in trust for the benefit of the appropriate Authorities.   Likewise, certain of the Deductions are held in trust for, among others, the Employees themselves.   I am advised that the Withholdings and Deductions are, therefore, not property of the Debtors' estates within the meaning of section 541 of the Bankruptcy Code. Because the Withholdings and Deductions are held in trust on behalf of others and thus do not constitute property of the Debtors' estates, the remittance of the Withholdings and Deductions will not adversely affect the Debtors' estates or their creditors and therefore such remittance is warranted.

98.     Further, many Authorities impose personal liability on the officers and directors of entities responsible for collecting taxes from employees to the extent any such taxes are collected but not remitted.   Accordingly, if these amounts remain unpaid, there is a risk that the Debtors' officers and directors may be subject to lawsuits on account of any such nonpayment during the pendency of these chapter 11 cases.   Such lawsuits obviously would constitute a significant distraction for officers and directors at a time when they should be focused on the Debtors' efforts to (a) stabilize their postpetition business operations and (b) develop and implement a successful reorganization strategy.   To avoid the serious disruption

-35-

of the Debtors' reorganization efforts that could result from the nonpayment of any Withholdings, the Debtors seek authority to remit all Withholdings collected on behalf of the Employees, including prepetition Withholdings, to the applicable Authorities to the extent that that they have not already been remitted.

Certain Employee Withholdings and
Contributions for ERISA Plans Are Not Property of the Estate

99.     I have been advised that amounts withheld or collected from Employees on account of certain Prepetition Benefits, such as 401(k) accounts, medical, life, disability and other insurance, or other benefits that are subject to title I of ERISA and thus satisfy the standards of section 541(b)(7) of the Bankruptcy Code, are not property of the Debtors' estates. The remittance of amounts constituting Prepetition Benefits that do not constitute property of the Debtors' estates will not adversely affect the Debtors' estates or their creditors and therefore such remittance is warranted.

100.     In addition, maintaining the goodwill of the Debtors' Employees and ensuring the uninterrupted availability of their services will (a) assist the Debtors in maintaining the necessary "business as usual" atmosphere and, in turn, protect the going concern value of the estates and maximize the value ultimately available to creditors and (b) preserve the Debtors' business relationships, with whom the Employees are the Debtors' primary interface. The creditors of the Debtors will ultimately benefit from the payment of these prepetition claims.

101.     Furthermore, any harm resulting from the Debtors' failure to obtain the relief requested herein would not be limited to the Debtors' estates. Because the amounts represented by Prepetition Compensation, Prepetition Business Expenses, Withholdings and Deductions are needed to enable the Debtors' Employees to meet their own personal obligations, they would suffer undue hardship and, in many instances, serious financial difficulties if the

-36-

relief requested herein is not granted. Many otherwise loyal Employees would likely seek other employment to the detriment of the Debtors and their reorganization prospects.

102.    For the same reasons, I believe my continued employment by the Debtors is essential to the Debtors' ability to operate during these difficult first months of the reorganization process. I have historical knowledge of the Debtors' operations that cannot be replaced and my continued employment will provide significant value and benefit to the estates.

**D.    *The Other Prepetition Claim Motions***

    i.    Certain Prepetition Taxes

103.    In the ordinary course of their businesses, the Debtors collect or remit certain taxes (collectively, the "Prepetition Taxes") owed to certain taxing authorities (collectively, the "Taxing Authorities"). The Debtors move for the entry of an order allowing them, in their sole discretion, to pay the Prepetition Taxes to the Taxing Authorities because: (a) certain of the Prepetition Taxes do not constitute property of the Debtors' chapter 11 estates; (b) substantially all of the Prepetition Taxes constitute priority claims that will be paid in full under a chapter 11 plan; (c) the failure to pay certain of the Prepetition Taxes may impact the Debtors' ability to conduct business in certain jurisdictions and their ability to perform under their postpetition agreements; and (d) the Debtors' officers may face personal liability if certain of the Prepetition Taxes are not paid. As of the Petition Date, the unpaid amount of (i) franchise tax is estimated as $0; and (ii) real property taxes were approximately $0. Absent payment of these amounts, the Debtors may face serious disruptions and distractions as they seek to reorganize. Accordingly, I believe that the paying of such taxes is in the Debtors' best interest.

**E.** ***Motions and Applications Relating to Professionals***

    j.      Professional Retention Applications

          104.    The retention of certain chapter 11 professionals is essential to the Debtors' reorganization efforts. Accordingly, the Debtors have sought or will seek to retain various professionals to represent and assist them. These professionals include: (a) Squire, Sanders & Dempsey LLP ("SSD"), as bankruptcy counsel, and (b) Kurtzman Carson Consultants LLC, as claims and noticing agent. The Debtors anticipate retaining conflicts counsel shortly after the Petition Date to represent them in connection with the few matters as to which SSD is unable to represent them, as set forth in their retention application. I believe that (i) the foregoing professionals are well qualified to provide the services contemplated by their various retention applications, (ii) the services to be provided by the foregoing professionals are necessary for the Debtors' successful reorganization, and (iii) the foregoing professionals will coordinate their services to avoid any duplication of effort. The Debtors may find it necessary to seek to retain additional professionals to assist them as their chapter 11 cases progress.

    k.      Ordinary Course Professionals

          105.    The Debtors' officers, management, and other employees, in the performance of their duties, regularly call upon certain professionals (each, an "Ordinary Course Professional"). The Ordinary Course Professionals include, without limitation, attorneys, tax preparers, and employee benefits consultants.

          106.    The Debtors desire to continue to employ the Ordinary Course Professionals to render a wide variety of services to their estates in the same manner and for the same purposes as such services were provided prior to the Petition Date. Accordingly, pursuant to sections 105(a), 327, 328 and 330 of the Bankruptcy Code and Bankruptcy Rule 2014(a), the Debtors have sought entry of an order authorizing them to retain, employ and pay Ordinary

Course Professionals and Service Providers in the ordinary course of the Debtors' businesses, effective as of the Petition Date, on the terms and conditions set forth in the motion.

107.    Notwithstanding the foregoing, the Debtors intend to separately retain any Ordinary Course Professional that becomes materially involved in the administration of these cases, pursuant to section 327 of the Bankruptcy Code.

l.    Interim Compensation

108.    Given the size and complexity of the Debtors' chapter 11 cases and the amounts of fees and expenses that will be incurred by the Debtors' professionals, the Debtors have sought the entry of an administrative order establishing an orderly, regular process for the monthly compensation and reimbursement of the Debtors' attorneys and other professionals that are consistent with the procedures adopted by courts in this District for the interim compensation of professionals in other large chapter 11 cases.  I believe that interim compensation procedures will provide the Debtors' estates with regular monthly feedback regarding the costs that they are accruing and are in the best interest of the Debtors' estates.

Dated:  November 30, 2009


  /s/ Peter Goldberg_____
Peter Goldberg


Sworn to and subscribed before me, a notary public for the State of Ohio, County of Cuyahoga, this 30th day of November, 2009.

# AMTRUST FINANCIAL CORPORATION



**AmTrust Financial Corporation** (Unitary Savings & Loan Holding Company)

- A1 — **AmTrust Real Estate Investments, Inc.** (real estate ownership & management)
  - A6 — AmTrust Investments Inc.
  - A7 — AmTrust Properties Inc.
  - A8 — AmTrust Management Inc.
- B — **AmTrust Bank** (wholly-owned Federal Savings Bank)
  - OS Mortgage Co.
  - Ohio Savings Service Corporation
  - OS Note Co.
  - Ohio American Financial, Inc.
  - Ohio American Services, Inc.
  - AmTrust Financial Services, Inc.
  - 50+ Real Estate Investments that are not subsidiaries
- A2 — **AmTrust Investment Services, Inc.** (licensed retail discount brokerage and mutual funds broker)
- A3 — **AmTrust Insurance Agency, Inc.** (licensed personal insurance and annuities agent)
- A4 — **Ohio Savings Capital Trust** (Delaware statutory business trust formed for the purpose of issuing preferred securities)
- A5 — **OS Reinsurance Company** (reinsurance of single family residential loans licensed as captive mortgage insurance re-insurance)

Legend:
- ▨ Debtor
- ☐ Non-Debtor

**Exhibit A**

## Exhibit B

### I. Equity Investments of AmTrust Real Estate Investments, Inc.

| NAME | % Capital | Type of Entity | State Formed |
|---|---|---|---|
| AxleTech Resilience Holdings II LLC | 9.018567% | LLC | Delaware |
| AxleTech Resilience Investors LLC | 9.018568% | LLC | Delaware |
| Bandera Investment Fund I, LLC | 31.92% | LLC | Ohio |
| BBi Resilience Holdings LLC | 3.75234522% | LLC | Delaware |
| Beach House Development Company | 0.50% | LP | Ohio |
| Beech Real Estate LLC | 8.2917% | LLC | Ohio |
| Beech Resilience Holdings LLC | 8.888889% | LLC | Delaware |
| Boynton 441 Development, L.P. | 49.2% | LP | Ohio |
| Boynton West Development, L.P. | 46.50% | LP | Ohio |
| Broadstone Investors II, L.P. | 3.434% | LP | Virginia |
| Brooklyn Corporate Center LLC | 50.00% | LLC | Ohio |
| Canyon Commercial, L.P. | 23.9091082% | LP | Ohio |
| Cleveland New Markets Investment Fund, LLC | 6.666654% | LLC | Ohio |
| Deer Run Investors | 5.9534% | GP | Ohio |
| Delray Development, L.P. | 46.50% | LP | Ohio |
| Early Stage Partners, L.P. | 1.14% | LP | Ohio |
| Euclid Beach Apartments (GP% & LP %) | 5%/45% | LP | Ohio |
| Everest Lot Opportunity Fund - Baseline, LLC | 11.0382315% | LLC | Delaware |
| Everest Lot Opportunity Fund - Meadows 18, L.L.C. | 9.7522267% | LLC | Delaware |
| Everest Lot Opportunity Fund - Park, LLC | 11.0426335% | LLC | Delaware |
| Everest Lot Opportunity Fund - Savannah, LLC | 11.7804811% | LLC | Delaware |
| Everest Lot Opportunity Fund - Sonoran, LLC | 11.0086122% | LLC | Delaware |
| Everest Lot Opportunity Fund - Tallyns Reach, L.L.C. | 10.2005303% | LLC | Delaware |
| Front Range Retail Company, L.L.C. | 50.00% | LLC | Delaware |
| Highview Property Company | 25.00% | GP | Ohio |
| Jog Road Development, L.P. | 50.00% | LP | Ohio |
| JS Fund I, LLC | 4.62% | LLC | Ohio |
| La Costa Villas LP | 49.00% | LP | Ohio |
| Lake Marion Development Group, LLC | 25.00% | LLC | Florida |
| Landstar Cypress Springs, Ltd. | 33.33333% | LP | Florida |
| Landstar Homes Dallas, Ltd. | 50.00% | LP | Texas |
| Landstar South Dade Ventures, Ltd. | 15.00% | LP | Florida |
| Legacy Place Apartment Homes, L.L.C. | 50.00% | LLC | Florida |
| Lexin AmTrust Real Estate GP, LLC | 50.00% | LLC | Delaware |
| Lexin AmTrust Real Estate Partners, L.P. | 19.5258% | LP | Delaware |
| Lyons Road Development, L.P. | 50.00% | LP | Ohio |
| Lyons West Development, L.P. | 53.00% | LP | Ohio |
| McCarty Development East, LLC | 80.00% | LLC | Florida |
| Midtown Real Estate Holdings LLC | 3.50% | LLC | Florida |

-42-

| | | | | | | |
|---|---|---|---|---|---|---|
| Midway 100 East, LLC | | | 80.00% | LLC | Florida | |
| Midway Development West, LLC | | | 80.00% | LLC | Florida | |
| MWV Pinnacle Capital Fund, L.P. | | | 2.1505% | LP | Ohio | |
| OSF/BES Fontana Investor Partners, LLC | | | 90.00% | LLC | Delaware | |
| Pennfield Holdings LLC | | | 5.185653% | LLC | Delaware | |
| Reno Retail Company, L.L.C. | | | 50.00% | LLC | Delaware | |
| Reno Retail Company II, L.L.C. | | | 50.00% | LLC | Delaware | |
| Resilience Capital Partners LLC | | | 2.00% | LLC | Ohio | |
| Resilience Capital Partners II, LLC | | | 0.00% | LLC | Delaware | |
| Sunset Lakes Development, L.P. | | | 50.00% | LP | Ohio | |
| The Resilience Fund II, L.P. | | | 4.6425% | LP | Delaware | |
| Twinsburg Land Company | | | 12.10% | JV | Ohio | |
| Uptown Investors II LLC | | | 41.81% | LLC | Michigan | |
| Uptown Investors LLC | | | 43.995% | LLC | Michigan | |
| Woodlands Bent Creek, LLC | | | 80.00% | LLC | Florida | |
| XLO Resilience Holdings LLC | | | 5.3333330% | LLC | Delaware | |

## II. Subordinated Debt Held by AmTrust Real Estate Investments, Inc.

| Notes | Entity | Note Date | Anniversary Date[14] | Interest Rate[15] | Principal Balance as of Note Date | Principal Balance as of 3/31/09 |
|---|---|---|---|---|---|---|
| 1 | Reno Retail Company, LLC | 3/31/07 | March 31 | 5% | 86,750.44 | 95,654.84 |
| 2 | Reno Retail Company, LLC | 3/31/07 | March 31 | 5% | 173,852.25 | 191,697.11 |
| 3 | Reno Retail Company, LLC | 3/31/07 | March 31 | 5% | 81,661.53 | 90,043.58 |
| 4 | Reno Retail Company, LLC | 3/31/07 | March 31 | 5% | 132,292.07 | 145,870.99 |
| 5 | Reno Retail Company, LLC | 3/31/07 | March 31 | 5% | 116,348.40 | 128,290.85 |
| 6 | Reno Retail Company, LLC | 3/31/07 | March 31 | 5% | 161,825.27 | 178,435.64 |
| 7 | Reno Retail Company, LLC | 3/31/07 | March 31 | 5% | 296,521.54 | 326,957.64 |
| 8 | Reno Retail Company, LLC | 3/31/07 | March 31 | 5% | 2,844,674.36 | 3,136,662.65 |
| 9 | Reno Retail Company, LLC | 3/31/07 | March 31 | 5% | 162,601.33 | 179,291.35 |
| 10 | Reno Retail Company, LLC | 3/31/07 | March 31 | 5% | 210,516.04 | 232,124.21 |
| 11 | Reno Retail Company, LLC | 3/31/07 | March 31 | 5% | 142,405.78 | 157,022.86 |
| 12 | Reno Retail Company, LLC | 3/31/07 | March 31 | 5% | 110,577.82 | 121,927.95 |
| 13 | Reno Retail Company, LLC | 3/31/07 | March 31 | 5% | 110,762.15 | 122,131.20 |
| 14 | Reno Retail Company, LLC | 3/31/07 | March 31 | 5% | 91,929.11 | 101,365.08 |
| 15 | Reno Retail Company, LLC | 3/31/07 | March 31 | 5% | 181,226.43 | 199,828.21 |
| 16 | Reno Retail Company, LLC | 3/31/09 | March 31 | 5% | 1,398,826.11 | 1,398,826.11 |
| 17 | Reno Retail Company, LLC | 3/31/07 | March 31 | 5% | 209,250.42 | 230,728.70 |
| 18 | Reno Retail Company, LLC | 3/31/07 | March 31 | 5% | 19,944.18 | 21,991.33 |
| 19 | Reno Retail Company, LLC | 3/31/07 | March 31 | 5% | 62,547.39 | 68,967.50 |
| 20 | Reno Retail Company, LLC | 3/31/07 | March 31 | 5% | 1,281,021.01 | 1,412,509.93 |
| 21 | Reno Retail Company, LLC | 3/31/07 | March 31 | 5% | 68,300.47 | 75,311.09 |
| 22 | Reno Retail Company, LLC | 3/31/07 | March 31 | 5% | 624,646.04 | 688,762.11 |

[14]     The anniversary date represents the date the interest, if unpaid to AREII, is capitalized.

[15]     No interest is to accrue on Notes 16, 25, 26 and 27 until such time as the members of the entity have established a "Wedge Tract Development Plan" (a development plan for the parcel purchased with loan proceeds), which plan has not been established as of the date hereof.

| Notes | Entity | Note Date | Anniversary Date[16] | Interest Rate | Principal Balance as of Note Date | Principal Balance as of 3/31/09 |
|---|---|---|---|---|---|---|
| 23 | Reno Retail Company, LLC | 3/31/07 | March 31 | 5% | 1,204,708.75 | 1,328,364.68 |
| 24 | Reno Retail Company, LLC | 3/31/07 | March 31 | 5% | 469.45 | 517.64 |
| 25 | Reno Retail Company, LLC | 3/31/09 | March 31 | 5% | 13,751.20 | 13,751.20 |
| 26 | Reno Retail Company, LLC | 3/31/09 | March 31 | 5% | 3,027.43 | 3,027.43 |
| 27 | Reno Retail Company, LLC | 3/31/09 | March 31 | 5% | 6,233.12 | 6,233.12 |
|  | Total |  |  |  | 9,796,670.09 | 10,656,295.00 |

| Notes | Entity | Note Date | Anniversary Date[16] | Interest Rate | Principal Balance as of Note Date | Principal Balance as of 3/31/09 |
|---|---|---|---|---|---|---|
| 1 | Front Range Retail Company, LLC | 5/31/2005 | March 31 | 5% | 832,750.00 | 1,004,288.39 |
| 2 | Front Range Retail Company, LLC | 3/1/2007 | March 31 | 5% | 3,537,777.00 | 3,916,939.13 |
|  | Total |  |  |  | 4,370,527.00 | 4,921,227.52 |

---

[16] The anniversary date represents the date the interest, if unpaid to AREII, is capitalized. The first anniversary date for Note 1 was March 31, 2007.

**Exhibit C**

# AmTrust Financial Corporation and subsidiaries excluding AmTrust Bank, OSRE and AmTrust Investments
## Flowchart of cashflows
## November 2009



Intercompany settlements include:

1) Management fees for various services and support
2) Reimbursements paid for amounts paid on behalf of affiliates
3) Income tax-sharing settlements
4) Dividends and advances
5) Other

# EXHIBIT D

| Debtor | Bank | Last 4 digits of Acct No. | Type of Account | Balance as of 10/30/2009 | Purpose |
|---|---|---|---|---|---|
| AmTrust Financial Corp | PNC | 2583 | Commercial Checking | $3,511,631.10 | Operating Account |
| AmTrust Real Estate Investments, Inc. | PNC | 2591 | Commercial Checking | $1,377,821.77 | Operating Account |
| AmTrust Real Estate Investments, Inc. | PNC | 2604 | Commercial Checking | $1,305,268.71 | Operating Account |
| AmTrust Investments, Inc. | PNC | 2647 | Commercial Checking | $100.00 | Operating Account |
| AmTrust Properties Inc. | PNC | 2612 | Commercial Checking | $100.00 | Operating Account |
| AmTrust Management Inc. | PNC | 2620 | Commercial Checking | $53,451.48 | Operating Account |
| AmTrust Insurance Agency, Inc. | PNC | 2639 | Commercial Checking | $596,044.53 | Operating Account |
| AmTrust Financial Corporation | AmTrust Bank | 0894 | Commercial Checking | $27,359.45 | Will be closed |
| AmTrust Real Estate Investments, Inc. | AmTrust Bank | 0681 | Commercial Checking | n/a | Will be closed |
| AmTrust Real Estate Investments, Inc. | AmTrust Bank | 0699 | Commercial Checking | n/a | Will be closed |
| AmTrust Investments Inc. | AmTrust Bank | 1648 | Commercial Checking | n/a | Will be closed |
| AmTrust Properties Inc. | AmTrust Bank | 1655 | Commercial Checking | n/a | Will be closed |
| AmTrust Management Inc. | AmTrust Bank | 1663 | Commercial Checking | n/a | Will be closed |
| AmTrust Insurance Agency, Inc. | AmTrust Bank | 0152 | Commercial Checking | $202,242.54 | Will be closed |
| AmTrust Financial Corporation | ShoreBank | 5062 | Jumbo 12 to 23 Month CD | $100,000.00 | Community Reinvestment Act |
| AmTrust Financial Corporation | ShoreBank | 5039 | Jumbo 12 to 23 Month CD | $100,000.00 | Community Reinvestment Act |