# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| In re | Chapter 11 |
| AMFIN FINANCIAL CORPORATION., *et al.,* Debtors. | Case No. 09-21323 (Jointly Administered) Judge Pat E. Morgenstern-Clarren |

**DISCLOSURE STATEMENT IN SUPPORT OF
AMFIN FINANCIAL CORPORATION, ET AL.,
JOINT PLAN OF REORGANIZATION**

**[THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.**

**A HEARING TO CONSIDER THE ADEQUACY OF THIS DISCLOSURE STATEMENT UNDER SECTION 1125 OF THE BANKRUPTCY CODE HAS BEEN SET BY THE BANKRUPTCY COURT FOR [_____], [__], 2011 AT [__:__] [__].M. EASTERN TIME. THE DEBTORS RESERVE THE RIGHT TO AMEND, SUPPLEMENT OR OTHERWISE MODIFY THIS DISCLOSURE STATEMENT PRIOR TO AND UP TO SUCH HEARING.]**

**SQUIRE, SANDERS & DEMPSEY L.L.P.**
4900 Key Tower
127 Public Square
Cleveland, Ohio 44114-1304
 G. Christopher Meyer (#0016268)
 Sherri L. Dahl (#0073621)
 Peter R. Morrison (#0085127)

and

221 East Fourth Street
Suite 2900
Cincinnati, OH 45202-4036
 Stephen D. Lerner (#0051284)

**Counsel to AmFin Financial Corporation., *et al.*, Debtors-In-Possession**

January [ ], 2011

**TABLE OF CONTENTS**

<b>Page</b>

INTRODUCTION ............................................................................................. 1

QUESTIONS AND ANSWERS ABOUT THE AMFIN BANKRUPTCY CASES .................... 1

SUMMARY ..................................................................................................... 8

    Overview ................................................................................................. 8

    Summary of Classification and Treatment Under the AmFin Plan ............................. 10

        Who May Vote .................................................................................. 12

        Voting of Disputed Claims or Equity Interests ...................................... 12

        Voting Procedures and Instructions .................................................... 13

    Acceptance or Rejection of a Plan ........................................................... 14

    Confirmation Hearing; Objections ........................................................... 14

EVENTS PRECIPITATING DEBTORS' CHAPTER 11 FILINGS ............................... 14

BACKGROUND AND SUMMARY OF THE DEBTORS' BUSINESS ............................ 16

    Overview of the Debtors and Their Business Operations .............................. 16

        Employees ....................................................................................... 17

        Significant Assets ........................................................................... 17

        Directors ........................................................................................ 18

        Executive Officers .......................................................................... 19

        Employee Benefit Plans ................................................................... 19

    Prepetition Capital Structure ................................................................ 19

        The Senior Notes ............................................................................. 19

        The Subordinated Notes .................................................................. 20

        The Bond Financing ........................................................................ 20

        The Common Stock ......................................................................... 21

SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASES ............................... 21

    Commencement of the Bankruptcy Cases ................................................ 21

    Receivership and Sale of AmTrust Bank ................................................. 22

    First Day Orders ................................................................................. 22

    Retention of Professionals ..................................................................... 22

    Official Unsecured Creditors' Committee ............................................... 22

    Debtor in Possession Use of Cash Collateral Approved ............................. 23

# TABLE OF CONTENTS
(continued)

Debtors' Adversary Proceeding Against Noteholders ................................................... 23

Debtors' Business Records and Information ............................................................ 24

Schedules and Statements of Financial Affairs ....................................................... 24

The Claims Bar Date ..................................................................................... 24

Sale of AIAI Business .................................................................................. 25

Sale of AISI Business .................................................................................. 25

Litigation With the FDIC ............................................................................... 25

Abandonment of AmTrust Bank Stock ..................................................................... 26

Proceedings Regarding AREI Investments ................................................................ 27

    Deer Run .......................................................................................... 27

    Reno/Front Range ................................................................................... 27

    Mutual Properties ................................................................................. 27

    Kenco  28

Sales of AREI Cleveland Real Estate ................................................................... 28

    In General ........................................................................................ 28

    Beachwood Office Building Sale .................................................................... 28

The Formulation of the Debtor's Plan of Reorganization ................................................ 29

OVERVIEW OF THE AMFIN PLAN ............................................................................. 29

Brief Explanation of Chapter 11 Reorganization ....................................................... 29

Solicitation of Acceptances of the AmFin Plan ........................................................ 30

Unimpaired Classes ..................................................................................... 30

Classification of Claims and Equity Interests ........................................................ 31

Treatment of Claims and Equity Interests Under the AmFin Plan ......................................... 31

    Unclassified Claims ............................................................................... 31

    Classified Claims and Equity Interests ........................................................... 34

Distributions to Creditors ............................................................................ 36

    Treatment of Subordination Rights ................................................................. 36

    Compliance with Tax Requirements .................................................................. 37

    Set Offs and Recoupments .......................................................................... 37

    Timing and Manner of Distributions ................................................................ 37

# TABLE OF CONTENTS
## (continued)

Uncashed Checks ........................................................................................... 38

Cancellation and Surrender of Securities and Instruments ................................... 38

Full and Final Satisfaction ............................................................................... 38

IMPLEMENTATION OF THE AMFIN PLAN .......................................................... 39

Settlements Incorporated in the AmFin Plan ...................................................... 39

The Noteholder Settlement ............................................................................... 39

The Equity Interests Settlement ........................................................................ 39

Approval of the Settlements .............................................................................. 39

Description of Transactions in Connection with the AmFin Plan ........................... 40

AFC Articles of Incorporation and Code of Regulations ...................................... 40

Initial Board of Directors ................................................................................. 40

Initial Officers ................................................................................................ 40

Corporate Structure ......................................................................................... 40

Chief Restructuring Officer .............................................................................. 40

Description of Other Provisions of the AmFin Plan ............................................. 41

Substantive Consolidation ................................................................................ 41

Operations of Reorganized Debtors .................................................................... 42

Disputed Claims .............................................................................................. 42

Plan Reserves ................................................................................................. 42

Retained Causes of Actions .............................................................................. 43

Discharge ....................................................................................................... 43

Cramdown ...................................................................................................... 44

Retention of Jurisdiction .................................................................................. 44

Executory Contracts and Unexpired Leases; Bar Date .......................................... 45

Indemnification Claims .................................................................................... 46

Revesting of Assets .......................................................................................... 46

Post-Confirmation Fees; Final Decree ................................................................ 47

Injunctions and Releases Provided in the AmFin Plan .......................................... 47

Injunction Against Asserting Claims of Debtors .................................................. 47

Injunction Against Interference with Plan ........................................................... 47

Creditor/Equity Interest Holder Releases ........................................................... 47

Debtor Releases .................................................................................................... 48

Limitations on Releases ........................................................................................ 48

Savings Clause ...................................................................................................... 48

General Release of Liens ....................................................................................... 49

Exculpation ........................................................................................................... 49

Conditions to Confirmation and Effective Date ................................................... 49

Conditions Precedent To Confirmation ................................................................ 49

Conditions Precedent To Effectiveness ................................................................ 49

Waiver or Non-Fulfillment of Conditions ............................................................ 49

ACCEPTANCE AND CONFIRMATION OF THE AMFIN PLAN ....................................... 50

Acceptance of the AmFin Plan ............................................................................. 50

Confirmation ......................................................................................................... 50

Confirmation Hearing ........................................................................................... 50

Statutory Requirements for Confirmation of the AmFin Plan .............................. 51

Confirmation Without Acceptance by All Impaired Classes ................................ 52

AMFIN PLAN VALUATION AND FEASIBILITY .............................................................. 53

Key Assumptions Underlying the Projections ....................................................... 54

OTHER AVAILABLE FINANCIAL INFORMATION ......................................................... 54

MATERIAL UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS ................ 54

Implementation of the Plan ................................................................................... 56

Federal Income Tax Consequences to the Debtors ............................................... 56

Losses and Loss Carryforwards ............................................................................ 56

An AFC Ownership Change .................................................................................. 56

Cancellation of Indebtedness Income ................................................................... 57

Summary of Conclusions ...................................................................................... 57

Federal Income Tax Consequences to the Holders of Class 4 Claims .................. 58

Federal Income Tax Consequences to the Holders of Class 6 Claims .................. 58

Interest Income ...................................................................................................... 58

Information Reporting and Backup Withholding .................................................. 58

# TABLE OF CONTENTS
(continued)

Page

RISK FACTORS ..................................................................................................... 59

    Risks Relating to the Reorganized Debtors' Operations .................................... 59

    Projected Financial Information ........................................................................ 59

    Risks Related to FDIC Litigation ..................................................................... 59

    Risk Factors Related to Estimates and Assumptions ........................................ 60

    Certain Bankruptcy-Related Considerations ..................................................... 61

        Risk That the AmFin Plan Will Not Be Confirmed ............................... 61

        Risks Arising Out of Potential For Nonconsensual Confirmation ....................... 61

ALTERNATIVES TO THE AMFIN PLAN AND CONSEQUENCES OF REJECTION ........ 61

    Alternative Plans ............................................................................................. 61

    Chapter 7 Liquidation ...................................................................................... 61

RECOMMENDATIONS AND CONCLUSION ....................................................... 62

# INTRODUCTION

AmFin Financial Corporation, formerly known as AmTrust Financial Corporation ("AFC"), and its five debtor subsidiaries identified in detail below (collectively, the "Debtors") seek your vote in favor of their Joint Plan of Reorganization (the "AmFin Plan") because the Debtors believe that the AmFin Plan is the best feasible plan for restructuring the Debtors, providing for the orderly disposition of their assets and providing the greatest recovery to creditors and equity interest holders

## THE DEBTORS RECOMMEND THAT YOU VOTE TO
## ACCEPT THE AMFIN PLAN.

### QUESTIONS AND ANSWERS ABOUT THE AMFIN BANKRUPTCY CASES

*The following is a brief summary of certain basic questions and answers pertinent to the Debtors' bankruptcy cases. This summary is not intended to be a complete discussion of the matters outlined in this summary. You should refer to the remainder of this Disclosure Statement (the "Disclosure Statement") and the AmFin Plan for a detailed description of the Debtors' bankruptcy cases and proposed treatment of creditor and interest holders. Capitalized terms used in this summary and the remainder of this Disclosure Statement are defined in this Disclosure Statement or, if not defined in this Disclosure Statement, are defined in the AmFin Plan.*

**Q: Why did the Debtors file their chapter 11 bankruptcy cases?**

A: AFC and its affiliates were adversely affected by the deterioration in the financial and credit markets in 2008 and 2009, especially those connected to the residential housing market. Such deterioration had an adverse effect on their investments in (a) one to four family home loans, and (b) land acquisition, development and construction loans. The continued weakening of the housing and credit markets and of the general economy contributed to increased levels of nonperforming assets, charge-offs, and credit loss reserves. As a result of these events, the Office of Thrift Supervision ("OTS") took a series of regulatory actions that increasingly constrained the operations of AFC and its federal savings bank subsidiary AmTrust Bank ("AmTrust Bank"). It became increasingly apparent to AFC that such actions would likely culminate in OTS seizing control of AmTrust Bank. The Debtors commenced the Bankruptcy Cases in order to assure that, following an OTS seizure, the remaining assets of the Debtors could be sold or disposed of in a controlled environment providing for equitable treatment of creditors. For further discussion, See "EVENTS PRECIPITATING DEBTORS' CHAPTER 11 FILINGS" at page 14 hereof.

**Q: Which of the AFC subsidiaries are involved in these bankruptcy cases?**

A: In addition to AFC, the parent company, five of AFC's subsidiaries are debtors in bankruptcy cases. These subsidiaries are AmFin Real Estate Investments, Inc. ("AREI"), AmFin Insurance Agency, Inc. ("AIAI"), AmFin Investments Inc. ("AII"), AmFin Properties Inc. ("API"), and AmFin Management Inc. ("AMI").[1] The bankruptcy cases of all of these companies are being jointly administered for procedural purposes. As used in this Disclosure Statement, the term "Reorganized Debtors" includes, following the Effective Date of the AmFin Plan, AFC and all its Debtor subsidiaries.

**Q: What is a chapter 11 case?**

A: Chapter 11 is the principal reorganization chapter of the United States Bankruptcy Code. Under chapter 11, debtors may reorganize their businesses and/or liquidate their assets for the benefit of their creditors and shareholders. The principal objective of a bankruptcy case is confirmation (which constitutes approval) of a plan of reorganization by the Bankruptcy Court.

**Q: What if my claim is against an AFC subsidiary Debtor or is against more than one of the Debtors?**

A: The AmFin Plan treats claims against each of the Debtors on a basis known as "substantive consolidation." For purposes of distributions under the AmFin Plan, the assets and liabilities of each of the Debtors will be treated as though they are assets and liabilities of a single entity. Accordingly, claims against each of the Debtors will receive identical treatment. In addition, claims against multiple Debtors will be treated as a single Claim against the combined estate of all Debtors. For further discussion, See "Substantive Consolidation" at page 41 hereof.

**Q: How are Claims against, or Equity Interests in, the Debtors treated in a chapter 11 case?**

A: Your treatment depends on the type of Claim you have against the Debtors and how that Claim is classified under the AmFin Plan. In general, the AmFin Plan divides Claims against, and Equity Interests (common stock) in, the Debtors into separate classes. The AmFin Plan specifies the treatment that each class is to receive in full satisfaction of such Claims and Equity Interests and contains other provisions necessary to the reorganization of the Debtors. Depending on how your Claim is classified, and assuming you have an "allowed" (i.e. approved) Claim, you may receive present or future payments of cash and/or the preservation of your relationship with the Debtors. You should review this Disclosure Statement to more fully understand your rights under the AmFin Plan. For further discussion, See "Treatment of Claims and Equity Interests Under the AmFin Plan" at page 31 hereof.

---

1 Such subsidiaries were formerly named AmTrust Real Estate Investments, Inc., AmTrust Insurance Agency, Inc., AmTrust Investments, Inc., AmTrust Properties, Inc. and AmTrust Management, Inc., respectively.

**Q:  What is the process for approving the AmFin Plan?**

A:  As a general matter under the Bankruptcy Code, every class of Claims or Equity Interests that is "impaired" under the AmFin Plan must vote in favor of the AmFin Plan in order for it to be confirmed by the Bankruptcy Court.  A class of Claims or Equity Interests is impaired if Claims or Equity Interests in that class receives less than the full value of the Claims or Equity Interests.  A class of impaired Claims is deemed to have accepted the AmFin Plan if the AmFin Plan is accepted by holders of Claims constituting at least two-thirds in dollar amount and more than one-half in number of allowed Claims within such class that vote on the AmFin Plan.  A class of impaired Equity Interests is deemed to have accepted the AmFin Plan if the AmFin Plan is accepted by holders of at least two-thirds in the amount of allowed Equity Interests in such class of Equity Interests that vote on the AmFin Plan.

If the Claims in a class will be reinstated under the AmFin Plan, or their legal, equitable and contractual rights are to remain unchanged by the reorganization, such class will be deemed to be unimpaired and to have accepted the AmFin Plan.  Accordingly, holders of such Claims will not be entitled to vote on the AmFin Plan.

If the holders of Claims or Equity Interests receive no distribution on account of such Claims or Equity Interests, such holders are deemed to have rejected the AmFin Plan.  Accordingly, holders of such Claims or Equity Interests would also not be entitled to vote on the AmFin Plan.

For further discussion of voting requirements, See "Who May Vote" and succeeding sections at page 12 hereof and "ACCEPTANCE AND CONFIRMATION OF THE AMFIN PLAN" at page 50 hereof.


**Q:  Can the AmFin Plan be approved if one or more of the impaired classes do not vote to accept the AmFin Plan?**

A:  Yes.  Chapter 11 of the Bankruptcy Code permits a plan of reorganization to be confirmed if at least one class of impaired Claims votes in favor of the plan.  However, if not all impaired classes vote to accept the plan, the Bankruptcy Court must find that the plan meets a number of statutory tests with respect to each non-accepting class before it may confirm the plan.  Those tests are designed to protect the interests of holders of Claims or Equity Interests who do not vote to accept the plan but who will nonetheless be bound by its provisions if confirmed by the Bankruptcy Court.  For further discussion, See "Confirmation Without Acceptance of All Impaired Classes" at page 52 hereof.


**Q:  What must I do, as a holder of a Claim against the Debtors, to vote my Claim under the AmFin Plan?**

A:  You should read this Disclosure Statement carefully and follow the instructions contained in it for voting your claim (if you are entitled to vote) by the established deadlines.  You should vote timely on the AmFin Plan by promptly returning your Ballot.  You may wish to consult legal counsel with respect to your rights.  For further discussion, See "Voting Procedures and Instructions" at page 13 hereof.

**Q: I am a current holder of AFC 11.78% Senior Notes due 2012. What will I receive if the AmFin Plan is confirmed by the Bankruptcy Court?**

A: If the AmFin Plan is confirmed by the Bankruptcy Court, each current holder of Senior Notes, as defined under the AmFin Plan (the "Senior Notes"), will be treated solely as the holder of an unsecured Claim against the Debtors. Liens and guarantees granted to the holders of Senior Notes in September of 2009 will be deemed avoided (meaning that such lien will be given no legal force or effect). Subject to the effects of the noteholder settlement described below, Allowed Claims of holders of Senior Notes will be entitled to receive pro rata distribution of amounts distributable to unsecured creditors under the AmFin Plan. In addition, by virtue of subordination provisions relating to the Subordinated Notes, the holders of Senior Notes will also be entitled to receive the amounts otherwise distributable to the Subordinated Notes, until the Senior Notes are repaid in full. Certain distributions to holders of Senior Notes may be delayed by virtue of an accelerated payment agreed to be made to other unsecured creditors, as more fully described elsewhere in this Disclosure Statement. The actual timing and amount of the distributions will depend, among other things, on the timing of resolution of certain litigation with the Federal Deposit Insurance Corporation ("FDIC"), the aggregate amount of Allowed Class 6 Other Unsecured Claims and the value of the Debtors' assets available for distribution to holders of such Claims. For further discussion, See "Treatment of Claims and Equity Interests Under the AmFin Plan" at page 31 hereof.

**Q: I am the holder of a small unsecured Claim against the Debtors. What will I receive if the AmFin Plan is confirmed by the Bankruptcy Court?**

A: If you satisfy the requirements to be treated as the holder of a Class 4 Convenience Claim, (certain claims of $25,000 or less) you will receive, in full and final satisfaction of your Allowed Class 4 Convenience Claim, a cash payment of 85% of the Allowed amount of your Claim promptly following the Effective Date of the AmFin Plan. For further discussion, See "Treatment of Claims and Equity Interests Under the AmFin Plan" at page 31 hereof.

**Q: I am the holder of an unsecured Claim against the Debtors. If my Claim is not a Class 4 Convenience Claim, what will I receive if the AmFin Plan is confirmed by the Bankruptcy Court?**

A: If you have an unsecured claim against the Debtors, but do not satisfy the requirements to be treated as the holder of a Class 4 Convenience Claim, you may elect to reduce your claim to $25,000 and be treated as a Class 4 Convenience Claim. If you do not so elect, you will be included in Class 6. As the holder of a Class 6 Other Unsecured Claim, you will receive your pro rata share of amounts distributable to holders of Class 6 Other Unsecured Claims under the AmFin Plan. Certain distributions to holders of Class 6 Other Unsecured Claims other than holders of Senior Notes may be accelerated by virtue of a settlement agreed to by the holders of Senior Notes. The actual timing and amount of the distributions will depend on, among other things, the timing of resolution of the certain litigation with the FDIC, the aggregate amount of Allowed Class 6 Other Unsecured Claims and the value of the Debtors' assets available for

distribution to holders of such Claims. For further discussion, See "Treatment of Claims and Equity Interests Under the AmFin Plan" at page 31 hereof.

**Q: I am a current holder of Trust Preferred Certificates issued by AmFin's non-debtor affiliate Ohio Savings Capital Trust I and the economic beneficiary of the AFC 9.05% Junior Subordinated Deferrable Interest Debentures due 2027. What will I receive if the AmFin Plan is confirmed by the Bankruptcy Court?**

A: The unsecured Claim against the Debtors represented by the Subordinated Notes, as defined in the AmFin Plan (the "Subordinated Notes"), is treated as a single unsecured Claim against the Debtors and will be included in Class 6. As the holder of a Class 6 Other Unsecured Claim, the Subordinated Notes Trustee would ordinarily receive, on your behalf, a pro rata share of amounts distributable to holders of Class 6 Other Unsecured Claims under the AmFin Plan. However, by virtue of subordination provisions relating to the Subordinated Notes, the holders of Senior Notes will be entitled to receive the amounts otherwise distributable to the Subordinated Notes, until the Senior Notes are repaid in full. The actual timing and amount of the distributions will depend on, among other things, the timing of resolution of certain litigation with the FDIC, the aggregate amount of Allowed Class 6 Other Unsecured Claims and the value of the Debtors' assets available for distribution to holders of such Claims. For further discussion, See "Treatment of Claims and Equity Interests Under the AmFin Plan" at page 31 hereof.

**Q: How does the FDIC Litigation affect the amount and timing of distributions under the AmFin Plan?**

A: Claims asserted by the FDIC allege that AFC guaranteed the capital adequacy of AmTrust Bank. The Debtors dispute the existence of any such claim. However, if the courts determine the dispute in favor of the FDIC, their "capital maintenance" Claim would be entitled to priority payment under the Bankruptcy Code. The amount of the asserted Claim ($765 million) exceeds the anticipated value of all the Debtors' assets. **Therefore, if the FDIC prevails in the litigation, no unsecured creditor would receive any distribution on its claim**. In addition, the Debtors are required to hold funds in reserve for possible allowance of the FDIC Claim until the conclusion of the litigation. As a result, no distribution can be made to unsecured creditors until the litigation is resolved.

**Q: What will the current holders of AFC Common Stock receive if the AmFin Plan is confirmed by the Bankruptcy Court?**

A: The legal, equitable and contractual rights of holders of AFC Common Stock will not be modified or altered under the AmFin Plan. However, the voting and other rights of certain holders of AFC Common Stock will be limited by the terms of a settlement embodied in the AmFin Plan. Holders of AFC Common Stock will be entitled to pro rata ownership of assets remaining after the payment in full of all Claims, if any. For further discussion, See "Treatment of Claims and Equity Interests Under the AmFin Plan" at page 31 hereof.

09-21323-pmc    Doc 865    FILED 01/06/11    ENTERED 01/06/11 10:06:44    Page 11 of 68

**Q: What do I need to do now?**

A: If you are the holder of a Claim in Classes 4 or 6, you should review this Disclosure Statement and the AmFin Plan, fill out a Ballot to accept or reject the AmFin Plan and return it to the Ballot Agent as follows:

| If by Mail: | If by Hand Delivery or Courier Service: |
|---|---|
| AmFin Ballot Processing Center<br>c/o Kurtzman Carson Consultants LLC<br>2335 Alaska Avenue<br>El Segundo, CA 90245 | AmFin Ballot Processing Center<br>c/o Kurtzman Carson Consultants LLC<br>2335 Alaska Avenue<br>El Segundo, CA 90245 |

All Ballots must be actually received by the Ballot Agent by 5:00 PM Pacific Time, on [    ], 2011, unless the Bankruptcy Court extends that deadline.

If you are the holder of a Claim in Classes 1, 2, 3 or 5 or the holder of an Equity Interest in Class 7, your Claim or Equity Interest is not impaired and therefore your Class is deemed to have accepted the AmFin Plan. Accordingly, you are not entitled to vote.

**Q: When are the Debtors expected to complete the confirmation process?**

A: A hearing before the Bankruptcy Court to consider confirmation of the AmFin Plan is currently scheduled for [    ], 2011. If that hearing occurs as scheduled and the AmFin Plan is approved by the Bankruptcy Court as the Debtors anticipate, the AmFin Plan will become effective, and the principal portion of the Debtors' reorganization will be complete, by approximately [    ], 2011. Notwithstanding confirmation of the AmFin Plan, claims objections and certain other items of case administration will continue following plan confirmation.

09-21323-pmc    Doc 865    FILED 01/06/11    ENTERED 01/06/11 10:06:44    Page 12 of 68

**Q:  Whom should I contact if I have questions concerning the AmFin Plan?**

A:   If you have additional questions concerning the AmFin Plan, please contact one of the following:

| | |
|---|---|
| G. Christopher Meyer | Stephen D. Lerner |
| Sherri L. Dahl | SQUIRE, SANDERS & DEMPSEY L.L.P. |
| Peter R. Morrison | 221 E. Fourth Street |
| SQUIRE, SANDERS & DEMPSEY L.L.P. | Suite 2900 |
| 4900 Key Tower | Cincinnati, OH 45202-4036 |
| 127 Public Square | Telephone:     (513) 361-1200 |
| Cleveland, Ohio 44114-1304 | Facsimile:     (513) 361-1201 |
| Telephone:     (216) 479-8500 | |
| Facsimile:     (216) 479-8780 | |

## SUMMARY

<u>Overview</u>

On November 30, 2009, the Debtors filed voluntary petitions for relief under the "Bankruptcy Code with the United States Bankruptcy Court for the Northern District of Ohio. On January 5, 2011, the Debtors filed with the Bankruptcy Court the AmFin Plan and this Disclosure Statement with respect to the AmFin Plan.

The purpose of this Disclosure Statement is to provide holders of Claims and Equity Interests with adequate information to make an informed judgment about the AmFin Plan. This information includes, among other matters, a brief history of AFC and its affiliates, a summary of the Debtors' chapter 11 cases (the "Bankruptcy Cases"), a description of the Debtors' assets and liabilities, a description of the terms under which the Debtors' businesses will be reorganized and restructured in accordance with the AmFin Plan, and an explanation of how Claims and Equity Interests will be treated and how the AmFin Plan will function. This Disclosure Statement also includes an analysis of the hypothetical liquidation value of the Debtors under chapter 7 of the Bankruptcy Code.

It is important that holders of Claims and Equity Interests read and carefully consider this Disclosure Statement and the AmFin Plan, and that eligible holders of Claims and Equity Interests vote promptly on the acceptance of the AmFin Plan. The Debtors believe that the restructuring contemplated by the AmFin Plan will yield a recovery to creditors greater than could be achieved through other restructuring alternatives or through liquidation under chapter 7 of the Bankruptcy Code, and therefore recommend that you vote in favor of the AmFin Plan.

**YOU SHOULD READ THIS DISCLOSURE STATEMENT AND THE AMFIN PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE AMFIN PLAN. THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN TERMS OF THE AMFIN PLAN, BUT THE AMFIN PLAN ITSELF IS THE GOVERNING DOCUMENT. IF ANY INCONSISTENCY EXISTS BETWEEN THE AMFIN PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE AMFIN PLAN WILL CONTROL.**

**A SUMMARY DESCRIPTION OF THE CLASSIFICATION OF YOUR CLAIM OR EQUITY INTEREST AND THE TREATMENT PROPOSED UNDER THE AMFIN PLAN IS CONTAINED IN "OVERVIEW OF THE AMFIN PLAN - TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE AMFIN PLAN" BELOW. EXHIBIT 1 TO THIS DISCLOSURE STATEMENT IS A COMPLETE COPY OF THE AMFIN PLAN AND IS BEING SERVED UPON YOU IN COMPLIANCE WITH THE BANKRUPTCY CODE AND BANKRUPTCY RULES.**

The Debtors reserve the right to amend, modify, or supplement the AmFin Plan at any time before the confirmation of the AmFin Plan and without resoliciting votes on the AmFin Plan, provided that such amendments or modifications do not materially alter the treatment of, or distributions to, holders of Claims or Equity Interests under the AmFin Plan.

THE FINANCIAL PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT REPRESENT THE DEBTORS' ESTIMATES OF FUTURE EVENTS BASED ON CERTAIN ASSUMPTIONS MORE FULLY DESCRIBED BELOW, SOME OR ALL OF WHICH MAY NOT BE REALIZED.  NONE OF THE FINANCIAL ANALYSES CONTAINED IN THIS DISCLOSURE STATEMENT IS CONSIDERED TO BE A "FORECAST" OR "PROJECTION" AS TECHNICALLY DEFINED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS.  THE USE OF THE WORDS "FORECAST," "PROJECT," OR "PROJECTION" WITHIN THIS DISCLOSURE STATEMENT RELATE TO THE BROAD EXPECTATIONS OF FUTURE EVENTS OR MARKET CONDITIONS AND QUANTIFICATIONS OF THE POTENTIAL RESULTS OF OPERATIONS UNDER THOSE CONDITIONS.

ALL FINANCIAL INFORMATION PRESENTED IN THIS DISCLOSURE STATEMENT WAS PREPARED BY THE DEBTORS OR THEIR REPRESENTATIVES AND REPRESENTS THEIR GOOD FAITH BELIEF THAT SUCH INFORMATION IS ACCURATE AND COMPLETE.  HOWEVER, THERE CAN BE NO GUARANTEE OR ASSURANCE THAT SUCH INFORMATION IS ACCURATE OR COMPLETE.

Certain statements, projections of future results, valuation estimates and the like contained in this Disclosure Statement involve known and unknown risks, uncertainties and other important factors that could cause the actual results, performance or achievements of the Reorganized Debtors to differ materially from any future results, performance or achievements expressed or implied by such projections and estimates.  Such risks, uncertainties and other important factors include, among others: general economic and business conditions; the availability, terms and deployment of capital; adverse determinations in any future litigation or regulatory proceedings and any other factors referenced in this Disclosure Statement or otherwise.  See "RISK FACTORS" at page 59 hereof.  These projections and estimates speak only as of the date of this Disclosure Statement, and the Debtors expressly disclaim any obligation or undertaking to disseminate any updates or revisions to any statement contained in this Disclosure Statement to reflect any change in the Debtors' or the Reorganized Debtors' expectations with regard to such statements or any change in events, conditions or circumstances on which any such statement is based.

THIS DISCLOSURE STATEMENT IS INTENDED FOR THE SOLE USE OF THE DEBTORS' CREDITORS, EQUITY SECURITY HOLDERS AND OTHER PARTIES IN INTEREST, AND FOR THE SOLE PURPOSE OF ASSISTING THEM IN MAKING AN INFORMED DECISION ABOUT THE AMFIN PLAN.  NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS IN CONJUNCTION WITH THE SOLICITATION OF VOTES TO ACCEPT THE AMFIN PLAN OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT OR IN THE BALLOTS.  IF GIVEN OR MADE, ANY SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS.

THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION TO PERMIT A CREDITOR TO VOTE ON THE AMFIN PLAN.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

## Summary of Classification and Treatment Under the AmFin Plan[2]

As described more fully elsewhere in this Disclosure Statement, the AmFin Plan enables a restructuring of the Debtors' prepetition indebtedness and operations and provides for an orderly disposition of the Debtors' assets. Set forth below is a summary of the classification and treatment of Claims and Equity Interests under the AmFin Plan.

The AmFin Plan divides the Claims of known creditors and Equity Interests into Classes and sets forth the treatment afforded to each Class. The Debtors believe that the classification of Claims and the distributions to be made under such classification takes into account the relative priorities of Claims and Equity Interests. The Debtors believe that they have classified all Claims and Equity Interests in compliance with the provisions of section 1122 of the Bankruptcy Code.

If the AmFin Plan is confirmed by the Bankruptcy Court, each holder of an Allowed Claim will receive the same treatment as all other holders of Allowed Claims in the same Class, regardless of whether a particular holder voted to accept the AmFin Plan. Moreover, upon confirmation, the AmFin Plan will be binding on all holders of Claims and Equity Interests regardless of whether such holders voted to accept the AmFin Plan.

The table below sets forth the specific classification and treatment under the AmFin Plan of each of the Classes of Claims against, and Equity Interests in, the Debtors.

| Class | Type of Claim or Equity Interest | Treatment |
|---|---|---|
| Unclassified | Allowed Administrative Expense Claims | Paid in full in the ordinary course of the Debtors' business, (a) in Cash, on the first Distribution Date, or (b) in accordance with the commercial credit terms extended by the creditor of such obligations or (c) upon terms agreed by the Debtors and the creditor, or (d) otherwise as required by law. |

---

[2] This summary contains only a brief and simplified description of the classification and treatment of Claims and Equity Interests under the AmFin Plan. This summary does not describe every provision of the AmFin Plan. Accordingly, you should refer to the entire Disclosure Statement (including exhibits) and the AmFin Plan for a complete description of the classification and treatment of Claims and Equity Interests.

| Class | Type of Claim or Equity Interest | Treatment |
|---|---|---|
| Unclassified | Professional Fees | Paid in full, in Cash, when Allowed pursuant to a Final Order of the Bankruptcy Court. |
| Unclassified | Allowed Priority Tax Claims | Paid in full, in Cash, on the first Distribution Date or, if the Debtors so elect, paid in Cash, over a period not exceeding six years after the respective dates of assessment of such Claims, in aggregate amounts equal to 100% of such respective Allowed Claims plus interest thereon from the Effective Date, at the Federal Judgment Rate; except that the Debtors retain the right to prepay any such Allowed Priority Tax Claim, or any remaining balance of such Claim, in full or in part, at any time on or after the Effective Date without premium or penalty. |
| Unclassified | Other Priority Claims | Paid in full in Cash on the first Distribution Date or on such later date as they become due and payable in accordance with their respective terms. |
| 1 | Secured TIF Claims | **Unimpaired.** The legal, equitable and contractual rights of holders of Allowed Class 1 Claims will not be modified or altered by the AmFin Plan. |
| 2 | Secured Bondholder Claims | **Unimpaired.** Subject to prior Order of the Bankruptcy Court, Debtors will transfer to holders of Allowed Class 2 Claims, in full satisfaction of their Allowed Class 2 Claims, all collateral securing their Class 2 Claims. |
| 3 | Other Secured Claims | **Unimpaired.** Holders of Allowed Class 3 Claims will receive one of the following, at the Debtors' election: (a) payment in full in Cash on the first Distribution Date, (b) the disposition proceeds of the collateral securing their Class 3 Claims, (c) cure and reinstatement of their Class 3 Claims as permitted by section 1124(2) of the Bankruptcy Code, or (d) their legal, equitable and contractual rights as holders of Class 3 Claims will remain unaltered by the AmFin Plan as permitted by the section 1124(1) of the Bankruptcy Code. |
| 4 | Convenience Claims | **Impaired.** Class 4 is impaired by the AmFin Plan; consequently, all holders of Allowed Class 4 Claims are entitled to vote on the AmFin Plan. Holders of Allowed Class 4 Claims will receive, on the first Distribution Date, in full satisfaction of their Allowed Class 4 Claims, a Cash payment equal to eighty-five percent (85%) of their respective Allowed Class 4 Claims. |

09-21323-pmc    Doc 865    FILED 01/06/11    ENTERED 01/06/11 10:06:44    Page 17 of 68

| Class | Type of Claim or Equity Interest | Treatment |
|---|---|---|
| 5 | Intercompany Claims | **Unimpaired.** The legal, equitable and contractual rights of holders of Class 5 Claims will not be modified or altered by the AmFin Plan. |
| 6 | Other Unsecured Claims | **Impaired.** Class 6 is impaired by the AmFin Plan; consequently, all holders of Allowed Class 6 Claims are entitled to vote on the AmFin Plan. Each holder of an Allowed Class 6 Claims will receive, subject to such holder's surrender of any debt instrument(s) evidencing its Allowed Class 6 Claim in accordance with Article 7 the AmFin Plan, in full satisfaction of its Allowed Class 6 Claims, its Pro Rata portion of amounts distributable by the Reorganized Debtors under the AmFin Plan. The timing of distributions to various holders my be accelerated or delayed by virtue of the settlement made by holders of Senior Notes and embodied in the AmFin Plan. |
| 7 | Equity Interests | **Unimpaired.** The legal, equitable and contractual rights of holders of Class 7 Equity Interests will not be modified or altered by the AmFin Plan. |

## Who May Vote

Under the Bankruptcy Code, impaired classes of Claims and Equity Interests are entitled to vote on a plan of reorganization. A Class that is not impaired under a plan is deemed to have accepted the plan and does not vote. A Class is "impaired" under the Bankruptcy Code unless the legal, equitable, and contractual rights of the holders of Claims or Equity Interests in that Class are not modified or altered. For purposes of the AmFin Plan, holders of Claims in Classes 4 and 6 are "impaired" and are entitled to vote on the AmFin Plan. Holders of Claims in Classes 1, 2, 3 and 5 and Equity Interests in Class 7 are unimpaired under the AmFin Plan and are deemed to have accepted the AmFin Plan without voting.

**Voting of Disputed Claims or Equity Interests**

If a Claim or Equity Interest for which a proof of claim or interest has been timely filed is marked on the proof of claim or interest as contingent, unliquidated or disputed, such Claim or Equity Interest will be temporarily allowed, for voting purposes only and not for purposes of allowance or distribution, in an amount equal to $1.00.

If the Debtors have served an objection to a Claim or Equity Interest by the date of the Order approving this Disclosure Statement, such Claim or Equity Interest will be disallowed for voting purposes during the pendency of such objection, except to the extent and in the manner as may be otherwise set forth in the objection, and subject to requests by the holder of a Claim or Equity Interest for temporary allowance under the Bankruptcy Rules.

**Voting Procedures and Instructions**

This Disclosure Statement is accompanied by, among other things, copies of the following: (a) the AmFin Plan, attached as Exhibit 1 to this Disclosure Statement; (b) an Order of the Bankruptcy Court approving this Disclosure Statement under Section 1125 of the Bankruptcy Code, approving the forms of Ballots to be used for voting on the AmFin Plan, and approving the notice of, and fixing the time for, submitting Ballots and the Confirmation Hearing; and (c) a Ballot to accept or reject the AmFin Plan.

All votes to accept or reject the AmFin Plan must be cast by using the appropriate form of Ballot enclosed with this Disclosure Statement. Votes not evidenced by properly completed and signed Ballots will not be counted, except to the extent the Bankruptcy Court orders otherwise. The Bankruptcy Court has set [    ], 2011, as the Voting Record Date. The Voting Record Date is the date for the determination of record holders of Claims entitled to receive a copy of this Disclosure Statement and vote, using appropriate Ballots, to accept or reject the AmFin Plan. All Ballots (including any master Ballots for record holders of Old Notes) must be actually received by the Ballot Agent by 5:00 PM, Pacific Time, on [    ], 2011 (the "Voting Deadline"), unless the Bankruptcy Court extends such date before such time.

**For your vote to count, your Ballot must be properly completed according to the voting instructions on the Ballot and received by the Ballot Agent no later than the Voting Deadline. If you are a beneficial holder of a security held by a nominee or record holder, your Ballot must be returned to your nominee or record holder in time for the nominee or record holder to include a summary of your Ballot on the Master Ballot to be submitted to the Ballot Agent by the Voting Deadline.**

For questions about voting procedures, the amount of your Claim, or the packet that you received, please contact one of the following:

| | |
|---|---|
| Sherri Dahl | Peter R. Morrison |
| SQUIRE, SANDERS & DEMPSEY L.L.P. | SQUIRE, SANDERS & DEMPSEY L.L.P. |
| 4900 Key Tower | 4900 Key Tower |
| 127 Public Square | 127 Public Square |
| Cleveland, Ohio 44114-1304 | Cleveland, Ohio 44114-1304 |
| Telephone:    (216) 479-8500 | Telephone:    (216) 479-8500 |
| Facsimile:    (216) 479-8780 | Facsimile:    (216) 479-8780 |

If you have any other questions concerning the AmFin Plan, please contact one of the following:

| | |
|---|---|
| G. Christopher Meyer | Stephen D. Lerner |
| Sherri Dahl | SQUIRE, SANDERS & DEMPSEY L.L.P. |
| Peter R. Morrison | 221 E. Fourth Street |
| SQUIRE, SANDERS & DEMPSEY L.L.P. | Suite 2900 |
| 4900 Key Tower | Cincinnati, OH 45202-4036 |
| 127 Public Square | Telephone:    (513) 361-1200 |
| Cleveland, Ohio 44114-1304 | Facsimile:    (513) 361-1201 |
| Telephone:    (216) 479-8500 | |
| Facsimile:    (216) 479-8780 | |

## Acceptance or Rejection of a Plan

Under the Bankruptcy Code, a voting class of claims is deemed to have accepted a plan if it is accepted by holders in such class who vote on the plan and who hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class. A voting class of equity interests is deemed to have accepted a plan if it is accepted by holders of equity interests who hold at least two-thirds in amount of the equity interests of such class that have actually voted on the plan.

If the AmFin Plan is not accepted by all impaired Classes of Claims, the AmFin Plan may still be confirmed by the Bankruptcy Court under section 1129(b) of the Bankruptcy Code if: (a) the AmFin Plan has been accepted by at least one impaired Class of Claims; and (b) the Bankruptcy Court determines, among other things, that the AmFin Plan complies with certain provisions of the Bankruptcy Code that require, among other things, that a plan "does not discriminate unfairly" and is "fair and equitable" with respect to each non-accepting impaired Class (the "Cramdown Provisions"). If the AmFin Plan is not accepted by all impaired Classes of Allowed Claims or Equity Interests, the Debtors reserve the right to ask the Bankruptcy Court to confirm the AmFin Plan under the Cramdown Provisions.

## Confirmation Hearing; Objections

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing. Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of the AmFin Plan. Under section 1128 of the Bankruptcy Code and rule 3017(c) of the Bankruptcy Rules, the Bankruptcy Court has scheduled the Confirmation Hearing before the Honorable Pat E. Morgenstern-Clarren, United States Bankruptcy Judge, Howard M. Metzenbaum U.S. Courthouse, 201 Superior Avenue Cleveland, Ohio for [       ], 2011 at [    ], Eastern Time. A notice (the "Confirmation Hearing Notice") setting forth the time and date of the Confirmation Hearing has been included along with this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of such adjourned hearing date by the Bankruptcy Court in open court at such hearing.

Any objection to confirmation of the AmFin Plan must be in writing, must comply with the Bankruptcy Rules and the Local Rules of the Bankruptcy Court, and must be filed and served as required in the Confirmation Hearing Notice.

## EVENTS PRECIPITATING DEBTORS' CHAPTER 11 FILINGS

Over a period of several years, culminating in 2009, the financial and credit markets in the United States, especially those connected to the residential housing market, experienced serious downward corrections and loss of value. A deterioration in mortgage credit quality and availability slowed the pace of transactions and de-valued homes. Mortgage delinquencies sky-rocketed. Unemployment rates rose. As a result, credit markets became seriously illiquid. In that environment, both the Debtors and AFC's former subsidiary AmTrust Bank were adversely affected as a result of their investments in (a) one to four family home loans, and (b) land

acquisition, development and construction loans. The continued weakening of the housing and credit markets and of the general economy contributed to increased levels of nonperforming assets, charge-offs, and credit loss reserves at AmTrust Bank.

In early 2008, the AFC Board determined that AmTrust Bank's level of classified assets was becoming a significant concern. The Board made the decision to seek to raise additional funds in the capital markets and began those efforts. Also, on July 15, 2008, AmTrust Bank entered into a Memorandum of Understanding with the OTS. A business plan was submitted in response to the Memorandum of Understanding as well as OTS Reports of Examination pertaining to both AmTrust Bank and AFC describing, among other things, prior and intended further efforts by AFC and AmTrust Bank to raise capital in the public markets.

In September 2008, the global financial markets imploded. Washington Mutual and Lehman Brothers filed bankruptcy and AIG began an extraordinary federal bailout to prevent its own collapse. This general financial turmoil resulted in the evaporation of the capital markets and the elimination of any opportunity for AFC and AmTrust Bank to raise additional capital. After expiration of the Memorandum of Understanding on September 30, 2008, the OTS issued a Troubled Condition Letter to AFC dated October 16, 2008. On November 19, 2008, the OTS issued:

(a) OTS Order to Cease and Desist (CN08-16) (the "AFC C&D") and the related Stipulation and Consent to Issuance of Order to Cease and Desist entered into between OTS and AFC on or about November 19, 2008;

(b) OTS Order to Cease and Desist (CN08-15) regarding AmTrust Bank (the "AmTrust Bank C&D" and together with the AFC C&D, collectively the "C&D's") and the related Stipulation and Consent to Issuance of Order to Cease and Desist entered into between OTS and AmTrust Bank on or about November 19, 2008.

During December 2008, Peter Goldberg, then the President of AFC and AmTrust Bank, met with OTS representatives and discussed the submission of a program to reduce financial risks at AmTrust Bank. On January 5, 2009, AFC and AmTrust Bank delivered their proposed "Risk Reduction Plan" to the OTS as their response to the C&D's. Revised versions of the Risk Reduction Plan were delivered to the OTS on January 21, January 27, and February 9, 2009. On February 20, 2009, the OTS issued its letter of non-objection to the Risk Reduction Plan.

During the first quarter of 2009, AFC and AmTrust Bank began implementation of their Risk Reduction Plan including monthly reports to the OTS. They also developed an enterprise-wide risk management system with related reporting. A third party consulting firm was employed to monitor the plan progress.

Although revenue at AmTrust Bank exceeded projections during this period, the bank found it difficult to sell the mortgage servicing rights ("MSRs") on new loans and the volume of such rights began to build up at AmTrust Bank. OTS directed AmTrust Bank to scale back its mortgage servicing. AmTrust Bank scaled back new loan originations and began to sell MSRs even at distressed prices. Those changes, among other things, caused AmTrust Bank to fall behind the targets contained in its Risk Reduction Plan.

In late summer of 2009, AFC and AmTrust Bank were advised by the FDIC that it intended to begin the marketing process for AmTrust Bank. On August 25, 2009 marketing resolutions consenting to that process were adopted by the Board of Directors of AmTrust Bank as requested by the FDIC. It thus had became increasing apparent to AFC that such actions would likely culminate in OTS seizing control of AmTrust Bank.

On November 4, 2009, the OTS delivered a letter to AmTrust Bank. This letter called for AmTrust Bank to submit a Capital Restoration Plan and indicated that such a plan would not be acceptable unless guaranteed by AFC. AmTrust Bank declined to submit a Capital Restoration Plan, and AFC never provided a guarantee. The Debtors commenced the Bankruptcy Cases in order to assure that, following an OTS seizure, the remaining assets of the Debtors could be sold or disposed of in a controlled environment providing for equitable treatment of creditors.

## BACKGROUND AND SUMMARY OF THE DEBTORS' BUSINESS

### Overview of the Debtors and Their Business Operations

The ownership of, commitment to, and involvement in AmTrust Bank by Goldberg family members dates back to the early 1960's when Leo Goldberg acquired the controlling interest of its predecessor Ohio Savings Bank. For the five decades since then, the Goldberg family exercised majority ownership and control of Ohio Savings Bank, which was renamed AmTrust Bank, and its affiliates. After Leo Goldberg died in 1971, his sons Robert, David and Gerald succeeded him in the leadership and management of AmTrust Bank. In 1977, Ohio Savings Financial Corporation, now known as AFC, was formed as the holding company for AmTrust Bank. As of the Filing Date, approximately 77% of the common stock of AFC is held by the Goldberg Family. In 2007 Peter Goldberg, who is Gerald Goldberg's son, became President of both the AmTrust Bank and AFC and, subsequently in 2009, became President and Chief Executive Officer of both AmTrust Bank and AFC. Peter, Robert, David and Gerald Goldberg were among the members of the Board of Directors of AFC as of the Filing Date. Other members of the Goldberg family were actively involved in the operations of AmTrust Bank prior to December 4, 2009, and in the operations of various subsidiaries of AFC.

Prior to the Filing Date, AFC's principal business consisted of acting as a holding company for AmTrust Bank, the Debtors, and its other non-Debtor affiliates. Under AmTrust Bank's charter, it was authorized to accept deposit accounts insured by the FDIC and to make consumer and business loans and certain related investments. AmTrust Bank and AFC, as its corporate parent, were both subject to oversight and regulation by the OTS.

Debtor AREI is a wholly-owned subsidiary of AFC. Debtor AIAI is, other than a single qualifying share, also wholly-owned by AFC. Debtors AII, API and AMI are wholly-owned subsidiaries of AREI.

Debtor AIAI and non-Debtor AmFin Investment Services, Inc. ("AISI") both provided services to customers within AmTrust Bank locations in Ohio, Florida, and Arizona. Wealth management advice was provided through AISI's financial advisors and AIAI's agents. AISI was registered with the U.S. Securities and Exchange Commission and (a) offered brokerage services, and (b) provided access to investment products, primarily mutual funds and variable

annuities. AIAI agents provided access to annuities and other insurance products. Products offered by AISI and AIAI were not FDIC insured.

Debtor AREI owns certain commercial real property in the Cleveland, Ohio area and elsewhere. In addition, In AREI holds investment interests in more than 50 real estate and business entities in a variety of capacities and locations. Debtors AII, API and AMI are each participants in additional real estate investments through the Lexin AmTrust Real Estate Partners, LP equity fund. Details regarding such investments are set forth in the Schedules of Assets and Liabilities filed in the Bankruptcy Cases for AREI as Document No. 204 on the Docket of the Bankruptcy Court. For further discussion of proceedings regarding certain AREI properties and investments, See "Proceedings Regarding AREI Investments" at page 26 hereof.

Non-Debtor OS Reinsurance Company ("OSRe") is a captive insurance subsidiary of AFC. OSRe was engaged in the business of providing mortgage insurance to certain borrowers of AmTrust Bank. Such policies were then reinsured by OSRe with other insurance companies. Prior to the Filing Date, OSRe ceased accepting new policies of insurance and is presently in the process of winding down its activities.

For the fiscal year ended September 30, 2009, AFC and its affiliates, including AmTrust Bank, recorded annual net revenues of more than $419 million. As of October 31, 2009, the companies had assets of approximately $11.7 billion and liabilities totaling $11.45 billion.

**Employees**

As of the Filing Date, AFC and its affiliates had approximately 1,700 employees. Most of the employees were employed by AmTrust Bank. After the FDIC receivership and sale of AmTrust Bank on December 4, 2009, the number of employees dropped significantly. Debtor AIAI and non-debtor AISI retained approximately sixty employees, pending the sale of those businesses discussed below. AFC retained four individuals as either employees or independent contractors. Subsequent to December 31, 2010, the Debtors had only 2 employees and independent contractors.

**Significant Assets**

AFC is a holding company. Its principal assets are the shares of its Debtor and non-Debtor subsidiaries. AFC believes that its investments in AREI and non-Debtor subsidiaries AISI and OSRe may have material value.

In addition, AFC is the taxpayer under a consolidated tax group that has included its various affiliates. Obligations and entitlements among the members of the consolidated tax group were allocated pursuant to a Tax Sharing Agreement dated as of March 28, 2006 (the "Tax Sharing Agreement"). For tax years ending prior to the Filing Date, those affiliates included AmTrust Bank and its subsidiaries. AFC believes that it is entitled to tax refunds including a federal income tax refund of approximately $190 million for the tax year ended September 30, 2009 (the "2009 Tax Refund"). AFC has filed a request for such refund, which is pending as of the date of this Disclosure Statement.

The FDIC has asserted that, in its capacity as Receiver for AmTrust Bank, it is the "owner" of the portion of the 2009 Tax Refund that pertains to taxes paid on earlier income earned by AmTrust Bank. The Debtors dispute the FDIC position. If the FDIC prevails in its position that it is the owner of that portion of the 2009 Tax Refund attributable to income previously allocable to AmTrust Bank, the Debtors' share of the 2009 Tax Refund is estimated to be approximately $15 million and the FDIC will have no claim under the Tax Sharing Agreement. If the Debtors prevail on their contention that AFC is the owner of the entire 2009 Tax Refund, the Debtors will receive the entire 2009 Tax Refund estimated at approximately $190 million and the FDIC will have an Unsecured Claim of approximately $175 million under the Tax Sharing Agreement. For further discussion of various disputes with FDIC, See "Litigation with the FDIC" at page 25 hereof.

AREI holds a variety of interests in real property, including interests in (a) the "515 Euclid Parking Garage," located at 515 Euclid Ave., Cleveland, Ohio 44114; (b) the "Rocky River Office Building," located at 22255 Center Ridge Rd., Rocky River, Ohio 44116; and (c) approximately 880 acres of vacant land in Maricopa County, Arizona. AmTrust Bank leased space for a branch in the Rocky River Office Building owned by AREI. That branch is now operated by New York Community Bank ("NYCB"), as the assignee of the lease. The other space in this building has been offered for rent to the public.

In addition to its ownership of real estate, AREI owns a variety of investments in real estate developments and ventures. In most of these investments, AREI is a member of a limited liability company or limited partner in a limited partnership. In others, AREI is the holder of subordinated debt or is a general partner or joint venturer. Details regarding such investments are set forth in the Schedules of Assets and Liabilities filed in the Bankruptcy Cases for AREI as Document No.204 on the Docket of the Bankruptcy Court.

Pursuant to applicable insurance regulations, non-Debtor subsidiary OSRe maintains reserves against possible claims under policies issued pursuant to arrangements involving OSRe As of the date of this Disclosure Statement, such reserves are estimated at approximately $14 million. As policies expire without claims, OSRe expects to be able to recover a significant portion of such reserves. Such amounts would be distributed to AFC for distribution under the AmFin Plan.

**Directors**

On the Filing Date, the Board of Directors of AFC was comprised of David Goldberg; Gerald Goldberg, Peter Goldberg, Robert Goldberg, Jon H. Outcalt, Thomas A. Hamilton, Jr., Joseph A. Campanella, Anat Bird and Richard L. Osborne.

On May 10, 2010, the directors of AFC each tendered resignations. Under the terms of the AmFin Plan, the individuals who will serve as directors following the Effective Date of the AmFin Plan will be designated by the Debtors no later than ten (10) days prior to the date of the Confirmation Hearing..

**Executive Officers**

At the Filing Date, Peter Goldberg served as the Chief Executive Officer and Alan Presby served as the Chief Financial Officer of each of the Debtors. Shortly after the Filing Date, Robert Goldberg replaced Peter Goldberg as Chief Executive Officer of the Debtors and Ronald Glass was appointed as the Chief Restructuring Officer of the Debtors. Robert Goldberg resigned as the Chief Executive Officer of the Debtors effective December 31, 2010. Neither Alan Presby nor Peter Goldberg are employed by the Debtors; both serve as paid consultants pursuant to negotiated agreements.

It is anticipated that Ronald Glass and Alan Presby will continue to serve as officers until the Effective Date of the AmFin Plan. Thereafter, new or additional officers may be designated by the Board of Directors of the Reorganized Debtors.

**Employee Benefit Plans**

As of the Filing Date, AFC and its affiliates maintained a variety of employee benefit plans in connection with their businesses. Such plans included medical and dental benefit plans, profit-sharing plans, 401k plans, group life and disability plans and similar arrangements common to companies like AFC and its affiliates. The majority of employees covered by most plans were employees of AmTrust Bank. Following the Filing Date, the Debtors have taken steps to terminate the various plans maintained by them. In many instances, such plans were replaced by NYCB, as the purchaser of assets of AmTrust Bank. For the profit-sharing and 401k plans, termination included the distribution to beneficiaries of their respective portions of plan assets.

**Prepetition Capital Structure**

As of the Filing Date, the Debtors had outstanding indebtedness for borrowed money totaling approximately $169.5 million, consisting of the Senior Notes, the Subordinated Notes, and Bond Financing, each of which is discussed in more detail below.

As of the Filing Date, AFC had issued and outstanding 161,421 shares of Common Stock, without par value per share (the "Common Stock"). Upon a liquidation, dissolution, or winding up of AFC, each share of Common Stock shares equally in assets legally available for distribution to shareholders.

**The Senior Notes**

AFC has approximately $99.49 million of principal indebtedness attributable to the Senior Notes[3]. This amount consists of a current unpaid principal amount of approximately $97.65 million, plus a "Deferred Make-Whole Payment" of approximately $1.84 million. The

---

[3]   A more detailed description of the Senior Notes and transactions related to the Senior Notes is set forth below in the discussion of the Cash Collateral Motion filed in the Bankruptcy Cases as Document No. 004 on the Docket of the Bankruptcy Court.

Senior Notes were issued on September 2, 2009 to various senior noteholders in exchange for original Senior Notes dated October 20, 2005. The original Senior Notes were issued pursuant to a Note Purchase Agreement, dated as of October 20, 2005, which was amended by agreement, dated June 23, 2009 and further amended by agreement dated September 2, 2009. The Note Purchase Agreement, as so amended, is referred to herein as the "Senior Notes Agreement". The 2009 amendments required issuance of the Senior Notes in exchange for the original Senior Notes, increased the interest rate from 5.78% to 11.78%, added a requirement for payment of the "Deferred Make Whole Payment" and made the maturity date three (3) years earlier than the original Senior Notes (October 20, 2012 rather than October 20, 2015), in addition to other amendments. Such amendments also added guaranties by certain AFC affiliates and granted liens securing the obligations of AFC and the guarantor affiliates. As discussed in greater detail below, the Debtors believe that the liens and guaranties granted by the September 2009 agreements are subject to avoidance as preferences and/or fraudulent transfers. The AmFin Plan treats the Claims of holders of Senior Notes in a manner consistent with avoidance of such liens and guaranties.

**The Subordinated Notes**

AFC has approximately $51.55 million of principal indebtedness attributable to the Subordinated Notes issued in connection with certain trust preferred equity securities, as of June 3, 1997. The Subordinated Notes are obligations of AFC only and are not guaranteed by or otherwise obligations of any other Debtor or any non-Debtor subsidiaries. The Subordinated Notes were issued pursuant to an Indenture dated June 3, 1997 with The Bank of New York, as trustee (the "Subordinated Indenture"). The Subordinated Notes are subordinate and junior in right of payment to the prior payment in full of all Senior Indebtedness (as defined in the Subordinated Indenture), including the Senior Notes. The Subordinated Notes were issued to a special purpose trust, non-Debtor Ohio Savings Capital Trust I (the "Trust"). The Trust, in turn, issued common securities to AFC (the "Trust Common Securities") and preferred securities to third parties (the "Trust Preferred Securities" and, together with the Trust Common Securities, the "Trust Securities"), to fund the Trust's purchase of the Subordinated Notes from AFC.

AFC is responsible for the debts and obligations of the Trust (other than with respect to the Trust Securities) to the extent not satisfied out of the Trust's assets. Furthermore, AFC has guaranteed the payment of (a) distributions required to be paid on the Trust Securities, (b) the redemption price with respect to the Trust Securities, and (c) upon a voluntary or involuntary termination and liquidation of the Trust (other than in connection with a distribution of the Subordinated Notes to holders of the Trust Securities), the lesser of (i) the liquidation amount and accumulated and unpaid distributions on the Trust Securities or (ii) the amount of assets of the Trust remaining available for distribution to holders of the Trust Securities, in each case, to the extent the Trust has funds legally available for such payments described in clauses (a) through (c). Furthermore, AmFin's guarantee is subordinate and junior in right of payment to Senior Indebtedness, as defined in the Subordinated Notes Indenture, including the Senior Notes.

**The Bond Financing**

In order to construct a multi-level parking facility with 522 parking spaces and approximately 11,000 square feet of ground-floor retail (the "Parking Garage") on certain of its

real property at 515 Euclid Avenue, Cleveland Ohio (the "Euclid Property"), Debtor AREI (then known as OSF Properties) obtained financing in the form of (a) $2,000,000 of tax incentive bonds from the City of Cleveland known as the 2003 City of Cleveland Ohio Economic Development Revenue Bonds (the "TIF Bonds") and (b) $16,000,000 of municipal bonds for construction costs from the Cleveland-Cuyahoga County Port Authority (the "Port Authority") issued on February 27, 2004 and known as the Cleveland-Cuyahoga County Port Authority Taxable Development Revenue Bonds, Series 2004 (OSF Properties, Inc. Project) (the "Port Authority Bonds" and together with the TIF Bonds, the "Bond Financing"). Cleveland-Cuyahoga County Port issued the Port Authority Bonds under a Trust Indenture naming U.S. Bank National Association as Trustee dated February 1, 2004. Charter One Bank, N.A. was the sole purchaser of the Port Authority Bonds.

In connection with the issuance of the Port Authority Bonds, AREI, as lessor, entered into a ground lease of the Euclid Property and the Parking Garage to the Port Authority for a term of 40 years. Simultaneously, the Port Authority leased the Euclid Property and the Parking Garage back to AREI on a "triple net" lease (the "Garage Lease"). The Garage Lease is guaranteed by AFC (the "Lease Guaranty") and payments thereunder are equal to the repayment obligations under the Port Authority Bonds. Obligations under the Garage Lease and the Port Authority Bonds are secured by an assignment of the Garage Lease and Lease Guaranty and a mortgage on the Euclid Property and the Parking Garage. At the end of the Garage Lease term, AREI has the option to purchase the Parking Garage for a payment of $10.

**The Common Stock**

As of the Filing Date, AFC had issued and outstanding 161,421 shares of Common Stock, without par value per share (the "Common Stock"). Upon a liquidation, dissolution, or winding up of AFC, each share of Common Stock shares equally in assets legally available for distribution to shareholders.

## SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASES

**Commencement of the Bankruptcy Cases**

On November 30, 2009 (the "Filing Date"), in furtherance of their restructuring efforts, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Bankruptcy Cases were assigned to the Honorable Pat E. Morgenstern-Clarren, United States Bankruptcy Judge for the Northern District of Ohio, in Cleveland, Ohio.

Since the Filing Date, the Debtors have continued to operate their businesses and manage their properties as debtors-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code. Unless otherwise restricted by the Court, a debtor-in-possession is generally permitted to operate its business in the ordinary course, subject only to specified supervisory powers of the Court. These powers generally include consideration of transactions by the debtor-in-possession which are outside the ordinary course of business, approval of retention of attorneys, accountants and various other professionals, review of matters involving claims against the debtor-in-possession, and consideration of objections raised by parties in interest to operations or proposed

actions by the debtor-in-possession. No trustee or examiner has been appointed in the Bankruptcy Cases.

## Receivership and Sale of AmTrust Bank

Four days after the Filing Date, on December 4, 2009, the OTS took control of AmTrust Bank and appointed the FDIC as receiver. On the same date, the FDIC, as Receiver, sold substantially all of AmTrust Bank's assets to NYCB, pursuant to that certain Purchase and Assumption Agreement, dated December 4, 2009.

## First Day Orders

Shortly after the Filing Date, the Bankruptcy Court entered several orders authorizing the Debtors to pay various prepetition claims and granting other relief necessary to help the Debtors stabilize their day-to-day business operations. These orders were designed to allow the Debtors to continue business operations with minimum disruptions and dislocations, and to ease the strain on the Debtors' relationships with their employees and other parties. Included among the orders entered by the Bankruptcy Court were orders authorizing the Debtors to: (a) pay wages, salaries, employment taxes, employee benefit payments, and workers compensation payments; (b) maintain certain bank accounts, cash management systems and business forms; (c) provide for continued utility service; (d) continue to employ, in the ordinary course of its business, certain attorneys, accountants and consultants, and (e) continue use of cash collateral.

## Retention of Professionals

Shortly after the Filing Date, the Bankruptcy Court entered orders authorizing the Debtors to retain, among others: (a) Squire, Sanders & Dempsey L.L.P., as lead bankruptcy and reorganization counsel and (b) Kurtzman Carson Consultants, LLC, as its Claims, Noticing and Balloting Agent.

Subsequently, the Debtors obtained orders from them Bankruptcy Court authorizing the retention of, among others: (a) Tucker Ellis & West LLP, as special counsel; (b) Ronald. Glass as Chief Restructuring Officer and (c) GlassRatner Advisory & Capital Group LLC, as Financial Advisors.

## Official Unsecured Creditors' Committee

On December 10, 2009, the United States Trustee appointed an Official Unsecured Creditors' Committee representing the unsecured creditors of the Debtors. The Committee composition was modified on February 5, 2010. The current members of the Committee are:

Robert N. Eisendrath
8603 Country Club Drive
Franklin, WI 53132
Phone: (414) 529-3843

Board Of Education of The
Cleveland Municipal School District
c/o Wayne Belock
1380 East Sixth Street
Cleveland OH 44114
Phone: (216) 574-8210
Fax: (216) 574-8108

Robert Christopher D'Andrea
469 Meridian Ct.
Avon Lake OH
Phone: (440) 933-6301

Wilmington Trust Company
Successor Trustee
c/o Patrick J. Healy
1100 North Market Street
Wilmington, DE 19890-1605
Phone: (302) 636-6391
Fax: (302) 636-4149

Pursuant to Orders entered by the Bankruptcy Court, the Committee was authorized to retain Hahn, Loeser & Parks LLP as counsel and J.H. Cohn, as financial advisors.

**Debtor in Possession Use of Cash Collateral Approved**

On the Filing Date, the Debtors filed their Motion requesting entry of interim and final Orders authorizing use of cash collateral, granting limited, provisional adequate protection, and providing certain other relief (the "Cash Collateral Motion"). A final order approving the Cash Collateral Motion was entered by the Court on December 21, 2009 and the Debtors have been using their cash collateral for operating and administrative expenses during these Bankruptcy Cases in exchange for granting replacement liens to its secured creditors to the extent that such liens validly existed, and in such amounts and priorities, prior to the filing of the Bankruptcy Cases.

**Debtors' Adversary Proceeding Against the Noteholders**

On November 30, 2009, the Debtors initiated an adversary proceeding against the holders of the Senior Notes, seeking avoidance of certain payments, guarantees and liens on and security interests in property of the Debtors' estates as either preferential transfers or fraudulent transfers or obligations under applicable provisions of the Bankruptcy Code and applicable state law. After the filing of the adversary proceeding, the Debtors' and the Noteholders agreed that it would be wasteful to devote estate resources to litigation against the Noteholders during the early phases of the Bankruptcy Cases and agreed to resolve such issues by negotiation instead. Accordingly, on December 29, 2009, the Debtors filed a Notice of Voluntary Dismissal Without Prejudice and the adversary proceeding was dismissed. The Debtors have retained their causes of action against the holders of Senior Notes. The terms of the AmFin Plan seek to resolve those issues through the treatment of Claims of holders of Senior Notes as solely Unsecured Claims. For further discussion, See, "The Noteholder Settlement" at page 39 hereof.

**Debtors' Business Records and Information**

On the Filing Date, the business records of the Debtors were maintained in premises owned and occupied by AmTrust Bank. Electronic business records and information were also maintained by AmTrust Bank on behalf of the Debtors and disbursements were made by AmTrust Bank on behalf of the Debtors. Following the sale by the FDIC of assets of AmTrust Bank to NYCB on December 4, 2009, the Debtors no longer had access to their business records or information, which was in the hands of the FDIC and NYCB.

The Debtors sought to obtain access to their business records by contractual agreements with the FDIC and NYCB. However, such efforts were not particularly successful. As a result, the Debtors had increasing difficulty performing their obligations under the Bankruptcy Code, due to the absence of necessary records and information. The Debtors concluded that they needed to take more formal action to secure access to their records.

On January 25, 2010, the Debtors filed a motion pursuant to Bankruptcy Rule 2004 for an Order Directing Examination of New York Community Bank and the Production of Documents, seeking access to the Debtors' business records in the hands of NYCB. Ultimately, the Debtors obtained access to their records by executing the Transition Services and Access Agreement with NYCB dated February 11, 2010. That agreement was amended to extend its term until January 31, 2011. The Debtors and NYCB representatives are discussing a potential further extension of the agreement. Pursuant to such agreement, the Debtors have agreed, among other things, to reimburse NYCB for the cost of services performed for the benefit of the Debtors in supplying business records and other information.

**Schedules and Statements of Financial Affairs**

On February 5, 2010, the Debtors submitted to the Court their Schedules and Statements of Financial Affairs setting forth all of their assets and liabilities as of the date of the petition as reflected in their accounting records. Such Schedules and Statements of Financial Affairs set forth detailed information on assets, liabilities and transactions regarding the Debtors and are found at Document Nos. 196, 197, 199 and 201- 210 on the Docket of the Bankruptcy Court.

**The Claims Bar Date**

By Order entered January 12, 2010, the Bankruptcy Court fixed March 1, 2010 (the "Bar Date") as the deadline for filing Proofs of Claim and Interest against the Debtors, except for governmental agencies whose Bar Date was fixed at June 1, 2010. Notice of the Bar Date was given to all persons identified in the Debtors' Schedules of Assets and Liabilities as having a potential claim against the Debtors and all record holders of debt or equity securities of the Debtors.

Creditors were not required to file a Proof of Claim if (a) they were listed in the Debtors' Schedules of Assets and Liabilities as having a claim against the Debtors that was not designated as "contingent," "unliquidated" or "disputed" and (b) the creditor did not dispute the amount or priority of their scheduled claim. A creditor that was required to file a Proof of Claim and that failed to do so by the Bar Date is barred from participating in distributions under the AmFin Plan.

## Sale of AIAI Business

On January 29, 2010, Debtors entered into an Asset Purchase Agreement to sell the assets and business of Debtor AIAI to Novak Insurance Agency, Inc. Thereupon, the Debtors filed a Motion seeking approval of such sale pursuant to section 363 of the Bankruptcy Code. Procedures for such sale, including the solicitation of competing bids, were approved by Order of the Bankruptcy Court entered February 12, 2010.

Following notice and solicitation, a qualifying competing bid was received by the Debtors and an auction was held on February 22, 2010. Novak Insurance Agency, Inc. was the prevailing bidder at the auction and the sale of AIAI assets for a net price to the Debtors of $600,000 was approved by order of the Bankruptcy Court entered February 25, 2010.

## Sale of AISI Business

On February 4, 2010, Debtors entered into an Asset Purchase Agreement to sell the assets and business of non-Debtor affiliate AISI to NYCB. The terms of the agreement provided for a total purchase price of $1,200,000 to be paid in a series of installments at milepost dates set forth in the agreement.

In a related action, on February 5, 2010, Debtor AIAI filed a Motion seeking approval to designate a replacement agent of record for certain insurance products theretofore serviced by AIAI. On March 2, 2010, the Bankruptcy Court entered an Order approving the requested relief.

Following required approval of the transactions by the Financial Industry Regulatory Authority, the parties consummated the transaction and completed transfer of customer accounts over a period from April to June, 2010. To date, AISI has received a total of $1,140,000 of the purchase price. The remaining $60,000, plus accrued interest, is held in escrow to protect NYCB against potential claims. In the absence of such claims, the remaining portion of the purchase price will be released on April 26, 2011.

## Litigation With the FDIC

In pleadings filed in December 2009, the FDIC took the position that, in actions taken in 2008 , AFC had committed to maintain the capital adequacy of its subsidiary AmTrust Bank and that such alleged commitment amounted to a guaranty obligation for amounts in excess of $2 billion. Subsequently, in filed proofs of claim, the FDIC reduced the amount of the alleged guaranty obligations to $765 million (the "FDIC Capital Maintenance Claim"). The FDIC also asserted that the FDIC Capital Maintenance Claim is entitled to priority treatment under the provisions of section 507(a)(9) of the Bankruptcy Code.

From the outset, the Debtors have disputed the existence of any such capital maintenance commitment or similar claim. In fact, the Debtors maintain that the facts demonstrate that such a commitment was twice requested by the OTS and refused by AFC.

On March 15, 2010, Debtors filed a Motion for an order estimating at $0.00 and disallowing in its entirety FDIC Capital Maintenance Claim. On April 1, 2010, the FDIC filed an objection to the Debtors' disallowance Motion. In addition, the FDIC filed a motion pursuant

to section 365(o) of the Bankruptcy Code, to require AFC to immediately cure the deficit under the alleged capital maintenance commitments (the "FDIC Claim Litigation"). The FDIC also filed a motion to have the United States District Court for the Northern District of Ohio "withdraw the reference" of the FDIC Claim Litigation, i.e., that the District Court take over responsibility for further proceedings in the litigation. By Order of the District Court, entered on June 11, 2010, the FDIC Claim Litigation was transferred to the District Court. The Debtors and the FDIC have both completed various document requests, depositions and other discovery on the issues in the FDIC Claim Litigation. Both parties have also filed Motions requesting judgment in their favor on legal grounds. As of the date of this Disclosure Statement, the District Court has not ruled on such motions.

The Debtors view resolution of the alleged FDIC Capital Maintenance Claim as critical to Debtors' ability to make distributions to creditors under the AmFin Plan. Since the FDIC Capital Maintenance Claim has been asserted as having priority under section 507(a)(9) of the Bankruptcy Code and because of the magnitude of the asserted FDIC Capital Maintenance Claim, Debtors will not be able to make distributions to general unsecured creditors until the alleged FDIC Capital Maintenance Claim has been finally determined. Debtors are not able to forecast how long it may take for the District Court to make a ruling in the FDIC Claim Litigation. Debtors are also not able to estimate the time required for any resulting appeals, to be finally determined. For further discussion of reserves and distributions under the AmFin Plan, See "Plan Reserves" at page 43 hereof.

As described elsewhere in this Disclosure Statement, the Debtors and the FDIC have asserted conflicting claims to the 2009 Tax Refund estimated at approximately $190 million. If the FDIC prevails in the FDIC Claim Litigation, its asserted FDIC Capital Maintenance Claim is likely to entitle them to all proceeds of the Debtors' assets and thus render the dispute over the 2009 Tax Refund irrelevant. However, if the Debtors prevail in the FDIC Claim Litigation, the FDIC will have no priority Claim. In such event, it will be necessary to determine the respective rights of the Debtors and the FDIC with regard to the 2009 Tax Refund. The Debtors have agreed to segregate the 2009 Tax Refund, when received, pending the outcome of the FDIC Claim Litigation.

### Abandonment of AmTrust Bank Stock

On April 16, 2010, Debtors filed a motion for an order authorizing AFC to abandon the common stock of AmTrust Bank owned by AFC pursuant to section 553 of the Bankruptcy Code. AFC requested that abandonment in the belief that, following the FDIC receivership and sale of AmTrust assets to NYCB, AFC no longer derived any benefit from ownership or control of AmTrust Bank but conceivably continued to have obligations as an entity regulated by the OTS. On May 7, 2010, the Bankruptcy Court entered an order authorizing AFC to abandon such stock as requested. Following entry of the Bankruptcy Court's Order, AFC sought and obtained OTS confirmation that AFC was disaffiliated from AmTrust Bank and no longer subject to supervision by the OTS as a regulated holding company.

## Proceedings Regarding AREI Investments

During the course of the Bankruptcy Cases, the Debtors have also brought, or been named in, various proceedings pertaining to entities which AREI holds interest in, and/or claims against. Generally speaking, such proceedings have involved issues concerning the ability of AREI to realize on such investments and the manner and timing of any such realization. Some of such proceedings are summarized below.

### Deer Run

On March 29, 2010, the Debtors filed a motion seeking authorization for AREI to execute a settlement agreement with Forest City Equity Services, Inc., Forest City Rental Properties Corporation, and Charlotte Goldberg, Trustee, providing payment to AREI of $250,000 in return for AREI's disposition of its interest in Deer Run Investors, a venture owning an apartment complex in Twinsburg, Ohio, On April 9, 2010, the Bankruptcy Court entered its Order approving the Deer Run settlement transaction.

### Reno/Front Range

Among the assets held by AREI at the Filing Date were membership and subordinated debt interests in Reno Retail Company, L.L.C., Reno Retail Company II, L.L.C. and Front Range Retail, L.L.C., entities owning shopping centers and related commercial property in Reno, Nevada and Ft. Collins, Colorado, respectively. On June 4, 2010, the managing members of such entities (collectively, the "JDJ Interests"), filed pleadings seeking authority to assert certain rights or remedies against AREI by virtue of AREI's bankruptcy filing. Such proceedings were brought in the context of restructuring negotiations between the owner entities and lenders to such entities for the restructuring of senior secured loans on the two shopping centers. AREI opposed the relief sought by the JDJ Interests from the Bankruptcy Court. At the same time, AREI sought to cooperate in negotiations with the senior lenders in the hope that a negotiated outcome would permit AREI to retain an economic interest in the shopping centers.

During October of 2010, the JDJ Interests and the lenders reached preliminary agreement on a restructuring proposal for the Reno and Ft. Collins properties. That proposal required significant capital investment by the members of both entities. After review, AREI concluded that it was not prepared to make the capital investment called for by the restructuring agreement. After further negotiations with the JDJ Interests, and agreement was reached to settle AREI's claims against and interests in the Reno and Ft. Collins entities for a payment by the JDJ Interests to AREI in the amount of $500,000 and the exchange of releases. After further negotiations with the Committee and an increase in the settlement amount to $550,000, that settlement was approved by the Bankruptcy Court by order entered December 17, 2010 and the settlement was consummated shortly thereafter.

### Mutual Properties

On July 16, 2010, the Debtors commenced an adversary proceeding against Mutual Properties, LTD and certain affiliates. The relief requested by the Debtors involves turnover of certain funds owed by Mutual Properties to the Debtors. Following entry of an order by the Bankruptcy Court recognizing AFC as the party entitled to such payments, Mutual Properties

remitted approximately $187,000 to AFC. AFC retains the right to certain contingent future payments from Mutual Properties.

**Kenco**

On August 13, 2010, the Debtors initiated an adversary proceeding seeking turnover of estate funds against Woodlands Bent Creek, LLC, Bent Creek Associates Limited, and Kenco Communities at IBIS, Inc. (collectively, "Kenco"). The relief requested by the Debtors involves turnover of approximately $1.2 million that the Debtors maintain is owed by Kenco to the Debtors. The Kenco parties have disputed the Debtors' right to recover the funds. As of the date of this Disclosure Statement, the adversary proceeding is in the discovery phase with trial scheduled for May 20, 2011. However, Kenco has agreed to an Order by the Bankruptcy Court requiring that the amounts claimed by the Debtors to be held in a segregated account pending completion of the litigation.

<u>**Sales of AREI Cleveland Real Estate**</u>

**In General**

On April 27, 2010, the Debtors filed a motion to engage NAI Daus, effective as of March 9, 2010, as an exclusive broker to solicit offers to purchase two commercial office buildings owned by AREI and located in Beachwood, Ohio and Rocky River, Ohio. On April 29, 2010, the Bankruptcy Court entered its Order authorizing the NAI Daus retention.

Since March, 2010, NAI Daus has been actively involved in seeking offers for purchase of the two described properties. Early in the process, NYCB made an offer to purchase both properties, as a package together with the Parking Garage. As described elsewhere herein, NYCB leases space for branches on the first floor of each office building. After review, the Debtors concluded that the prices offered by NYCB were not sufficient to justify entering into an agreement for the sale of any of the subject properties. Accordingly, NAI Daus continued its efforts to find prospective purchasers at higher values.

**Beachwood Office Building Sale**

On August 5, 2010, AREI entered into a Real Estate Purchase Agreement to sell the office building owned by AREI at 26949 Chagrin Boulevard, Beachwood, Ohio to Dollar Bank, Federal Savings Bank for a purchase price of $2.5 million. Thereupon, the Debtors filed a motion seeking approval of such sale pursuant to section 363 of the Bankruptcy Code. Procedures for such sale, including the solicitation of competing bids, were approved by Order of the Bankruptcy Court entered August 31, 2010.

Although NAI Daus received various indications of interest from potential bidders, no qualified competing bids were received by the bidding deadline. Accordingly, the Bankruptcy Court entered its Order approving the sale to Dollar Bank and the sale was consummated on October 8, 2010.

## The Formulation of the Debtor's Plan of Reorganization

Within a few months of the Filing Date, the Debtors began efforts to formulate a plan of reorganization to allow Debtors to engage in an orderly disposition of their assets and make resulting distributions to creditors. The Debtors have held detailed, in-depth discussions regarding their proposed plan structure and mechanics with the Creditors' Committee and representatives of holders of Senior Notes. The Debtors have also discussed certain aspects of the AmFin with various other parties in interest. The AmFin Plan described below is a result of those discussions and negotiations.

## OVERVIEW OF THE AMFIN PLAN

A copy of the AmFin Plan accompanies this Disclosure Statement as Exhibit 1. The following summary of the material provisions of the AmFin Plan is qualified in its entirety by the specific provisions of the AmFin Plan, including the AmFin Plan's definitions of certain terms used below.

## Brief Explanation of Chapter 11 Reorganization

Chapter 11 of the Bankruptcy Code is the principal reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself and its creditors and shareholders. Confirmation of a plan of reorganization is the principal objective of a chapter 11 case.

In general, a chapter 11 plan of reorganization (a) divides claims and equity interests into separate classes, (b) specifies the property that each class is to receive under the plan, and (c) contains other provisions necessary to the reorganization of the debtor. A chapter 11 plan may specify that certain classes of claims or equity interests are either to be paid in full upon the effective date of the plan, reinstated, or their legal, equitable and contractual rights are to remain unchanged by the reorganization effectuated by the plan. Such classes are referred to under the Bankruptcy Code as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan. Accordingly, it is not necessary to solicit votes from the holders of claims or equity interest in such classes. A chapter 11 plan also may specify that certain classes will not receive any distribution of property. Such classes are deemed to reject the plan.

All other classes of claims and equity interests contain "impaired" claims and equity interests entitled to vote on the plan. As a condition to confirmation, the Bankruptcy Code generally requires that each impaired class of claims or equity interests votes to accept a plan. Acceptances must be received (a) from the holders of claims constituting at least two-thirds in dollar amount and more than one-half in number of the allowed claims in each impaired class of claims that have voted to accept or reject the plan, and (b) from the holders of at least two-thirds in amount of the allowed equity interests in each impaired class of equity interest that have voted to accept or reject the plan. If any class or classes of claims or equity interests entitled to vote with respect to the plan rejects the plan, upon request of the plan proponents, the Bankruptcy Court may nevertheless confirm the plan if certain minimum treatment standards are met with respect to such class or classes.

Chapter 11 of the Bankruptcy Code does not require each holder of a claim or equity interest to vote in favor of a plan of reorganization in order for the bankruptcy court to confirm the plan. However, the Bankruptcy Court must find that the plan of reorganization meets a number of statutory tests (other than the voting requirements described in this section) before it may confirm, or approve, the plan of reorganization. Many of these tests are designed to protect the interest of holders of claims or equity interest that do not vote to accept the plan of reorganization but who will nonetheless be bound by the plan's provisions if it is confirmed by the Bankruptcy Court.

## Solicitation of Acceptances of the AmFin Plan

The Debtors are seeking acceptances of the AmFin Plan from holders of Allowed Claims classified in Classes 4 and 6 under the AmFin Plan, which are the only Classes impaired under the AmFin Plan and therefore entitled to vote on the AmFin Plan. If the requisite acceptances are received, the Debtors will use the acceptances as evidenced by Ballots solicited in accordance with this Disclosure Statement and the AmFin Disclosure Statement Approval Order to seek confirmation of the AmFin Plan under chapter 11 of the Bankruptcy Code.

If any impaired Class is determined to have rejected the AmFin Plan in accordance with section 1126 of the Bankruptcy Code, the Debtors may use the provisions of section 1129(b) of the Bankruptcy Code to satisfy the requirements for confirmation of the AmFin Plan. For further discussion of this ability, See "Confirmation Without Acceptance by All Impaired Classes" at page 52 hereof.

The Debtors believe that this Disclosure Statement complies with applicable bankruptcy and non-bankruptcy law. This Disclosure Statement and the AmFin Plan are being transmitted to all known holders of impaired Claims and Equity Interests. The Debtors believe that this Disclosure Statement contains adequate information for all holders of impaired Claims to cast an informed vote to accept or reject the AmFin Plan. Furthermore, the Debtors believe that holders of Claims will obtain a greater recovery under the AmFin Plan than they would otherwise obtain if the Debtors' assets were liquidated under chapter 7 of the Bankruptcy Code or otherwise restructured and that the AmFin Plan will enable the Debtors to maximize the value of their assets and the distributions to holders of Allowed Claims.

If the AmFin Plan is confirmed by the Bankruptcy Court, each holder of an Allowed Claim will receive, except as otherwise expressly agreed by such holder, the same pro rata consideration as other holders of Allowed Claims in the same Class, whether or not such holder voted to accept the AmFin Plan. Moreover, upon confirmation by the Bankruptcy Court, the AmFin Plan will bind all holders of Claims and Equity Interests regardless of whether or not such creditors and Equity Interest holders voted to accept the AmFin Plan.

## Unimpaired Classes

Claims in Classes 1 (Secured TIF Claims), 2 (Secured Bondholder Claims), 3 (Other Secured Claims) and 5 (Intercompany Claims) and Equity Interests in Class 7 (Common Stock) are not impaired under the AmFin Plan and, under section 1126(f) of the Bankruptcy Code, are conclusively deemed to accept the AmFin Plan and are not entitled to vote on the AmFin Plan.

## Classification of Claims and Equity Interests

Section 1123 of the Bankruptcy Code provides that a plan of reorganization must classify claims against a debtor. Under section 1122 of the Bankruptcy Code, a plan must classify claims and equity interests into classes that contain substantially similar claims and equity interests. The AmFin Plan divides the Claims of known creditors and the Equity Interests into Classes and sets forth the treatment offered each Class. The Debtors believe they have classified all Claims and Equity Interests in compliance with the provisions of section 1122 of the Bankruptcy Code, but it is possible that a holder of a Claim or Equity Interest may challenge such classification and that the Bankruptcy Court may find that a different classification is required for the AmFin Plan to be confirmed. If so, the Debtors intend, to the extent permitted by the Bankruptcy Code and the provisions of the AmFin Plan, to amend or revoke the AmFin Plan and file an amended or different Plan that would make modifications to the classification of Claims or Equity Interests required by the Bankruptcy Court for confirmation.

The Classes under the AmFin Plan take into account the differing nature and priority of Claims against the Debtors. Section 101(5) of the Bankruptcy Code defines "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured"; or a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured." A "claim" against the Debtors also includes a Claim against the Debtors' property as provided in section 102(2) of the Bankruptcy Code. An "interest" is an equity interest in a debtor.

For the holder of a claim or interest to participate in a reorganization plan and receive the treatment offered to the class in which it is classified, its claim or equity interest must be "Allowed". Under the AmFin Plan, a Claim or Equity Interest that is "Allowed" means a Claim or Equity Interest: (a) proof of which was filed on or before the Bar Date; or (b) that has been or hereafter is scheduled by the Debtors as liquidated in amount and not disputed or contingent and, (c) in either case, as to which no objections to the allowance thereof has been filed within the applicable period of limitation fixed by the Bankruptcy Code, Bankruptcy Rules or an order of the Bankruptcy Court, or as to which any objection has been determined by a Final Order of the Bankruptcy Court allowing such Claim or Equity Interest in whole or in part.

## Treatment of Claims and Equity Interests Under the AmFin Plan

The following describes the AmFin Plan's classification of Claims and Equity Interests and the treatment the holders of Allowed Claims and Allowed Equity Interests would receive under the AmFin Plan. The treatment of Claims set forth below is consistent with the requirements of section 1129(a)(9)(A) of the Bankruptcy Code.

## Unclassified Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, the following Claims are designated as unclassified under Article 3 of the AmFin Plan.

### Administrative Claims

Administrative Claims are generally any Claims that arise after the Filing Date in conjunction with the administration of the Bankruptcy Cases and allowed under section 503(b), section 507(b) or section 546(c)(2) of the Bankruptcy Code and entitled to priority under section 507(a)(1) of the Bankruptcy Code. To the extent that a Claim is Allowed as an Administrative Claim under section 365(d)(3) of the Bankruptcy Code, such Claim will also be treated as an Administrative Claim under the AmFin Plan. Administrative Claims include, for example, quarterly fees to the U.S. Trustee payable under section 1930 of title 28 of the United States Code, Claims for the payment of professional fees, actual and necessary costs and expenses incurred in the ordinary course of AmFin's business or of preserving AmFin's estate, reclamation Claims, and, unless otherwise agreed to by the parties, claims arising under section 365(b)(1).

Each Allowed Administrative Expense Claim will be paid in full by the Reorganized Debtors in the ordinary course of their business, (a) in Cash, on the first Distribution Date, (b) in accordance with the commercial credit terms extended by the creditor of such obligations, (c) on terms agreed by the Debtors and the creditor or (d) otherwise as required by law.

In connection with confirmation of the AmFin Plan, the Debtors will ask the Bankruptcy Court to establish a deadline for the filing of all requests for payment of Administrative Expense Claims. Any request not filed by that deadline will not be eligible to receive payment under the AmFin Plan.

### Professional Fees

This category includes fees and expenses of professionals employed at the expense of the estate of the Debtors (which include professionals employed by the Committee) and entities which may be entitled to an allowance of fees and expenses from the estate of the Debtors pursuant to sections 503(b)(2) through 503(b)(6) of the Bankruptcy Code, to the extent specifically approved by the Bankruptcy Court. Based upon a review of available cost information and historical cost experience, the Debtors estimate that unpaid professional fees for services to the Debtors and the Committee in the Bankruptcy Cases will aggregate approximately $[    ]. As described elsewhere in this Disclosure Statement, Debtors have agreed in connection with the a settlement with holders of Senior Notes (the "Noteholder Settlement") not to object to a request for approval of fees and related expenses of holders of Senior Notes in an aggregate of up to $950,000. For further discussion, See "The Noteholder Settlement" at page 39 hereof. The Debtors cannot predict (a) to what extent the Noteholder fee request may be approved by the Bankruptcy Court, or (b) what other fee requests may be made by other parties in interest.

Professional fees will be paid by the Debtors, in Cash, as soon as practicable after the order approving such allowance of compensation or reimbursement of expenses becomes a Final Order.

As described elsewhere in this Disclosure Statement, the Debtors have agreed in connection with the Noteholder Settlement not to object to any claims filed by (a) the holders of the Senior Notes, or their professionals or (b) the Bank of New York Mellon, as collateral agent

for the Senior Notes, or its professionals, for substantial contribution under section 503(b) of the Bankruptcy Code or otherwise up to an aggregate amount of $950,000.

In connection with confirmation of the AmFin Plan, the Debtors will ask the Bankruptcy Court to establish a deadline for the filing of final fee applications by all professionals seeking payment for fees and expenses of services rendered to the Debtors and the Committee or otherwise seeking compensation from the Debtors' for professional fees and services.

All professional fees for services rendered by the Debtors' professionals in connection with the Bankruptcy Cases and the AmFin Plan after the Confirmation Date including, without limitation, those relating to the occurrence of the Effective Date, the prosecution of causes of action preserved under the AmFin Plan, and the resolution of disputed Claims, are to be paid by the Reorganized Debtors upon receipt of an invoice for such services, or on such other terms as the Reorganized Debtors may agree to, without the need for further Bankruptcy Court authorization or entry of a Final Order. If Reorganized Debtors and any professional cannot agree on the amount of post-Confirmation Date fees and expenses to be paid to such professional, such amount is to be determined by the Bankruptcy Court.

### Priority Tax Claims

Priority Tax Claims of a governmental unit for taxes entitled to priority under sections 502(i) and 507(a)(8) of the Bankruptcy Code. The IRS has filed a Priority Tax Claim for approximately $200 million, based on initial disallowance of certain deductions in tax returns filed by the Debtors for periods prior to the Filing Date. Such deductions are under discussion in ongoing audit proceedings and the Debtors believe that such deductions will ultimately be upheld. The Debtors estimate that Allowed Priority Tax Claims will ultimately be *de minimis* in amount and are unlikely to exceed an aggregate amount of $10,000.

Any Allowed Priority Tax Claim is to be paid in full by the Reorganized Debtors, in Cash, on the Distribution Date or, if the Reorganized Debtors so elect, be paid by the Reorganized Debtors, in Cash, over a period not exceeding six years after the respective dates of assessment of such Claims, in aggregate amounts equal to one hundred percent (100%) of such respective allowed Claims plus interest thereon from the Effective Date, at the Federal Judgment Rate. The Federal Judgment rate is adjusted weekly and, as of [   ], 2011, was [   ]%. The Reorganized Debtors retain the right to prepay any such Allowed Claim, or any remaining balance of such Claim, in full or in part, at any time on or after the Effective Date without premium or penalty.

### Other Priority Claims

These are other Claims of persons entitled to priority under section 507(a) of the Bankruptcy Code. The FDIC has asserted the Capital Maintenance Claim for $765 million, which is disputed by the Debtors, all as described elsewhere in this Disclosure Statement. Aside from the Capital Maintenance Claim, the Debtors estimate that Other Priority Claims, to the extent that they exist, will be *de minimis* in amount and are unlikely to exceed an aggregate amount of $10,000.

Other Allowed Unsecured Claims of the kinds given priority under section 507(a) of the Bankruptcy Code will be paid by the Reorganized Debtors, in Cash, on the Distribution Date or on such later date as they become due and payable in accordance with their respective terms.

As described elsewhere in this Disclosure Statement, the FDIC has filed the FDIC Capital Maintenance Claim in an alleged claim of $765 million and has asserted that the FDIC Capital Maintenance Claim is entitled to priority under section 507(a)(9) of the Bankruptcy Code. The Debtors have disputed the FDIC Capital Maintenance Claim. However, until the FDIC Litigation is finally resolved, the Debtors will be required to maintain a reserve for the asserted FDIC Capital Maintenance Claim. While that reserve is maintained, the Debtors be unable to make creditor distributions to any of the holders of Class 6 Claims (Other Unsecured Claims) under the AmFin Plan. For further discussion of reserves and distributions under the AmFin Plan, See "Plan Reserves" at page 43 hereof.

**Classified Claims and Equity Interests**

The treatment of Claims and Equity Interests and the provisions governing distributions on account of Allowed Claims and Equity Interests is set forth in Articles 4 and 5 of the AmFin Plan. You should refer to the AmFin Plan itself for the complete provisions governing the treatment of your particular Claim or Equity Interest.

### Class 1 - Secured TIF Claims

Class 1 consists of Secured Claims of the holders of TIF Bonds that are secured by valid and unavoidable liens on or security interest in property of the Debtors, to the extent of the value of such lien or security interest.

Class 1 is not impaired by the AmFin Plan; consequently, holders of Allowed Claims in Class 1 are not entitled to vote on the AmFin Plan. The legal, equitable and contractual rights of the holders of the Class 1 Allowed Claims shall remain unaltered by the AmFin Plan.

### Class 2 - Secured Bondholder Claims

Class 2 consists of Secured Claims of the holders of Port Authority Bonds that are secured by valid and unavoidable liens on or security interest in property of the Debtors, to the extent of the value of such lien or security interest.

Class 2 is not impaired by the AmFin Plan; consequently, holders of Allowed Claims in Class 2 are not entitled to vote on the AmFin Plan. On the initial Distribution Date, the Reorganized Debtors shall convey to the trustee for the Port Authority Bonds, in full settlement and satisfaction of all Class 2 Allowed Claims, all the Reorganized Debtors' right, title and interest in the property that is collateral for the Port Authority Bonds

### Class 3 - Other Secured Claims

Class 3 consists of Secured Claims other than those Secured Claims in Class 1 and Class 2. Class 3 is not impaired by the AmFin Plan; consequently, holders of Allowed Claims in Class 3 are not entitled to vote on the AmFin Plan. Each holder of an Allowed Class 3 Secured Claim

is to receive one of the following treatments, at the Debtors' election: (a) the payment of such holder's Allowed Secured Claim in full, in Cash, (b) the sale or disposition proceeds of the collateral securing any Allowed Secured Claim, (c) cure and reinstatement of such holder's Allowed Secured Claim as required by section 1124(2) of the Bankruptcy Code, or (d) the legal, equitable and contractual rights of the holders of the Class 3 Allowed Claims shall remain unaltered by the AmFin Plan as required by section 1124(1) of the Bankruptcy Code.

The Debtors are currently unaware of any creditor whose claim would qualify as a Class 3 Secured Claim.

### Class 4 – Convenience Claims

Class 4 consists of Unsecured Claims that would otherwise be Class 6 Claims but which either (a) are for $25,000 or less or (b) which have been reduced to $25,000 at least ten days prior to the Distribution Date by written election of the holders of such Claims in form and substance satisfactory to the Debtors.

Class 4 is impaired by the AmFin Plan; consequently, all holders of Allowed Class 4 Claims are entitled to vote on the AmFin Plan. Pursuant to the terms of the AmFin Plan, on the first Distribution Date, or as soon thereafter as practicable, each holder of an Allowed Class 4 Claim will be entitled to receive, in full and final satisfaction of such Allowed Class 4 Claim, Cash in the amount of eighty-five percent (85 %) of its respective Class 4 Allowed Claims.

The Debtors estimate that approximately 25 creditors have Claims which are automatically in Class 4 and that such Claims total approximately $80,000. Other holders of Unsecured Claims may voluntarily elect to reduce the amount of their Claims to become eligible for treatment as a Class 4 Claim. Given the difference in treatment between Class 4 Allowed Claims and the recoveries anticipated on Class 6 Other Unsecured Claims, the Debtors believe that it may be economically advantageous for a number of holders of Unsecured Claims to consider electing treatment as a Class 4 Claim. However, the Debtors are unable to predict the number and amount of additional Unsecured Claims whose holders may elect to voluntarily reduce their Claims to $25,000 and become Class 4 Claims.

### Class 5 – Intercompany Claims

Class 5 consists of Unsecured Claims for intercompany liabilities. Class 5 is unimpaired by the AmFin Plan; consequently, all holders of Claims in Class 5 are deemed to have accepted the AmFin Plan and are not entitled to vote on the AmFin Plan. The legal, equitable and contractual rights of the holders of the Class 5 Allowed Claims shall remain unaltered by the AmFin Plan.

The Debtors' Plan treats all Claims on a "substantively consolidated" basis, without regard to the separate legal status of the Debtors and effectively leaving unaffected all Intercompany Claims. If confirmation is granted on that basis, it will be unnecessary to include any Claims in Class 5. Class 5 is preserved to take account of Intercompany Claims in the event that the estates are not substantively consolidated. The Debtors estimate that the aggregate of all Class 5 Allowed Claims is approximately $125 million. However, the Debtors believe that the treatment afforded Intercompany Claims will have no significance for other creditors.

09-21323-pmc    Doc 865    FILED 01/06/11    ENTERED 01/06/11 10:06:44    Page 41 of 68

### Class 6 - Other Unsecured Claims

Class 6 consists of Unsecured Claims that are not Class 4 or Class 5 Claims. Class 6 includes, without limitation, the Unsecured Claims of holders of Senior Notes and Subordinated Notes, as well as the holders of a variety of disputed Claims and miscellaneous Claims. As described elsewhere in the Disclosure Statement, notwithstanding the guaranties and liens granted to the Senior Notes, the AmFin Plan disregards such guaranties and liens and treats the Senior Notes only as unsecured claims. Also as described elsewhere in this Disclosure Statement, the AmFin Plan will give full recognition to the subordination provisions of the Subordinated Notes. As a result, distributions otherwise payable to holders of Allowed Class 6 Claims based on Subordinated Notes will instead be made to the holders of Senior Notes, until the Allowed Class 6 Claims of holders of Senior Notes have been paid in full.

Class 6 is impaired by the AmFin Plan; consequently, all holders of Allowed Class 6 Claims are entitled to vote on the AmFin Plan. Each holder of an Allowed Class 6 Claim will receive, subject to such holder's surrender of any debt instrument(s) evidencing its Allowed Class 6 Claim in accordance with Article 7 of the AmFin Plan, in full and final satisfaction of such Allowed Class 6 Other Unsecured Claim, their Pro Rata portion of amounts distributable by the Reorganized Debtors to holders of Unsecured Claims. Pursuant to the terms of the Noteholder Settlement, as described elsewhere in this Disclosure Statement, (a) distributions to holders of Allowed Class 6 Claims based on Senior Notes may be delayed and (b) distributions to certain holders of Allowed Class 6 Claims may be accelerated, in each case based on the terms of the Noteholder Settlement. For further discussion, see

The Debtors believe that the aggregate of Class 6 Claims is approximately $173 million, including approximately $100 million by the holders of Senior Notes, approximately $53 million by the holders of Subordinated Notes and approximately $20 million in the aggregate for other general unsecured creditors, rejection damages, employee and retiree claims and other not yet liquidated claims. Until litigation on the FDIC Capital Maintenance Claim is finally resolved, the Reorganized Debtors will be unable to make distributions to holders of Allowed Class 6 Claims under the AmFin Plan. For further discussion of reserves and distributions under the AmFin Plan, see "Plan Reserves" at page 43 hereof.

### Class 7 - Equity Interests

Class 7 consists of Equity Interests in the Debtors. The legal, equitable and contractual rights of holders of Class 7 Equity Interests will not be modified or altered by the AmFin Plan. Consequently, all holders of Interests in Class 7 are deemed to have accepted the AmFin Plan and are not entitled to vote on the AmFin Plan.

## Distributions to Creditors

## Treatment of Subordination Rights

Distributions under the AmFin Plan will be made in a manner to give full contractual effect to the subordination provisions of the Subordinated Notes Indenture. Until the Allowed Claims of the holders of Senior Notes have been paid in full, distributions of Available Cash otherwise distributable with respect to the holders of the Subordinated Notes shall instead be

distributed, Pro Rata, on the Allowed Claims of the holders of the Senior Notes. After the Allowed Claims of the holders of Senior Notes have been paid in full, distributions of Available Cash otherwise distributable with respect to the holders of the Senior Notes shall instead be distributed to the Subordinated Notes Trustee on account of the Subordinated Notes.

## Compliance with Tax Requirements

For purposes of distributions on any interest-bearing obligations included as Class 4 Allowed Claims or Class 6 Allowed Claims, distributions under the AmFin Plan will be applied first in payment of the principal portion of such Allowed Claims and, after full payment of such principal portion, then to the portion of such Allowed Claims comprised of any interest accrued but unpaid at the Filing Date.

The Reorganized Debtors will comply with all applicable tax withholding and reporting requirements imposed by any governmental unit, and all distributions pursuant to the AmFin Plan will be subject to such withholding and reporting requirements. Each entity receiving a distribution pursuant to the AmFin Plan will have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on it by any governmental body on account of such distribution.

## Set Offs and Recoupments

The Reorganized Debtors are allowed to set off or recoup, to the extent permitted under applicable law, any claims that the Reorganized Debtors may have against the holder of any Claim, to reduce any payments or other distributions to be made pursuant to the AmFin Plan. However, neither the failure to do so nor the allowance of any Claim hereunder will constitute a waiver or release by the Reorganized Debtors, of any such claim or counterclaim that they may have against such creditor.

## Timing and Manner of Distributions

Payments or distributions under the AmFin Plan will be deemed to be timely made if made within twenty (20) days after the date specified in the AmFin Plan, or as soon thereafter as reasonably practicable. Any distribution to be made on a day other than a Business Day will instead be made on the immediately succeeding Business Day, but will be deemed to have been made on the date due.

Any payment to be made by the Reorganized Debtors may be made either by check drawn on a domestic bank or by wire transfer from a domestic bank. No payments shall be required to be made to a holder of an Allowed Claim unless the amount payable is equal to or greater than Fifty Dollars ($50.00).

Distributions and deliveries to holders of Allowed Claims will be made (a) to the address set forth for such holder in the Debtors' Schedules if no proof of claim has been filed on behalf of such holder, (b) to the address reflected in the proof of claim filed by the holder of an Allowed Claim, or (c) to the address set forth in any written notices of address change delivered after the date of any related proof of claim. If any distribution is returned as undeliverable, no further distributions to the applicable holder will be made unless and until the Reorganized Debtors are

09-21323-pmc    Doc 865    FILED 01/06/11    ENTERED 01/06/11 10:06:44    Page 43 of 68

notified of the holder's then current address, at which time all missed distributions will be made to the holder without interest.

## Uncashed Checks

Distribution checks issued by the Reorganized Debtors will be null and void if not negotiated within 90 days from and after the date of issuance thereof. Requests for reissuance of any check shall be made in writing directly to the Reorganized Debtors. Any claim regarding a voided check must be made before the later of (a) the second anniversary of the Effective Date or (b) 90 days after the date of issuance of such check. Thereafter, all claims in respect of voided checks shall be waived and forever barred and the Reorganized Debtors shall retain all monies related thereto.

## Cancellation and Surrender of Securities and Instruments

As of the Effective Date, all Old Notes, and all agreements, instruments, and other documents evidencing the Old Notes and the rights of the holders of the Old Notes are canceled, extinguished, and deemed void (all without further action by any Person), and all obligations of any Person under such instruments and agreements is deemed fully and finally satisfied and released. All holders of Claims based on Senior Notes shall surrender their respective Senior Notes to the Reorganized Debtors in accordance with the written instructions of the Reorganized Debtors. All holders of Claims based on Subordinated Notes shall surrender their respective Subordinated Notes to the Subordinated Notes Trustee in accordance with the written instructions of the Debtors and such Subordinated Notes Trustee. Upon surrender of such Old Notes, the Reorganized Debtors or the Subordinated Notes Trustee, as applicable, shall (a) cancel such Old Notes and deliver such cancelled Old Notes to the Reorganized Debtors, and (b) the holders of such Allowed Claims shall thereafter be entitled to their Pro Rata share of distributions on account of such Allowed Claim as described in the AmFin Plan. No distribution shall be made to holders of Claims based on Old Notes until such time as such holders shall have surrendered or be deemed to have surrendered their Old Notes in accordance with the AmFin Plan.

Any holder of a Claim based on Old Notes that have been lost, stolen, mutilated or destroyed shall, in lieu of surrendering such Old Notes as provided in the AmFin Plan, deliver to the Reorganized Debtors (a) evidence reasonably satisfactory to the Reorganized Debtors of the loss, theft, mutilation or destruction of such Old Notes and (b) such security or indemnity as may be reasonably required by the Reorganized Debtors to save each of them harmless with respect thereto. Upon compliance by a holder of a Claim based on Old Notes, such holder shall, for all purposes under the AmFin Plan, be deemed to have surrendered its Old Notes.

## Full and Final Satisfaction

In accordance with the AmFin Plan, all payments and all distributions are in full and final satisfaction, settlement, release, and discharge or all Claims, except as otherwise provided in the AmFin Plan.

# IMPLEMENTATION OF THE AMFIN PLAN

## Settlements Incorporated in the AmFin Plan

### The Noteholder Settlement

The AmFin Plan incorporates a proposed compromise and settlement regarding the holders of the Senior Notes Claims. Specifically, the holders of the Senior Notes Claims have agreed to (a) be treated as holders of Unsecured Claims against AFC, (b) have any liens, security interests, mortgages or guaranties granted pursuant to the Senior Notes Agreement be disregarded for all purposes under the AmFin Plan, (c) permit the accelerated payment $1,100,000 to other specified holders of Class 6 Claims, and (d) the substantive consolidation of the Debtors' estates pursuant to the AmFin Plan. In consideration for such agreements by the holders of the Senior Notes Claims, the Debtors have agreed that the Senior Notes Claims shall be deemed Allowed in the aggregate amount of $100,763,414.93 and that the releases of the holders of the Senior Notes set forth in the AmFin Plan are appropriate. In addition, the Debtors have agreed not to object to any claims filed by (i) the holders of the Senior Notes, or their professionals or (ii) the Bank of New York Mellon, as collateral agent for the Senior Notes, or its professionals, for substantial contribution under section 503(b) of the Bankruptcy Code up to an aggregate amount of $950,000.

### The Equity Interests Settlement

The AmFin Plan also incorporates a proposed compromise and settlement regarding Charlotte Goldberg, David Goldberg, Gerald Goldberg, Peter Goldberg, Robert Goldberg and additional holders of Class 7 Interests who elect to join in such settlement. Specifically, those persons, as Settling Interest Holders, agree, until the completion of distributions to creditors under the AmFin Plan (a) not to assert a worthless stock deduction with respect to Interests owned or controlled by them, except as may be expressly approved by prior written action of the Reorganized Debtors, (b) not to sell or otherwise transfer or dispose of any Interests owned or controlled by them, except as may be expressly approved by prior written action of the Reorganized Debtors, and (c) to provide an irrevocable proxy for voting of all Interests owned or controlled by them to a person or persons designated by the Debtors. In consideration for such agreements by such Settling Interest Holders, the Debtors have agreed that (y) on the Effective Date, the Class 6 Claims of such Settling Interest Holders will be deemed Allowed in specified amounts set forth on Exhibit D to the AmFin Plan, and (z) the releases of the Settling Interest Holders set forth in the Plan are appropriate.

### Approval of the Settlements

The entry of the Confirmation Order will constitute the Bankruptcy Court's finding and determination that the settlements reflected in the Plan are (i) in the best interests of the Debtors and their bankruptcy estates, (ii) fair, equitable and reasonable, (iii) made in good faith, (iv) approved by the Bankruptcy Court, and (v) in full satisfaction, settlement, release, and discharge of any rights which might otherwise exist. On the Effective Date the Reorganized Debtors will take all actions necessary or reasonably required to affect the matters and terms set forth in such settlements.

09-21323-pmc    Doc 865    FILED 01/06/11    ENTERED 01/06/11 10:06:44    Page 45 of 68

**Description of Transactions in Connection with the AmFin Plan**

**AFC Articles of Incorporation and Code of Regulations**

As of the Effective Date, the certificate of incorporation and the code of regulations of AFC will be amended and restated substantially in the forms contained as exhibits to the AmFin Plan. Such articles of incorporation and code of regulations will prohibit (to the extent required by section 1123(a) and (b) of the Bankruptcy Code) the issuance of non-voting equity securities. After the Effective Date, AFC may further amend and restate its articles of incorporation and code of regulations as permitted by such documents and applicable state law.

**Initial Board of Directors**

The initial Board of Directors of AFC following the Confirmation Date will consist of the directors designated in the Amended and Restated Articles of AFC attached as an Exhibit to the AmFin Plan and filed with the Bankruptcy Court not less that ten (10) days prior to the Confirmation Hearing. The initial members of the Board of Directors will serve until such directors, or their successors, are elected at a properly noticed and constituted meeting of stockholders of AFC.

**Initial Officers**

As of the date of this Disclosure Statement, Reorganized AFC expects that Ronald L. Glass and Al Presby will continue to serve until the Effective Date as officers of the Debtors, on terms and conditions substantially similar to current terms and conditions of their respective service. After the Effective Date, the Boards of Directors of the Reorganized Debtors may name other or additional officers.

**Corporate Structure**

On the Effective Date of the AmFin Plan, the assets of each of the Debtors' bankruptcy estates will revest in the Reorganized Debtors free and clear of all liens and other encumbrances. Thereafter, the Reorganized Debtors will operate their businesses free of the restrictions contained in the Bankruptcy Code and will implement the terms of the AmFin Plan. The Reorganized Debtors are expected to remain in existence until their assets have been wholly converted to cash or abandoned, and all costs and expenses incurred in administering the AmFin Plan have been fully paid and all remaining proceeds have been distributed in accordance with the AmFin Plan.

On the Effective Date, AIAI will be deemed to be dissolved pursuant to Ohio Revised Code section 1701.86 and the Reorganized Debtors will file certificates with the Ohio Secretary of State and other regulatory authorities evidencing the adoption of appropriate authorizing resolutions and will take any necessary steps to complete such dissolution.

**Chief Restructuring Officer**

Following the Effective Date, the business of the Reorganized Debtors will be managed by a Chief Restructuring Officer designated in the AmFin Plan. The Chief Restructuring Officer

will have responsibility to implement the AmFin Plan, including (a) converting the assets of the Reorganized Debtors into cash and distributing the cash pursuant to the AmFin Plan; (b) objecting to Claims against the Debtors and resolving such objections; (c) pursuing any retained causes of action of the Debtors; (d) employing attorneys, accountants, and other professionals in his or her discretion; and (e) in general, taking all steps necessary to implement the AmFin Plan.

## Description of Other Provisions of the AmFin Plan

### Substantive Consolidation

If the Debtors' estates were not substantively consolidated, it would be necessary for each of the six Debtors to propose and confirm its own plan of reorganization, with each holder of a claim receiving a distribution from the estate of the Debtor or Debtors with whom the holder of the claim did business. In this case, many claims against one or more Debtors were guaranteed by one or more other Debtors. Accounting for the separate claims against guarantors, and especially for the complicated inter-company claims created by guaranty and indemnity claims would be difficult, expensive, and time consuming. Further complicating the process, some of the guaranties in this case are subject to disputes as to enforceability and extent. In addition, intercompany claims unrelated to guaranties significantly complicate the analysis of claims on a non-consolidated basis. The Debtors believe that the delay, expense and difficulty of managing the reorganization and claims process separately for each of the six estates is unwarranted and may be obviated through substantive consolidation.

Substantive consolidation is an equitable remedy which prevents undue expense, difficulty and delay in confirming plans for multiple related debtors with complicated debt structures. The AmFin Plan constitutes a motion for the substantive consolidation of the estates of the six Debtors in this case. Bankruptcy courts have approved motions for substantive consolidation to facilitate or expedite reorganization for related debtors, especially where separate plans of reorganization are not practical. Many courts have held that substantive consolidation is appropriate only when it will avoid some harm or allow the estates to realize some benefit. The Debtors believe that these factors apply here, where substantive consolidation will substantially streamline and expedite the claims process and the plan confirmation process, and will thus meaningfully reduce delay and expense. The Debtors believe that substantive consolidation is particularly appropriate in this case because (i) creditors of AFC typically were aware of the existence of that corporation's subsidiaries when extending credit, and in many cases thus already viewed all Debtors as an integrated business enterprise and calculated their credit risks accordingly; (ii) significant creditors of the Debtors have already sought the benefits of substantive consolidation by obtaining guaranties of the obligations of one Debtor from one or more other Debtors; and (iii) the economic benefit to all creditors of substantive consolidation is likely to substantially outweigh any prejudice to a particular creditor caused by the substantive consolidation of the six estates.

As a result of the substantive consolidation of all Debtors, (a) the Bankruptcy Cases will be deemed to be one consolidated case; (b) all property of any of the Debtors will be deemed to be property of a consolidated entity consisting of all Debtors; (c) all Claims against any Debtor will be deemed to be a Claim against a consolidated entity consisting of all Debtors, and any

proof of claim filed against one or more of Debtors will be deemed to have been filed against the consolidated entity unless otherwise provided in the AmFin Plan; (d) all Equity Interests in any subsidiary Debtor will be left unaffected; (e) all Claims by one of the Debtors against one or more of the other Debtors will be left unaffected; (f) all guarantees by one Debtor in favor of any other Debtors will be eliminated; and (g) for purposes of determining the availability of the right of setoff under section 553 of the Bankruptcy Code, the Debtors will be treated as one entity so that, subject to the other provisions of section 553, debts due to any of the Debtors may be set off against the debts of any of the Debtors. Substantive consolidation will not merge or otherwise affect the separate legal existence of each Debtor for licensing, regulatory or other purposes, other than with respect to distribution rights under this Plan. Moreover, substantive consolidation will have no effect on valid, enforceable and unavoidable liens, except for liens that secure a Claim that is eliminated by virtue of substantive consolidation and liens against collateral that ceases to exist by virtue of substantive consolidation. Furthermore, substantive consolidation will not create a Claim in a class different from the class in which a Claim would have been placed in the absence of substantive consolidation.

**Operations of Reorganized Debtors**

On and after the Effective Date, the Reorganized Debtors will continue to operate their businesses and will implement the terms of the Plan. The Reorganized Debtors are expected to remain in existence until their assets have been wholly converted to Cash, or abandoned, and all costs, expenses, and obligations incurred in administering the Plan have been fully paid and discharged, and all remaining income, proceeds, and products of the assets have been distributed in accordance with the Plan.

**Disputed Claims**

Except as to applications for allowances of compensation and reimbursement of expenses under sections 330 and 503 of the Bankruptcy Code, the Reorganized Debtors have the exclusive right to make and file objections to Administrative Expense Claims, Claims, and Equity Interests after the Confirmation Date. All objections will be litigated to Final Order, provided, however, that the Debtors retain the authority to compromise, settle, otherwise resolve, or withdraw any objections with the approval of the Bankruptcy Court.

Under the AmFin Plan, distributions are made only to holders of Allowed Claims. When a disputed Claim becomes an Allowed Claim, the Reorganized Debtors will distribute to the holder of such Allowed Claim the property to be distributed under the applicable provisions of the AmFin Plan. The AmFin Plan provides that Reorganized AFC, rather than making a partial payment or distribution to a holder of a disputed Claim, will instead hold such payment or distribution until the Bankruptcy Court or other court having appropriate jurisdiction issues a Final Order resolving such dispute.

**Plan Reserves**

Under the AmFin Plan, on each Distribution Date, in calculating amounts available for distributions to holders of Claims under the AmFin Plan, the Reorganized Debtors will retain and set aside in a Reserve Fund an amount in Cash, in one or more accounts maintained by the

Reorganized Debtors, such that the aggregate balance of the Reserve Fund (exclusive of any interest earned thereon) will be sufficient to make all payments and distributions that may be subsequently required by the AmFin Plan, or such lesser amount as may be approved by the Bankruptcy Court from time to time. Cash held by the Reorganized Debtors in the Reserve Fund will be invested in accordance with the requirements contained in the AmFin Plan.

As discussed elsewhere in this Disclosure Statement, by virtue of the amount and asserted priority status of the FDIC Capital Maintenance Claim, all amounts potentially distributable by the Reorganized Debtors will be required to be held in the Reserve Fund until the FDIC Litigation is resolved by Final Order. For further discussion of the FDIC Capital Maintenance Claim, see "Litigation with the FDIC" at page 25 hereof.

In addition to the general Reserve Fund, the Reorganized Debtors will maintain the Tax Refund Account pending determination of the ownership of the 2009 Tax Refund by Final Order. Amounts in the Tax Refund Account will be invested pursuant to the investment guidelines and procedures approved by the Bankruptcy Court.

**Retained Causes of Actions**

Debtors and the Reorganized Debtors are the only parties authorized to object to Claims and Equity Interests. As of the Effective Date, Reorganized Debtors will waive the right to prosecute any preference avoidance actions under section 547 of Bankruptcy Code, other than any such actions that (a) pertain to the avoidance of the liens and guaranties created under the Senior Notes Agreement, (b) pertain to AmTrust Bank or the FDIC, (c) were commenced on or before the Effective Date, or (d) are designated by Debtors as actions to be preserved in a pleading filed with the Bankruptcy Court and served five (5) business days prior to the deadline for casting Ballots to accept or reject the AmFin Plan. In addition to the foregoing, the Reorganized Debtors will retain any such avoidance actions for purposes of asserting the claim or cause of action underlying such avoidance action as a defense or counterclaim to any claim against the Debtors, including pursuant to section 502(d) of the Bankruptcy Code. Unless Debtors consent, or unless otherwise ordered by the Bankruptcy Court, no other party will have the right or obligation to pursue any such actions. Notwithstanding confirmation of the AmFin Plan and except as otherwise provided in the AmFin Plan, all other claims, rights or causes of action in favor of the Debtors will be preserved and maintained for the benefit of the Reorganized Debtors.

**Discharge**

Except as provided in the AmFin Plan or the Confirmation Order, and except for the rights of parties to executory contracts and unexpired leases assumed by the Debtors as provided in the AmFin Plan, the rights afforded under the AmFin Plan and the treatment of Claims and Equity Interests under the AmFin Plan are in exchange for and in complete satisfaction, discharge, and release of, all Claims including any interest accrued on Other Unsecured Claims from the Filing Date and termination of all Equity Interests. Except as provided in the AmFin Plan or the Confirmation Order, and except for the rights of parties to executory contracts and unexpired leases assumed by the Debtors as provided in the AmFin Plan, confirmation of the AmFin Plan (a) discharges the Debtors and Reorganized Debtors from all Claims or other debts

that arose before the Confirmation Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of claim based on such debt is filed or deemed filed under section 501 of the Bankruptcy Code; (ii) a Claim based on such debt is Allowed under section 502 of the Bankruptcy Code; or (iii) the holder of a Claim based on such debt has accepted the AmFin Plan; and (b) terminates all Equity Interests and other rights of Equity Interests in the Debtors except as expressly provided in the AmFin Plan.

**Cramdown**

If any impaired Class entitled to vote does not accept the AmFin Plan by the requisite majorities provided in section 1126(c) or 1126(d) of the Bankruptcy Code as applicable (See "Acceptance or Rejection of the AmFin Plan" above), or if any impaired Class is deemed to have rejected the AmFin Plan, the Debtors reserve the right to undertake to have the Bankruptcy Court confirm the AmFin Plan under section 1129(b) of the Bankruptcy Code (See "ACCEPTANCE AND CONFIRMATION OF THE AMFIN PLAN" below) and to amend the AmFin Plan, in accordance with the applicable provisions of the AmFin Plan governing amendments or modifications, to the extent necessary to obtain entry of the Confirmation Order.

**Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will, under the AmFin Plan, retain such jurisdiction over the Bankruptcy Cases after the Effective Date as is legally permissible including, without limitation, jurisdiction to:

- determine any and all pending applications, adversary proceedings and contested matters;

- determine any and all objections to the allowance of Claims and Equity Interests;

- determine any and all applications for allowance of compensation and reimbursement of expenses;

- determine any and all controversies and disputes arising under or in connection with the AmFin Plan and such other matters as may be provided for in the Confirmation Order;

- effectuate payments under and performance of the provisions of the AmFin Plan;

- enter such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

- determine the Debtors' or the Reorganized Debtors' motion, if any, to modify the AmFin Plan in accordance with section 1127 of the Bankruptcy Code;

- issue such orders in aid of execution of the AmFin Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

- consider any modifications of the AmFin Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the order confirming the AmFin Plan;

- hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the AmFin Plan and any related documents;

- hear and determine any issue for which the AmFin Plan or any related document requires a Final Order of the Bankruptcy Court;

- enter a final decree closing the Bankruptcy Cases; and

- determine any other matter not inconsistent with chapter 11 of the Bankruptcy Code.

**Executory Contracts and Unexpired Leases; Bar Date**

All executory contracts and unexpired leases that exist between a Debtor and any Person that are not expressly rejected by the Debtors pursuant to an order of the Bankruptcy Court entered prior to the Confirmation Date or pursuant to the Confirmation Order will be deemed assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code upon entry of the Confirmation Order.

Entry of the Confirmation Order constitutes: (a) the approval under section 365(a) of the Bankruptcy Code of the assumption of the executory contracts and unexpired leases assumed under the AmFin Plan or otherwise during the Bankruptcy Cases; and (b) the approval under section 365(a) of the Bankruptcy Code of the rejection of the executory contracts and unexpired leases rejected under the AmFin Plan or otherwise during the Bankruptcy Cases.

Exhibit C to the AmFin Plan contains a list of those assumed executory contracts and unexpired leases and the amounts which the Debtors believe are necessary to cure defaults thereunder. Except as set forth on Exhibit C, the Debtors believe that no cure obligation is required for such assumed contracts. Exhibit C to the AmFin Plan also contains a list of those executory contracts and unexpired leases currently identified by Debtors for rejection. It is possible that the Debtors will amend Exhibit C to add additional executory contracts and unexpired leases or to change the treatment of one or more of those now on such list. Any such amendment will be done on notice to parties whose agreements are affected.

The parties to executory contracts and unexpired leases assumed by the Debtors will be entitled to full performance of their agreements subsequent to the confirmation of the AmFin Plan. Such parties will not have any other Claim pertaining to such agreements entitled to treatment under the AmFin Plan. As a result, their ongoing contractual obligations will not be subject to the discharge of Claims contained in the AmFin Plan or to the Releases applicable to holders of Claims under the AmFin Plan. On the Effective Date or as soon thereafter as practicable, the Reorganized Debtors will cure any defaults under any executory contract or unexpired lease assumed under this Plan in accordance with section 365(b) of the Bankruptcy Code.

09-21323-pmc    Doc 865    FILED 01/06/11    ENTERED 01/06/11 10:06:44    Page 51 of 68

Executory contracts and unexpired leases entered into, and other obligations incurred, after the Filing Date by the Debtors, will be performed by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business.

All proofs of claims relating to Claims arising from the rejection of any executory contract or unexpired lease under the AmFin Plan must be filed with the Bankruptcy Court and served on the Reorganized Debtors counsel no later than thirty (30) days after the Confirmation Date. Any such Claim not filed within that time is forever barred. With respect to any executory contract or unexpired lease rejected by the Debtors before the Confirmation Date, the deadline for filing such Claims will be as set forth in the order rejecting such lease or executory contract.

## Indemnification Claims

The obligations of the Debtors to indemnify present or former directors, officers, agents, employees and representatives, pursuant to their certificates of incorporation and bylaws and applicable statutes, in respect of all future actions, suits and proceedings against any of such officers, directors, agents, employees and representatives, based on any act or omission related to service with or for or on behalf of any of the Debtors after the Filing Date, will not, with respect to any such party that is bound by or otherwise agrees to the releases contained in the AmFin Plan, be discharged or impaired by confirmation or consummation of the AmFin Plan but will survive unaffected by the reorganization contemplated by the AmFin Plan and will be performed and honored by the Reorganized Debtors without regard to such confirmation, consummation and reorganization. Such surviving indemnity obligations do not include claims by present or former directors, officers, agents, employees and representatives related to service with or for or on behalf of the AFC or the other Debtors prior the Filing Date.

The governing corporate documents of the Debtors provide for the indemnification of officers and directors in a manner consistent with the applicable state law. Generally, under such governing documents and state law, indemnification is permitted only if the person being indemnified has acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the relevant Debtor. The Debtors are not aware of any claims for indemnification that have been asserted by current or former officers or directors.

Nothing contained in the AmFin Plan adversely affects, impairs or prejudices the rights of any person covered by any applicable directors' and officers' liability insurance policy with respect to such policy or policies.

## Revesting of Assets

Subject to the provisions of the AmFin Plan, the property of the Debtors' estates will vest in the Reorganized Debtors on the Effective Date. As of the Effective Date, all such property is free and clear of all liens, Claims, and Equity Interests, except as otherwise expressly provided in the AmFin Plan. From and after the Effective Date, the Reorganized Debtors may operate or liquidate their business, and may use, acquire, and dispose of their property free of any restrictions of the Bankruptcy Code, including the employment of, and payment to, professionals, except as otherwise provided in the AmFin Plan or the Confirmation Order.

**Post-Confirmation Fees; Final Decree**

The Reorganized Debtors will be responsible for the payment of any post-confirmation fees due to the U.S. Trustee under 28 U.S.C. § 1930(a)(6) and the filing of post-confirmation reports, until a final decree is entered. A final decree will be entered as soon as practicable after distributions have commenced under the AmFin Plan.

## Injunctions and Releases Provided in the AmFin Plan

**Injunction Against Asserting Claims of Debtors**

On and after the Confirmation Date, subject to the Effective Date, all Persons are permanently enjoined by the AmFin Plan from commencing or continuing any action or proceeding regarding any claim, debt, right or cause of action of the Debtors for which the Debtors or Reorganized Debtors retain the sole and exclusive authority to pursue under the AmFin Plan.

**Injunction Against Interference with Plan**

Upon the entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors or principals, are enjoined by the AmFin Plan from taking any actions to interfere with the implementation or consummation of the AmFin Plan.

**Creditor/Equity Interest Holder Releases**

As of the Effective Date, in consideration for the obligations of the Debtors and Reorganized Debtors under the AmFin Plan and other agreements or documents to be entered into or delivered in connection with the AmFin Plan (a) each holder of a Claim that votes in favor of the AmFin Plan and (b) to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, each entity that has held, holds or may hold a Claim or Equity Interest or at any time was a creditor or of equity interest holder of any of the Debtors and that does not vote on the AmFin Plan, is deemed to have accepted the AmFin Plan or votes against the AmFin Plan, will be deemed to forever release, waive and discharge all claims (including derivative claims), obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities (other than the right to enforce the Debtors' or the Reorganized Debtors' obligations under the AmFin Plan and the contracts, instruments, releases, agreements and documents delivered thereunder or contracts assumed by the Debtors in connection therewith). Such release will include all claims, rights and causes of action, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction or other occurrence taking place on or prior to the Effective Date. Such release will extend to all claims, rights and causes of action, in any way relating to a Debtor, the Bankruptcy Cases or the AmFin Plan that such entity has, had or may have against any Debtor, the Committee and its members, the Holders of Senior Notes, the Subordinated Notes Trustee, the Settling Interest Holders and each of their respective present or former directors, officers, employees, attorneys, accountants, underwriters, investment bankers, financial advisors and agents, acting in such capacity. Such release is in

addition to the discharge of Claims provided in the AmFin Plan and under the Confirmation Order and the Bankruptcy Code.

**Debtor Releases**

As of the Effective Date, each of the Debtors, in its corporate capacity and as a debtor-in-possession, will be deemed to forever release, waive and discharge any present or former officer, director or employee of any of the other Debtors, the Committee and its members, the Holders of Senior Notes, the Subordinated Notes Trustee, the Settling Interest Holders and each of their respective present or former directors, officers, employees, attorneys, accountants, underwriters, investment bankers, financial advisors and agents, acting in such capacity, for and from any and all claims (including derivative claims), obligations, suits, judgments, damages, demands, debts, rights, rights of setoff (except as otherwise expressly reserved in the AmFin Plan), Such release will include all claims, rights and causes of action, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date (excluding the right to enforce the terms of the AmFin Plan and the contracts, instruments, releases, agreements and documents delivered thereunder).

**Limitations on Releases**

The creditor releases set forth in the AmFin Plan do not apply to claims (a) based on gross negligence, willful misconduct or fraud, (b) to enforce the terms of the AmFin Plan and the contracts, instruments, releases, agreements and documents delivered thereunder or (c) for breach of fiduciary liability under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq. ("ERISA").

The Debtor releases set forth in the AmFin Plan do not apply to claims (a) based on gross negligence, willful misconduct or fraud, (b) to enforce the terms of the AmFin Plan and the contracts, instruments, releases, agreements and documents delivered thereunder (c) for breach of fiduciary liability under ERISA, (d) for indebtedness of any released party to any of the Debtors for funds advanced to such released party, (e) which are currently asserted in a case or proceeding brought by any Debtors and currently pending against such released party, and (f) which are asserted solely as a set-off or counterclaim with respect to a Claim asserted by such released party, provided that the amount of the set-off or counterclaim that is not released will not exceed the aggregate amount of such released party's asserted Claim against the Debtors.

**Savings Clause**

To the extent that the Bankruptcy Court concludes that the AmFin Plan cannot be confirmed with any portion of the releases provided for therein, then the AmFin Plan is to be confirmed with such portion excised so as to give effect as much as possible to the releases without preventing confirmation of the AmFin Plan.

## General Release of Liens

Except as otherwise provided in the AmFin Plan or in any contract, instrument, indenture, or other agreement or document created in connection with the AmFin Plan, on the Effective Date, all mortgages, deeds of trust, liens, or other security interests against property of the Estate are released and extinguished, and all the right, title, and interest of any holder of such mortgages, deeds of trust, liens, or other security interests will revert to the Reorganized Debtors and their successors and assigns.

## Exculpation

Neither the Debtors, the Committee nor any of their respective directors, officers, employees, attorneys, advisors, affiliates or agents will have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with or arising out of Chapter 11 cases, the negotiation, confirmation or consummation of the AmFin Plan or the administration of the Debtors' estates, the AmFin Plan or property to be distributed under the AmFin Plan, except for willful misconduct or gross negligence, or to enforce the terms of the AmFin Plan and the contracts, instruments, releases, agreements and documents delivered thereunder. Exculpated parties will, in all respects, be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the AmFin Plan.

## Conditions to Confirmation and Effective Date

## Conditions Precedent To Confirmation

The confirmation of the AmFin Plan by the Bankruptcy Court is conditioned upon, (a) the Confirmation Order being entered in form and substance reasonably acceptable to the Debtors and (b) the Tax Refund Account being established pursuant to terms approved by the Bankruptcy Court.

## Conditions Precedent To Effectiveness

The effectiveness of the AmFin Plan is conditioned upon, (a) the Confirmation Order becoming a Final Order, (b) no request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code having been made or, if made, remaining pending, (c) the Debtors retaining sufficient Cash on the Effective Date to make all distributions required on the initial Distribution Date, (d) the Debtors receiving all regulatory approvals and all other material approvals, permits, authorizations, consents, licenses, and agreements from other third parties necessary or appropriate to permit the transactions contemplated by the AmFin Plan and any related agreements and to permit the Reorganized Debtors to carry on their business after the Effective Date, and (e) all other actions and documents necessary to implement the AmFin Plan will have been effected or executed.

## Waiver or Non-Fulfillment of Conditions

The conditions to confirmation and the Effective Date may be waived in whole or in part by the Debtors at any time without further order of the Bankruptcy Court or any further action other than proceeding to confirmation and consummation of the AmFin Plan. The Debtors will

provide notice of the Effective Date of the AmFin Plan in accordance with the Bankruptcy Rules and orders of the Bankruptcy Court.

If each of the conditions to confirmation and the Effective Date have not been satisfied or duly waived by the Debtors within sixty (60) days after the Confirmation Date, the Debtors or any party in interest may request that the order confirming the AmFin Plan may be vacated by the Bankruptcy Court. If the Confirmation Order is vacated, the AmFin Plan will be void and of no effect.

## ACCEPTANCE AND CONFIRMATION OF THE AMFIN PLAN

The following is a brief summary of the provisions of the Bankruptcy Code relevant to acceptance and confirmation of a plan of reorganization. Holders of Claims and Equity Interests are encouraged to review the relevant provisions of the Bankruptcy Code with their own attorneys.

### Acceptance of the AmFin Plan

This Disclosure Statement is provided in connection with the solicitation of acceptances of the AmFin Plan. The Bankruptcy Code defines acceptance of a plan of reorganization by a class of Claims as acceptance by holders of a least two-thirds in dollar amount, and more than one-half in number, of the Allowed Claims of that Class that have actually voted or are deemed to have voted to accept or reject a plan. The Bankruptcy Code defines acceptance of a plan of reorganization by a class of interests as acceptance by at least two-thirds in amount of the allowed interests of that class that have actually voted or are deemed to have voted to accept or reject a plan.

If one or more impaired Classes rejects the AmFin Plan, the Debtors may, in their discretion, nevertheless seek confirmation of the AmFin Plan if the Debtors believe that they will be able to meet the requirements of section 1129(b) of the Bankruptcy Code for confirmation of the AmFin Plan (which are summarized below), despite the lack of acceptance by all Impaired Classes.

### Confirmation

### Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation ("Confirmation Hearing") of a plan. Notice of the Confirmation Hearing regarding the AmFin Plan has been provided to all known holders of Claims and Equity Interests or their respective representatives along with this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to confirmation of the AmFin Plan must be in writing,

must conform with the Bankruptcy Rules and the Local Rules of the Bankruptcy Court, must set forth the name of the objecting party, the nature and amount of Claims or Equity Interests held or asserted by that party against the Debtors' estates or property, and the specific basis for the objection. Such objection must be filed with the Bankruptcy Court, with a copy forwarded directly to the chambers of the Bankruptcy Judge, together with a proof of service, and served on all parties by the date set forth on the notice of the Confirmation Hearing.

**Statutory Requirements for Confirmation of the AmFin Plan**

At the Confirmation Hearing, the Debtors will request that the Bankruptcy Court determine that the AmFin Plan satisfies the requirements of section 1129 of the Bankruptcy Code. If the Bankruptcy Court so determines, the Bankruptcy Court will enter an order confirming the AmFin Plan. The applicable requirements of section 1129 of the Bankruptcy Code are as follows:

(a) The AmFin Plan must comply with the applicable provisions of the Bankruptcy Code;

(b) The Debtors must have complied with the applicable provisions of the Bankruptcy Code;

(c) The AmFin Plan must have been proposed in good faith and not by any means forbidden by law;

(d) Any payment made or promised to be made by the Debtors under the AmFin Plan for services or for costs and expenses in, or in connection with, the Bankruptcy Cases, or in connection with the AmFin Plan, must have been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the AmFin Plan must be reasonable, or if such payment is to be fixed after confirmation of the AmFin Plan, such payment must be subject to the approval of the Bankruptcy Court as reasonable;

(e) The Debtors must have disclosed the identity and affiliates of any individual proposed to serve, after confirmation of the AmFin Plan, as a director, officer, or voting trustee of the Reorganized Debtors under the AmFin Plan. Moreover, the appointment to, or continuance in, such office of such individual, must be consistent with the interests of holders of Claims and Equity Interests and with public policy, and the Debtors must have disclosed the identity of any insider that the Reorganized Debtors will employ or retain, and the nature of any compensation for such insider;

(f) *Best Interests of Creditors Test:* With respect to each Class of Impaired Claims or Equity Interests, either each holder of a Claim or Equity Interest of such Class must have accepted the AmFin Plan, or must receive or retain under the AmFin Plan on account of such Claim or Equity Interest, property of a value, as of the Effective Date of the AmFin Plan, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code. In a chapter 7 liquidation, creditors and equity interest

holders of a debtor are paid from available assets generally in the following order, with no lower class receiving any payments until all amounts due to senior classes have either been paid in full or payment in full is provided for: (i) first to secured creditors (to the extent of the value of their collateral), (ii) next to priority creditors, (iii) next to unsecured creditors, (iv) next to debt expressly subordinated by its terms or by order of the Bankruptcy Court, and (v) last to holders of equity interests. Attached as Exhibit 2 to this Disclosure Statement is a liquidation analysis prepared by the Debtors, which indicates that, in light of the foregoing priority scheme, if the Bankruptcy Cases were converted to cases under chapter 7 of the Bankruptcy Code liquidation, holders of Allowed Claims and Equity Interests would receive less than they will receive under the AmFin Plan;

(g)     Each Class of Claims or Equity Interests must have either accepted the AmFin Plan or not be impaired under the AmFin Plan;

(h)     Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the AmFin Plan provides that Allowed Administrative and Priority Claims (other than Allowed Priority Tax Claims) will be paid in full on the Effective Date and that Allowed Priority Tax Claims will receive on account of such Claims deferred Cash payment, over a period not exceeding six years after the date of assessment of such Claim, of a value, as of the Effective Date, equal to the Allowed amount of such Claim;

(i)     At least one impaired Class of Claim must have accepted the AmFin Plan, determined without including any acceptance of the AmFin Plan by any insider holding a Claim of such Class;

(j)     *Feasibility:* Confirmation of the AmFin Plan must not be likely to be followed by the liquidation, or the need for further financial reorganization of the Debtors or any successor(s) to the Debtors under the AmFin Plan.  Attached as Exhibit 3 to this Disclosure Statement are projections for approximately 60 months following confirmation and a *pro forma* balance sheet as of the Effective Date that demonstrates that, given estimated expenses and income, and taking into account cash reserves, the Reorganized Debtors will be able to satisfy its obligations under the AmFin Plan, as well as its obligations arising in connection with its ongoing business operations.

**Confirmation Without Acceptance by All Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows a Bankruptcy Court to confirm a plan, even if such plan has not been accepted by all impaired classes entitled to vote on such plan, provided that such plan has been accepted by at least one impaired class.  If any impaired class reject or is deemed to have rejected the AmFin Plan, the Debtors reserves the right to seek the application of the requirements set forth in section 1129(b) of the Bankruptcy Code for confirmation of the AmFin Plan despite the lack of acceptance by all impaired classes.

Section 1129(b) of the Bankruptcy Code provides that notwithstanding the failure of an impaired class to accept a plan or reorganization, the plan must be confirmed, on request of the plan proponent, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of impaired claims or equity interests that has not accepted the plan.

The condition that a plan be "fair and equitable" with respect to a rejecting class of secured claims includes the requirements that (a) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan, and (b) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

The condition that a plan be "fair and equitable" with respect to a rejecting class of unsecured claims includes the requirement that either (a) such class receive or retain under the plan property of a value as of the effective date of the plan equal to the allowed amount of such claim or (b) if the class does not receive such amount, no class junior to the non-accepting class will receive a distribution under the plan.

The condition that a plan be "fair and equitable" with respect to a rejecting class of equity interests includes the requirements that either (a) the plan provides that each holder of an equity interest in such class receive or retain under the plan, on account of such equity interest, property of a value, as of the effective date of the plan, equal to the greater of (i) the allowed amount of any fixed liquidation preference to which such holder is entitled, (ii) any fixed redemption price to which such holder is entitled, or (iii) the value of such equity interest, or (b) if the class does not receive such amount, no class of equity interests junior to the rejecting class will receive a distribution under the plan.

## AMFIN PLAN VALUATION AND FEASIBILITY

Section 1129(a)(11) of the Bankruptcy Code requires that, in order for the Court to confirm a plan of reorganization, the Court must determine that the plan is feasible – that is, that confirmation of the plan is not likely to be followed by liquidation or by the need for further financial structuring, unless such is specifically provided for in the plan. For purposes of determining whether the AmFin Plan meets this requirement, the Debtors have analyzed the Reorganized Debtors' future prospects and their ability to meet their obligations under the AmFin Plan.

Included as [Exhibit 3] to this Disclosure Statement are: (a) unaudited pro forma financial information, consisting of an unaudited pro forma consolidated balance sheet and an unaudited pro forma consolidated statement of operations, together with the assumptions related to such pro forma financial information; and (b) unaudited expected financial information, consisting of unaudited expected consolidated balance sheets, unaudited expected consolidated statements of operations, and unaudited expected consolidated statements of cash flows, together with the

assumptions related to such expected financial information. This financial information was prepared by the Debtors and includes projections of the expected results of operations of Reorganized AmFin.

**Based on the projected results of operations, cash flows, and income, the Debtors believe that the AmFin Plan complies with the feasibility standards for confirmation of the AmFin Plan set forth in section 1129(a)(11) of the Bankruptcy Code. The Debtors believe that the assumptions set forth in the various projections are reasonable, that the projections are attainable by the Reorganized Debtors on an operational basis, and that the Reorganized Debtors will have sufficient funds available to meet its obligations under the AmFin Plan.**

THE PROJECTIONS AND ANALYSES CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS, THE REORGANIZED DEBTORS, OR ANY OTHER PERSON, INCLUDING ANY PROFESSIONAL EMPLOYED BY, OR ANY OFFICERS, DIRECTORS, EMPLOYEES, OR OTHER REPRESENTATIVES OF, SUCH PARTIES, THAT ANY PROJECTED RESULTS OF OPERATIONS OR RECOVERIES WILL BE REALIZED. ACTUAL RESULTS ACHIEVED BY THE REORGANIZED DEBTORS MAY VARY MATERIALLY FROM THE PROJECTED RESULTS. HOLDERS OF CLAIMS AND EQUITY INTERESTS MUST MAKE THEIR OWN DETERMINATION AS TO THE REASONABLENESS OF THE ASSUMPTIONS UNDERLYING THE PROJECTIONS IN REACHING THEIR DECISIONS TO ACCEPT OR REJECT THE AMFIN PLAN.

**Key Assumptions Underlying the Projections**

The projections set forth in Exhibit 3 to this Disclosure Statement assume: (a) an Effective Date of the AmFin Plan during [    ], 2011; and (b) from and after the Effective Date, the Reorganized Debtors will operate their businesses in substantially the same manner as immediately before the Effective Date and described in this Disclosure Statement. Any other assumptions underlying particular projections are set forth in Exhibit 3 to this Disclosure Statement.

## OTHER AVAILABLE FINANCIAL INFORMATION

As described elsewhere herein, prior to the Filing Date, AFC and AmTrust Bank were regulated by the OTS and subject to a variety of reporting requirements as a function of such regulation. Certain reports and related financial information is available through the public records maintained by the OTS.

In addition to the foregoing, the Debtors have filed periodic financial reports during the Chapter 11 Cases. Such reports are available for review and copying in the office of the Clerk of the Bankruptcy Court, United States Courthouse, 201 Superior Avenue, Cleveland, Ohio.

## MATERIAL UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS

**IRS CIRCULAR 230 LEGEND.** TO COMPLY WITH U.S. TREASURY REGULATIONS, WE ADVISE YOU THAT ANY U.S. FEDERAL TAX ADVICE INCLUDED IN THIS COMMUNICATION (1) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, TO AVOID ANY U.S. FEDERAL TAX PENALTIES, AND (2) WAS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTION OR MATTER ADDRESSED BY THIS COMMUNICATION. ANY TAXPAYER RECEIVING THIS COMMUNICATION SHOULD SEEK ADVICE FROM AN INDEPENDENT TAX ADVISOR BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES.

The following provides a summary description of certain material federal income tax consequences of the Plan to the Debtors and the holders of Class 4 Claims and Class 6 Claims, which are the only two classes of Allowed Claims that are Impaired. Unless otherwise noted, all claims discussed under this heading "Material United States Federal Income Tax Considerations" are presumed to be "Allowed".

The following discussion of federal income tax consequences is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), regulations promulgated thereunder, judicial decisions, and published administrative rulings and pronouncements of the Internal Revenue Service ("IRS") as in effect on the date hereof. Legislative, judicial, or administrative changes or interpretations enacted or promulgated in the future could alter or modify the analyses and conclusions set forth below.

This discussion does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as governmental entities, foreign entities, nonresident alien individuals, mutual funds, insurance companies, financial institutions, taxpayers using mark-to-market accounting, small business investment companies, regulated investment companies, broker-dealers, tax-exempt organizations, and those taxpayers subject to the alternative minimum tax). Furthermore, estate and gift tax issues are not addressed herein.

No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan and no tax opinion is given by this Disclosure Statement. No rulings or determination letters from the IRS or any other taxing authorities have been obtained or sought with respect to the Plan, and the description below is not binding upon the IRS or such other taxing authorities. With respect to some of the tax consequences discussed herein, the tax law is unclear. Accordingly, it is possible that the IRS may disagree with some of the tax consequences described below, and there can be no certainty that the IRS would not prevail in any challenge it may decide to make in this regard.

FOR THE FOREGOING REASONS, ALL HOLDERS OF ALLOWED CLAIMS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE SPECIFIC TAX CONSEQUENCES (FOREIGN, FEDERAL, STATE, AND LOCAL) OF THE PLAN TO THEM. THE DEBTORS ARE NOT MAKING ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO ANY SPECIFIC HOLDER OF AN ALLOWED CLAIM, NOR ARE THE DEBTORS

RENDERING ANY FORM OF LEGAL OPINION AS TO SUCH TAX CONSEQUENCES.

**Implementation of the Plan.**

Under the Plan, only the Class 4 Claims and Class 6 Claims are Impaired. The holders of Class 1 Claims, Class 2 Claims, Class 3 Claims, Class 5 Claims and Class 7 Equity Interests are not Impaired under the Plan. On and after the Effective Date, the Reorganized Debtors will continue to operate their businesses and will continue to implement the terms of the Plan. The Reorganized Debtors will remain in existence until their assets have been wholly converted to Cash, or abandoned, and all costs, expenses, and obligations incurred in administering the Plan have been fully paid and discharged, and all remaining income and proceeds from the assets have been distributed in accordance with the Plan. The Reorganized Debtors will remain under the jurisdiction of the Bankruptcy Court until the final distribution has been made under the Plan.

**Federal Income Tax Consequences to the Debtors**

**Losses and Loss Carryforwards**

During 2010, AFC made an election to disaffiliate both AmTrust Bank, which had been a wholly owned subsidiary of AFC, and all of the Bank's subsidiaries, from AFC's consolidated tax group. The disaffiliation election was effective immediately before the FDIC took over the Bank on December 4, 2009. One consequence of the disaffiliation election is that AFC generated a worthless stock deduction of approximately $____million, which reflects AFC's adjusted tax basis in the Bank's stock immediately before the disaffiliation election was effective. The law is unclear as to whether this type of loss should be characterized as an ordinary loss or capital loss. **AFC plans to take the position that it is an ordinary loss for federal income tax purposes, but disclose this information on its federal income tax return for the taxable year ending September 30, 2010.** In addition to the loss arising from the disaffiliation election, the AFC consolidated tax group has generated significant operating losses during its taxable year ending September 30, 2010.

**An AFC Ownership Change**

If AFC has experienced or were to experience an ownership change as defined in Section 382 of the Tax Code (an "Ownership Change"), its ability to use its net operating losses and capital losses that were generated prior to the date of the Ownership Change to offset income generated after the date of the Ownership Change could be severely limited. Under Section 382(g)(4)(D) of the Tax Code, if certain AFC shareholders were to declare their Common Stock to be worthless for federal income tax purposes, an Ownership Change may occur. Based upon (a) representations on behalf of AFC shareholders that own more than [70]% of the Common Stock of AFC, and (b) AFC's stock records, the Debtors believe that AFC has not yet experienced an Ownership Change. In addition, in order to avoid an unexpected Ownership Change in the future, a settlement entered into by shareholders that own more than [70]% of the Common Stock of AFC and embodied in the Plan provides that none of such holders will either take a worthless stock deduction with respect to his or her AFC stock for federal income tax purposes or transfer, sell, assign or in any other way dispose of all or any portion of his or her

Common Stock without the approval of the Reorganized Debtors or the Bankruptcy Court.. Accordingly, this discussion of the material U.S. federal income tax considerations of the Plan assumes that AFC has not and will not experience an Ownership Change.

**Cancellation of Indebtedness Income**

Generally, the settlement of a debt obligation for an amount less than the adjusted issue price (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments) gives rise to cancellation of indebtedness income ("COD Income") for the debtor, which must be included in the debtor's gross income for federal income tax purposes. However, COD Income is not recognized by a taxpayer that is a debtor in a title 11 bankruptcy case if the settlement is granted pursuant to a plan of reorganization approved by the bankruptcy court.

If debt is settled in a title 11 bankruptcy case, however, certain tax attributes otherwise available and oftentimes of value to the debtor are reduced by an amount that generally correlates to the COD Income that is not required to be recognized by the debtor for federal income tax purposes. Tax attributes subject to reduction include: (a) net operating losses and loss carryforwards ("NOLs"); (b) most credit carryforwards, including the general business credit and the minimum tax credit; (c) capital losses and capital loss carryforwards; (d) the tax basis of the debtor's depreciable and nondepreciable assets, but not in an amount greater than the excess of the aggregate tax bases of the property held by the debtor immediately after the settlement over the aggregate of the debtor's liabilities immediately after the settlement; (e) passive activity loss and credit carryovers, and (f) foreign tax credit carryforwards. Attribute reduction generally takes place at the beginning of the taxable year following the taxable year in which the settlement occurs.

The Debtors will trigger a relatively insignificant amount of COD Income on the initial Distribution Date when the Class 4 Claims are settled. However, the Debtors will not be required to recognize such COD Income for federal income tax purposes due to the fact that the Debtors are in a title 11 bankruptcy. Rather, the Debtors will be required to reduce their NOLs for federal income tax purposes by the amount of the excluded COD Income.

Upon final liquidation of the Reorganized Debtors, the Reorganized Debtors will likely trigger significant amounts of COD Income. Because the Reorganized Debtors will be under the jurisdiction of the Bankruptcy Court until the final distribution under the Plan has been made, the Reorganized Debtors will not be required to recognize such COD Income for federal income tax purposes. Rather, the Reorganized Debtors will be required to reduce their tax attributes. However, because the tax attribute reduction generally does not take place until the beginning of the taxable year following the taxable year in which the COD Income was triggered (in this case, upon final liquidation of the Reorganized Debtors), the tax attribute reduction will be meaningless.

**Summary of Conclusions**

In sum, based upon the above discussion, conferences with the Debtors' tax preparer and projections provided by the Debtors' financial advisor, the Debtors do not expect to incur any material federal income tax obligations.

## Federal Income Tax Consequences to the Holders of Class 4 Claims

The holders of Class 4 Claims will recognize loss (or gain) equal to the difference between the amount of Cash received under the Plan (other than Cash received in exchange for accrued interest) and such holder's adjusted tax basis in its Class 4 Claim. The gain or loss recognized will be capital or ordinary depending on the manner in which the Class 4 Claim arose against the Debtors. Due to limitations in the Tax Code, a holder of a Class 4 Claim that recognizes a capital loss, may not be able to utilize such capital loss in the taxable year it arises or possibly ever. To the extent that Cash received is allocable to accrued interest that has not already been taken into income by the holder of a Class 4 Claim, such holder may be required to recognize ordinary interest income. (See the discussion of <u>Interest Income</u> below for more information).

## Federal Income Tax Consequences to the Holders of Class 6 Claims

The holders of Class 6 Claims will recognize loss (or gain) equal to the difference between the cumulative distributions of Available Cash received by such holder under the Plan (other than Available Cash received in exchange for accrued interest) and such holder's adjusted tax basis in its Class 6 Claim. The gain or loss recognized will be capital or ordinary depending on the manner in which the Class 6 Claim arose against the Debtors, but will not be recognized by a holder of a Class 6 Claim until the final Distribution Date. Due to limitations in the Tax Code, a holder of a Class 6 Claim that recognizes a capital loss, may not be able to utilize such capital loss in the taxable year it arises or possibly ever. To the extent that Available Cash received is allocable to accrued interest that has not already been taken into income by the holder of a Class 6 Claim, such holder may be required to recognize ordinary interest income. (See the discussion of <u>Interest Income</u> below for more information).

## Interest Income

Under the Plan, the aggregate consideration to be distributed to holders of Class 4 Claims and Class 6 Claims will be treated as first satisfying an amount equal to the stated principal amount of the Allowed Claim and any remaining consideration as satisfying accrued, but unpaid, interest, if any. It is not certain that the allocation described above will be upheld for federal income tax purposes. The IRS could take the position that the consideration received by a holder of a Class 4 Claim or Class 6 Claim should be allocated in some way other than as provided in the Plan. Holders of Class 4 Claims and Class 6 Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan. A holder of a Class 4 Claim or Class 6 Claim that previously included in its federal taxable income accrued by unpaid interest on its Class 4 Claim or Class 6 Claim, as the case may be, may be entitled to recognize a deductible loss to the extent that such interest is not satisfied under the Plan.

## Information Reporting and Backup Withholding

In general, payments or deemed payments made under the Plan to the holders of Allowed Claims will be subject to IRS information reporting requirements, and may also be subject to backup withholding (at a rate of [31%] beginning January 1, 2011). Backup withholding is not

an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of federal income tax by the taxpayer, if the taxpayer files an appropriate refund claim with the IRS.

## RISK FACTORS

The restructuring and orderly disposition of the Debtors assets under the AmFin Plan involves a degree of risk, and this Disclosure Statement and certain of its exhibits contain forward-looking statements that involve risks and uncertainty. The Reorganized Debtors' actual results could differ materially from those anticipated in such forward-looking statements as a result of a variety of factors, including those set forth in the following risk factors and elsewhere in this Disclosure Statement.

**HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSIDER CAREFULLY THE FOLLOWING FACTORS, IN ADDITION TO THE OTHER INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, BEFORE SUBMITTING A VOTE TO ACCEPT OR REJECT THE AMFIN PLAN.**

### Risks Relating to the Reorganized Debtors' Operations

The Debtors caution that there are various important factors that could cause actual events to differ materially from those indicated in the forward-looking statements; accordingly, there can be no assurance that such indicated events will occur. Among such factors are: general economic and business conditions; the ability to maintain sufficient liquidity; availability of qualified personnel; and the outcome of legal matters. By making these forward-looking statements, the Debtors do not undertake to update them in any manner.

### Projected Financial Information

The financial projections annexed as [Exhibit 3] to this Disclosure Statement depend on the validity of the assumptions contained in it and in the AmFin Plan. These projections reflect numerous assumptions, including confirmation of the AmFin Plan, and consummation of the AmFin Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtors, general business and economic conditions, and other matters, many of which are beyond the Reorganized Debtors' control. Those assumptions may prove to be incorrect. In addition, unanticipated events and circumstances occurring after the preparation of the projections may affect the actual financial results ultimately achieved. Although the Debtors believe that the projections are reasonably attainable, variations between the actual financial results and those projected may occur and be material.

### Risks Related to FDIC Litigation

As discussed elsewhere in this Disclosure Statement, distributions to creditors under the AmFin Plan will be dramatically affected by the outcome of (a) the pending litigation on the FDIC Capital Maintenance Claim and (b) litigation regarding the ownership of the Tax Refunds. If the FDIC prevails in its assertion of a priority Claim arising out of the FDIC Capital

Maintenance Claim, the Debtors project that the holders of Allowed Unsecured Claims will receive <u>no</u> distributions under the AmFin Plan. In such event, other than Secured Claims and Claims having higher legal or structural priority than the FDIC Capital Maintenance Claim, the FDIC will be entitled to distribution of the proceeds of all the assets of the Debtors' estates. For further discussion of the FDIC Capital Maintenance Claim, See "Litigation with the FDIC" at page 25 hereof..

If the Debtors prevail in the litigation on the FDIC Capital Maintenance Claim, holders of Allowed Unsecured Claims will be entitled to receive significant distributions under the AmFin Plan. The amount of those distributions will be significantly impacted by the determination of the ownership of the 2009 Tax Refund. For further discussion of the 2009 Tax Refund, See "Significant Assets" at page 17 hereof.

## **Risk Factors Related to Estimates and Assumptions**

As with any plan of reorganization or other financial transaction, there are certain risk factors that must be considered. All risk factors cannot be anticipated, some events will develop in ways that were not foreseen, and many or all of the assumptions that have been used in connection with this Disclosure Statement and the AmFin Plan will not be realized exactly as assumed. Some or all of such variations may be material. While efforts have been made to be reasonable in this regard, there can be no assurance that subsequent events will bear out the analyses set forth in this Disclosure Statement. Holders of Claims and Equity Interests should be aware of some of the principal risks associated with the contemplated reorganization:

- There is a risk that one of more of the required conditions or obligations under the AmFin Plan will not occur, be satisfied or waived, as the case may be, resulting in the inability to confirm the AmFin Plan.

- The total amount of all Claims filed in the Bankruptcy Cases may be materially in excess of the estimated amounts of Allowed Claims assumed in the development of the AmFin Plan and in the valuation estimates provided above. The actual amount of all Allowed Claims in any Class may differ significantly from the estimates provided in this Disclosure Statement. Accordingly, the amount and timing of the distributions that will ultimately be received by any particular holder of an Allowed Claim in any Class may be materially and adversely affected should the estimates be exceeded as to any Class.

- A number of other uncertainties may adversely affect Reorganized AmFin's future operations including, without limitation, economic recession, adverse regulatory agency actions, acts of God, or similar circumstances. Many of these factors will be substantially beyond the Reorganized Debtors' control, and a change in any factor or combination of factors could have a material adverse effect on the Reorganized Debtors' financial condition, cash flows, and results of operations.

## Certain Bankruptcy-Related Considerations

### Risk That the AmFin Plan Will Not Be Confirmed

Although the Debtors believe that the AmFin Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. There can also be no assurance that modifications of the AmFin Plan will not be required for confirmation, that such negotiations would not adversely affect the holders of Allowed Claims and Equity Interests, or that such modifications would not necessitate the re-solicitation of votes.

### Risks Arising Out of Potential For Nonconsensual Confirmation

If any impaired class of claims or equity interests does not accept a plan of reorganization, a bankruptcy court may nevertheless confirm such a plan of reorganization at the proponent's request if at least one impaired class has accepted the plan of reorganization (without including the acceptance of any "insider" in such class) and, as to each impaired class that has not accepted the plan of reorganization, the bankruptcy court determines that the plan of reorganization "does not discriminate unfairly" and is "fair and equitable" with respect to rejecting impaired classes. If any Impaired Class of Claims or Equity Interests fails to accept the AmFin Plan in accordance with section 1129(a)(8) of the Bankruptcy Code, the Debtors reserve the right to request nonconsensual confirmation of the AmFin Plan in accordance with section 1129(b) of the Bankruptcy Code.

## ALTERNATIVES TO THE AMFIN PLAN AND CONSEQUENCES OF REJECTION

Among the possible consequences if the AmFin Plan is rejected or if the Bankruptcy Court refuses to confirm the AmFin Plan are the following: (a) an alternative plan could be proposed or confirmed; or (b) the Bankruptcy Cases could be converted to a liquidation case under chapter 7 of the Bankruptcy Code.

### Alternative Plans

As previously mentioned, with respect to an alternative plan, the Debtors and their professional advisors have explored various alternative scenarios and believe that the AmFin Plan enables the holders of Claims and Equity Interests to realize the maximum recovery under the circumstances. The Debtors believes that the AmFin Plan is the best plan that can be proposed and served the best interests of the Debtors and other parties in interest.

### Chapter 7 Liquidation

A discussion of a chapter 7 liquidation is included in the analysis of the so-called "best interests" test in "Statutory Requirements for Confirmation of the AmFin Plan" at page 51 hereof. Exhibit 2 to this Disclosure Statement is a liquidation analysis of the Debtors prepared for purposes of the AmFin Plan.

## RECOMMENDATIONS AND CONCLUSION

The Debtors and their professional advisors have analyzed different scenarios and believe that the AmFin Plan will provide for a larger distribution to holders of Claims and Equity Interests than would otherwise result if another alternative restructuring plan were proposed or the Debtors' assets were liquidated.  In addition, any alternative other than confirmation of the AmFin Plan could result in extensive delays and increased administrative expenses resulting in potentially smaller distributions to the holders of Claims and Equity Interests.  Accordingly, the Debtors recommend confirmation of the AmFin Plan and urges all holders of Impaired Claims to vote to accept the AmFin Plan and to indicate acceptance of the AmFin Plan by returning their signed Ballots so as to be received by no later than the Voting Deadline.

Date:   Cleveland, Ohio
January 5, 2011

**AMFIN FINANCIAL CORPORATION, INC., et al**

By: _/s/ Ronald Glass_
      Ronald Glass
      Chief Restructuring Officer

**SQUIRE, SANDERS & DEMPSEY L.L.P.**

4900 Key Tower
127 Public Square
Cleveland, Ohio  44114-1304
(216) 479-8500

By: _/s/ G. Christopher Meyer_
      G. Christopher Meyer
      Sherri L. Dahl
      Peter R. Morrison

      and

221 E. Fourth Street
Suite 2900
Cincinnati, OH 45202-4036
(513) 361-1200
      Stephen D. Lerner

Counsel to Debtors