**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| In re | Chapter 11 |
| AMFIN FINANCIAL CORPORATION., *et al.,* | Case No. 09-21323 |
| Debtors. | (Jointly Administered) |
| | Judge Pat E. Morgenstern-Clarren |

**AMENDED JOINT PLAN OF REORGANIZATION**

AFC and its affiliated debtor subsidiaries,[1] debtors and debtors in possession, hereby jointly propose the following Plan for the resolution of the outstanding Claims against and Equity Interests in the Debtors pursuant to section 1121 of the Bankruptcy Code. Each of the Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

**ARTICLE 1**
**DEFINITIONS**

1.01    Terms Defined in the Plan. Capitalized terms used in the Plan shall have the respective meanings specified in Exhibit A to the Plan.

1.02    Terms Defined in the Bankruptcy Code. Capitalized terms used in the Plan which are not defined in Exhibit A to the Plan but which are defined in the Bankruptcy Code shall have the respective meanings specified in the Bankruptcy Code.

---

[1] The affiliated debtor subsidiaries are AmTrust Real Estate Investments, Inc. nka AmFin Real Estate Investments, Inc., (Case No. 09-21328), AmTrust Insurance Agency, Inc. nka AmFin Insurance Agency, Inc. (Case No. 09-21325), AmTrust Investments Inc. nka AmFin Investments Inc. (Case No. 09-21331), AmTrust Properties Inc. nka AmFin Properties Inc. (Case No. 09-21329) and AmTrust Management Inc. nka AmFin Management Inc. (Case No. 09-21332).

1.03    Rules of Interpretation.    For purposes of the Plan: (i) whenever it appears appropriate from the context, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (ii) any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means such document substantially in such form or substantially on such terms and conditions; (iii) any reference in the Plan to an existing document or exhibit means such document or exhibit, as it may have been or may be amended, modified or supplemented; (iv) the words "herein," "hereof," "hereto," "hereunder" and others of similar import refer to the Plan in its entirety rather than to only a particular portion of the Plan; and (v) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply, except to the extent inconsistent with the express provisions of this Section 1.03 of the Plan.

1.04    Exhibits.  Exhibits to the Plan may be amended from time to time, and both original and amended Exhibits may be filed with the Bankruptcy Court from time to time, but in no event later than five (5) Business Days before the date set for the hearing on the confirmation of the Plan or such other date as may be authorized by the Bankruptcy Court.  Current copies of Exhibits may be obtained by reference to the Bankruptcy Court's files or shall be provided to parties in interest upon written request to the Debtors.

1.05    Time Periods.  Except as specifically provided in the Plan, Bankruptcy Rule 9006(a) applies to the computation of any period of time prescribed or allowed by the Plan, and Bankruptcy Rules 9006(b) and 9006(c) apply respectively to the enlargement or reduction of any period of time prescribed or allowed by the Plan.

1.06    Governing Law.  Except to the extent that the Bankruptcy Code or Bankruptcy Rules are applicable, and subject to the provisions of a contract, instrument, release, or other agreement or document entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and constructed and enforced in accordance with, the laws of the State of Ohio, without giving effect to the principles of conflicts of law thereof.

# ARTICLE 2
# PAYMENT OF ADMINISTRATIVE EXPENSES, TAX CLAIMS AND CERTAIN UNCLASSIFIED CLAIMS

2.01    Administrative Expenses. Except as otherwise provided in Section 2.02 of the Plan, and except for the FDIC Capital Claims, administrative expenses of the kind specified in Section 507(a)(2) of the Bankruptcy Code, including obligations for goods and services arising after commencement of the Bankruptcy Cases in the ordinary course of the Debtors' business, shall be paid by the Reorganized Debtors in the ordinary course of their business, (i) in Cash, on the initial Distribution Date, (ii) in accordance with the commercial credit terms extended by the creditor of such obligations, (iii) upon such terms as may be agreed between the Reorganized Debtors and the holder of such administrative expense or (iv) otherwise as required by law.

2.02    Fees of Professionals.  Professionals employed at the expense of the estate of the Debtors and entities which may be entitled to an allowance of fees and expenses from the estate of the Debtors incurred prior to the Confirmation Date pursuant to sections 503(b)(2) through

503(b)(6) of the Bankruptcy Code shall be paid by the Reorganized Debtors, in Cash, as soon as practicable after the order approving such allowance of compensation or reimbursement of expenses becomes a Final Order. All professional fees for services rendered by the Debtors' professionals in connection with the Bankruptcy Cases and the Plan after the Confirmation Date including, without limitation, those relating to the occurrence of the Effective Date, the prosecution of causes of action preserved under the Plan, and the resolution of disputed Claims, are to be paid by the Reorganized Debtors upon receipt of an invoice for such services, or on such other terms as the Reorganized Debtors may agree to, without the need for further Bankruptcy Court authorization or entry of a Final Order. If the Reorganized Debtors and any professional cannot agree on the amount of post-Confirmation Date fees and expenses to be paid to such professional, such amount is to be determined by the Bankruptcy Court.

2.03 <u>Tax Claims</u>. Each holder of an Allowed Priority Tax Claim, except to the extent that a holder of such Claim and the applicable Reorganized Debtor agree to a different treatment, shall receive, in full satisfaction of such Claim, payment in Cash of the amount of such Allowed Claim over a period not exceeding five (5) years after the Filing Date, with interest at a rate equal to the Federal Judgment Rate as of the Confirmation Date, in periodic payments having a value, as of the Effective Date, equal to the amount of such Allowed Priority Tax Claim; *provided, however,* that Reorganized Debtors retain the right to prepay any such Allowed Claim, or any remaining balance of such Allowed Claim, in full or in part, at any time on or after the Effective Date without premium or penalty.

2.04 <u>Other Priority Claims</u>. Except as otherwise provided in this ARTICLE 2 of the Plan, and except for the FDIC Capital Claims, Allowed Unsecured Claims of the kinds specified in section 507(a) of the Bankruptcy Code shall be paid by the Reorganized Debtors, in Cash, on the initial Distribution Date or on such later date as they become due and payable in accordance with their respective terms.

## ARTICLE 3
## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

3.01 <u>Secured Claims</u>. Secured Claims shall comprise the following Classes:

(a) <u>Secured TIF Claims</u>. Class 1 shall consist of Secured Claims of the holders of the TIF Bonds, including without limitation all rights of such holders in the premises covered by the Garage Lease, which Claim shall be treated for all purposes under the Plan as a Secured Claim, to the extent provided in section 506 of the Bankruptcy Code.

(b) <u>Secured Bondholder Claims</u>. Class 2 shall consist of the Secured Claims of holders of the Port Authority Bonds.

(c) <u>Other Secured Claims</u>. Class 3 shall consist of Secured Claims other than Secured Claims treated under ARTICLE 2 of the Plan and those Secured Claims in Class 1 and Class 2.

09-21323-pmc    Doc 1014    FILED 05/20/11    ENTERED 05/20/11 14:42:20    Page 3 of 39

3.02    <u>Unsecured Claims</u>.  Unsecured Claims shall comprise the following Classes**:**

(a)    <u>FDIC Capital Claims</u>.  Class 4 shall consist of Unsecured Claims that are FDIC Capital Claims.

(b)    <u>Convenience Claims</u>.  Class 5 shall consist of Unsecured Claims that are Convenience Claims.

(c)    <u>Unsecured Bondholder Claims</u>.  Class 6 shall consist of Unsecured Claims of holders of Port Authority Bonds.

(d)    <u>Intercompany Claims</u>.  Class 7 shall consist of Unsecured Claims that are Intercompany Claims.

(e)    <u>Other Unsecured Claims</u>.  Class 8 shall consist of Unsecured Claims other than Unsecured Claims in Class 5, Class 6 and Class 7 and including, without limitation, the Senior Notes Claims and the Subordinated Notes Claims.

3.03    <u>Equity Interests</u>.  Class 9 shall consist of Equity Interests.

## ARTICLE 4
## TREATMENT OF CLASSES
## OF CLAIMS AND EQUITY INTERESTS

4.01    <u>Treatment of Secured TIF Claims</u>.  Class 1 Claims are not  Impaired.  The legal, equitable and contractual rights of such holder's Class 1 Allowed Claim shall remain unaltered by the Plan.

4.02    <u>Treatment of Secured Bondholder Claims</u>.  Class 2 Claims are not  Impaired.  On the initial Distribution Date and subject to prior Order of the Bankruptcy Court, the Reorganized Debtors shall convey the Port Authority Bonds Trustee, or its assignee, in full settlement and satisfaction of all Class 2 Allowed Claims, all the Reorganized Debtors' right, title and interest in the property comprising collateral for the Port Authority Bonds.

4.03    <u>Treatment of Other Secured Claims</u>.  Class 3 Claims are not Impaired. Each holder of a Class 3 Claim shall be treated as though it comprised a separate Class hereunder.  In full settlement, release and discharge of all Class 3 Claims, each holder of a Class 3 Allowed Claim shall receive, on the initial Distribution Date, one of the following treatments: (i) the payment to such holder of sale or disposition proceeds of the property securing such holder's Class 3 Allowed Claim to the extent of the value of its interest in such property, (ii) the cure and reinstatement of such holder's Class 3 Allowed Claim as provided in section 1124(2) of the Bankruptcy Code or (iii) the legal, equitable and contractual rights of such holder's Class 3 Allowed Claims shall remain unaltered by the Plan.  The particular manner and treatment of each Class 3 Allowed Claim shall be determined by the Debtors and transmitted, in writing, to each holder of a Class 3 Allowed Claim on or prior to the commencement of the hearing on confirmation of the Plan.

09-21323-pmc    Doc 1014    FILED 05/20/11    ENTERED 05/20/11 14:42:20    Page 4 of 39

4.04    Treatment of FDIC Capital Claims.  Class 4 Claims are not Impaired.  The FDIC, as the holder of any Class 4 Allowed Claim, shall retain, unaltered, the legal, equitable and contractual rights of such Class 4 Allowed Claim.

4.05    Treatment of Convenience Claims.  Class 5 Claims are not Impaired. In full settlement, release and discharge of all Class 5 Claims, each holder of a Class 5 Allowed Claim shall receive, on the initial Distribution Date, Cash in the amount of one hundred percent (100%) of such holder's Class 5 Allowed Claim.

4.06    Treatment of Unsecured Bondholder Claims.  Class 6 Claims are Impaired. Each Bondholder Claim shall be treated for purposes of all reserves or distributions under the Plan as having a Claim or Allowed Claim equal to one hundred three percent (103%) of the pre-adjusted amount of such Bondholder Claim.  In full settlement, release and discharge of all Class 6 Claims, each holder of a Class 6 Allowed Claim shall receive, on each Distribution Date, its Pro Rata share of Available Cash, based on its adjusted claim amount, until its Class 6 Allowed Claim is paid in full.

4.07    Treatment of Intercompany Claims.  Class 7 Claims are not Impaired. The holders of Class 7 Allowed Claims shall retain, unaltered, the legal, equitable and contractual rights of their respective Class 7 Allowed Claims.

4.08    Treatment of Other Unsecured Claims.

(a)    Class 8 Claims are Impaired. In full settlement, release and discharge of all Class 8 Claims, and subject to subsection 4.08**Error! Reference source not found.**, each holder of a Class 8 Allowed Claim shall receive, on each Distribution Date, its Pro Rata share of Available Cash, until its Class 8 Allowed Claims is paid in full.

(b)    On the Effective Date, the Senior Note Claims shall be deemed Allowed in the aggregate amount of $100,763,414.93.  Notwithstanding the provisions of the Senior Notes Agreement, the Senior Notes Claims shall be treated for all purposes related to the Plan as Unsecured Claims against AFC only.  Any liens or guaranties granted pursuant to the Senior Notes Agreement shall be deemed avoided and shall be disregarded for all purposes under the Plan.

(c)    On the Effective Date, the Subordinated Note Claim shall be deemed Allowed in the aggregate amount of $53,628,210.13.

4.09    Treatment of Equity Interests.  Class 9 Equity Interests are not Impaired. The holders of Class 9 Allowed Equity Interests shall retain, unaltered, the legal, equitable and contractual rights of their respective Class 9 Equity Interests.

4.10    Subordination Rights.  Notwithstanding the provisions of Section 4.08 of the Plan, distributions under the Plan shall be made in a manner to give full contractual effect to the subordination provisions of the Subordinated Notes Indenture.  Without limiting the generality of the foregoing, (i) until Allowed Senior Notes Claims have been paid in full, all distributions of Available Cash that would otherwise be distributed with respect to the Subordinated Notes Claims shall instead be distributed to the holders of Allowed Senior Notes Claims, pro rata in proportion

09-21323-pmc    Doc 1014    FILED 05/20/11    ENTERED 05/20/11 14:42:20    Page 5 of 39

to their respective Allowed Senior Notes Claims, and (ii) after the Allowed Senior Notes Claims have been paid in full, all distributions of Available Cash that would otherwise be distributed with respect to the Allowed Senior Notes Claims shall instead be distributed to the Subordinated Notes Trustee on account of the Allowed Subordinated Notes Claims, until the Allowed Subordinated Notes Claims have been paid in full.

4.11    <u>Compliance with Tax Requirements</u>.  For purposes of distributions on any interest-bearing obligations included as Class 5 Allowed Claims or Class 8 Allowed Claims, distributions under the Plan shall be applied first in payment of the principal portion of such Allowed Claims and, after full payment of such principal portion, then to the portion of such Allowed Claims comprised of any interest accrued but unpaid at the Filing Date.  In connection with this Plan, to the extent applicable, the Reorganized Debtors will comply with all tax withholding and reporting requirements imposed by any governmental unit, and all distributions pursuant to this Plan will be subject to such withholding and reporting requirements. Notwithstanding any other provision of this Plan, each entity receiving a distribution pursuant to this Plan will have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on it by any governmental unit on account of such distribution, including income, withholding, and other tax obligations.

4.12    <u>Set Offs and Recoupments</u>.  Except to the extent a Claim has been previously Allowed or is Allowed by the Plan, the Reorganized Debtors may, but shall not be required to, set off or recoup against any Claim and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever which the Reorganized Debtors may have against the holder of such Claim to the extent such claims may be set off or recouped under applicable law, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors, of any such claim or counterclaim that they may have against such holder.

4.13    <u>Timing of Payments and Distributions</u>.  Any payments or distributions to be made under the Plan shall be deemed to be timely made if made within twenty (20) days after the date specified in the Plan, or as soon thereafter as reasonably practicable.  Whenever any distribution to be made under the Plan shall be due on a day other than a Business Day, such distribution shall instead be made, without interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due.

4.14    <u>Manner of Payments</u>.  Unless the person or entity receiving a payment agrees otherwise, any payment of Cash to be made by the Reorganized Debtors shall be made, at the election of the Reorganized Debtors, by check drawn on a domestic bank or by electronic or wire transfer from a domestic bank; <u>provided</u>, <u>however</u>, that no Cash payments shall be required to be made to a holder of an Allowed Claim unless the amount payable thereto is equal to or greater than Fifty Dollars ($50.00).

4.15    <u>Delivery of Distributions</u>.  Subject to the provisions of Section 4.10 of the Plan, distributions and deliveries to each holder of an Allowed Claim will be made (a) at the address set forth for such holder in the Debtors' Schedules if no proof of claim has been filed on behalf of such holder (b) at the address reflected in the proof of claim filed by the holder of an Allowed Claim, or (c) at the address set forth in any written notices of address change delivered after the date of any

related proof of claim. If any distribution is returned as undeliverable, no further distributions to the applicable holder will be made unless and until the Reorganized Debtors are notified of the holder's then current address, at which time all missed distributions will be made to the holder without interest.

4.16    <u>Aggregation of Claims Based on Old Notes</u>.  For purposes of classification of Claims under the Plan, the Old Notes beneficially owned by any entity shall be aggregated with the Old Notes beneficially owned by all affiliates of such entity.

4.17    <u>Uncashed Checks</u>.  Checks issued by the Reorganized Debtors on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof.  Requests for reissuance of any check shall be made in writing directly to the Reorganized Debtors by the holder of the Allowed Claim with respect to which such check originally was issued.  Any claim in respect of such a voided check shall be made on or before the later of (i) the second anniversary of the Effective Date or (ii) ninety (90) days after the date of issuance of such check.  After such date, all claims in respect of voided checks shall be discharged and forever barred and the Reorganized Debtors shall retain all monies related thereto.

4.18    <u>Impaired Classes to Vote</u>.  Each holder of a Claim or Equity Interest in an impaired Class, not otherwise deemed to have rejected the Plan shall be entitled to vote, separately to accept or reject the Plan.  In the event of a controversy as to whether any Class of Claims or Equity Interests is impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy.

4.19    <u>Cram-Down</u>.  If any Impaired Class fails to accept the plan by the requisite statutory majorities, the Debtors reserve the right to confirm the Plan by a "cram-down" of such non-accepting Class pursuant to section 1129(b) of the Bankruptcy Code.  In the event the Bankruptcy Court declines to impose a "cram-down" on a non-accepting Class unless certain modifications are made to the terms and conditions of such Class's treatment under the Plan, the Debtors reserve the right, without re-solicitation to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules, to propose any such modifications and to confirm the Plan as modified by the required modification.

## ARTICLE 5
## IMPLEMENTATION OF THE PLAN

5.01    <u>Senior Notes Compromise and Settlement</u>.  Pursuant to Bankruptcy Rule 9019, the Plan incorporates a compromise and settlement regarding the holders of the Senior Notes Claims. Specifically, the holders of the Senior Notes Claims have agreed to (i) be treated as holders of Unsecured Claims against AFC only, (ii) have any liens, security interests, mortgages or guaranties granted pursuant to the Senior Notes Agreement be disregarded for all purposes under the Plan, and (iii) the substantive consolidation of the Debtors' estates pursuant to Section 5.05 of the Plan.  In consideration for such agreements by the holders of the Senior Notes Claims, the Debtors have agreed (1) that on the Effective Date, the Senior Notes Claims shall be deemed Allowed in the aggregate amount of $100,763,414.93, and (2) not to object to any claims filed by (a) the holders of the Senior Notes, or their professionals or (b) the Bank of New York Mellon, as

collateral agent for the Senior Notes, or its professionals, for substantial contribution under section 503(b) of the Bankruptcy Code or otherwise up to an aggregate amount of $950,000.

5.02    Port Authority Bonds Settlement.  Pursuant to Bankruptcy Rule 9019, the Plan incorporates a compromise and settlement regarding the holders of Port Authority Bonds. Specifically, the holders of the Port Authority Bonds have agreed to (i) have their Unsecured Claims treated as Class 6 Claims under the Plan and (ii) the substantive consolidation of the Debtors' estates pursuant to Section 5.05 of the Plan.  In consideration for such agreements by the holders of the Port Authority Bonds, the Debtors have agreed (a) to waive any claim for recovery of costs or expenses pursuant to section 506(c) of the Bankruptcy Code with respect to the Port Authority Bonds and (b) that Class 6 Allowed Claims will receive Pro Rata distributions based on a Claim amount adjusted as provided in Section 4.06 of the Plan.

5.03    Equity Interests Compromise and Settlement.  Pursuant to Bankruptcy Rule 9019, the Plan incorporates a proposed compromise and settlement regarding certain holders of Interests. Specifically, the Settling Interest Holders have agreed, until the completion of distributions to creditors under the Plan (i) not to assert a worthless stock deduction with respect to Interests owned or controlled by them, except as may be expressly approved by prior written action of the Reorganized Debtors, (ii) not to sell or otherwise transfer or dispose of any Interests owned or controlled by them, except as may be expressly approved by prior written action of the Reorganized Debtors, and (iii) to provide an irrevocable proxy for voting of all Interests owned or controlled by them to the person or persons designated by the Debtors.  In consideration for such agreements by the Settling Interest Holders, the Debtors have agreed (1) that on the Effective Date, the Claims of certain Settling Interest Holders shall be deemed Allowed in the respective amounts set forth on Exhibit B, and (2) that the release of the holders of Interests set forth in ARTICLE 13 of the Plan is appropriate.

5.04    Approval of Settlements.  The Plan and the distributions set forth in the Plan incorporate the terms of a compromise and settlement pursuant to Bankruptcy Rule 9019 with respect to claims of the Debtors and their bankruptcy estates against various parties in interest, including those compromises and settlements set forth in Sections 5.01, 5.02 and 5.03 of the Plan. The entry of the Confirmation Order shall constitute the Bankruptcy Court's finding and determination that the settlements reflected in the Plan are (i) in the best interests of the Debtors and their bankruptcy estates, (ii) fair, equitable and reasonable, (iii) made in good faith, (iv) approved by the Bankruptcy Court, and (v) *inter alia,* in full satisfaction, settlement, release, and discharge of any rights which might otherwise exist.  Subject to obtaining the approval of the settlements reflected in this Plan by the Bankruptcy Court, on the Effective Date the Reorganized Debtors will take all actions necessary or reasonably required to affect the matters and terms set forth in such settlements.

5.05    Substantive Consolidation.  The Plan shall be implemented through a substantive consolidation of the assets and liabilities of the Debtors. The Confirmation Order shall contain findings and conclusions providing for substantive consolidation for purposes of distribution on the terms set forth in this Section 5.05 of the Plan.  The substantive consolidation of the assets and liabilities and properties of the Debtors shall have the effects set forth in this Section 5.05 of the Plan.

(a)     The Bankruptcy Cases shall be consolidated into the case of AFC as a single consolidated case.  All property of the estate of each Debtor shall be deemed to be property of the consolidated estates.

(b)     All Claims against each Debtor's estate shall be deemed to be Claims against the consolidated estates, all proofs of claim filed against one or more of Debtors shall be deemed to be a single claim filed against the consolidated estates, and all duplicate proofs of claim for the same claim filed against more than one Debtor shall be deemed expunged.

(c)     No distributions under the Plan shall be made on account of Intercompany Claims and such Intercompany Claims shall not be treated or affected by the Plan.

(d)     All equity interests owned by one Debtor in another Debtor or in an affiliate shall remain outstanding after the Confirmation Date and shall not be affected by the Plan.

(e)     Except as specifically provided herein, all guarantees by one Debtor in favor of any other Debtors shall be eliminated, and no distributions under this Plan shall be made on account of Claims based upon such guarantees.

(f)     For purposes of determining the availability of the right of setoff under section 553 of the Bankruptcy Code, Debtors shall be treated as one consolidated entity so that, subject to the other provisions of section 553, debts due to any Debtor may be set off against the debts of any other Debtor.

(g)     Except as provided in Section 5.06 of the Plan, substantive consolidation shall not merge or otherwise affect the separate legal existence of each Debtor for licensing, regulatory or other purposes, other than with respect to distribution rights under this Plan.

(h)     Substantive consolidation shall have no effect on valid, enforceable and unavoidable liens, except for liens that secure a Claim that is eliminated by virtue of substantive consolidation and liens against collateral that are extinguished by virtue of substantive consolidation.

(i)     Substantive consolidation shall not have the effect of creating a Claim in a Class different from the Class in which a Claim would have been placed in the absence of substantive consolidation.

(j)     Substantive consolidation shall not affect any applicable date(s) for purposes of pursuing any avoidance actions or other actions reserved to the Debtors pursuant to Section 5.12 of the Plan.

(k)     Substantive consolidation shall not affect provisions in the Plan, if any, which provide that specific entities comprising the Debtors shall be liable on specific obligations under the Plan.

5.06    <u>Dissolution of Specified Affiliates</u>.  On the Effective Date, AIAI and AISI shall be deemed to be dissolved pursuant to Ohio Revised Code section 1701.86 and the Reorganized

Debtors shall file certificates with the Ohio Secretary of State and other regulatory authorities evidencing the adoption of appropriate authorizing resolutions and shall take any necessary steps to complete such dissolution.

5.07    Vesting of Assets.  Except as otherwise provided in the Plan, on the Effective Date the assets of each of the Debtors' bankruptcy estates shall vest in the respective Reorganized Debtors free and clear of all liens and other encumbrances.  After the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of their assets, free of any restrictions contained in the Bankruptcy Code; *provided, however,* that the corporate purpose of the Reorganized Debtors shall be limited to taking such actions as are necessary to implement, and are consistent with implementing, the Plan.

5.08    Operations of Reorganized Debtors.   On and after the Effective Date, the Reorganized Debtors will continue to operate their businesses and will implement the terms of the Plan. The Reorganized Debtors are expected to remain in existence until their assets have been wholly converted to Cash, or abandoned, and all costs, expenses, and obligations incurred in administering the Plan have been fully paid and discharged, and all remaining income, proceeds, and products of the assets have been distributed in accordance with the Plan.

5.09    Chief Restructuring Officer.    The Debtors, following consultation with representatives of the creditors, have designated Ronald L. Glass as Chief Restructuring Officer. The Chief Restructuring Officer will serve pursuant to the terms of an Agreement with the Reorganized Debtors substantially in the form attached to this Plan as Exhibit C.  The Chief Restructuring Officer will serve pursuant to the terms of that Agreement, as it may be modified from time to time, until the assets of the Reorganized Debtors have been wholly converted to Cash or abandoned, and all costs, expenses, and obligations incurred in administering the Plan have been fully paid and discharged, and all remaining income, proceeds, and products of such assets have been distributed in accordance with the Plan.

5.10    Powers of the Chief Restructuring Officer.  The Chief Restructuring Officer, on behalf of the Reorganized Debtors, shall have such power and authority as is necessary to implement the Plan, including,without limitation, the following:

(a)    to convert the assets of the Reorganized Debtors into Cash and distribute the Cash pursuant to the Plan;

(b)    to object to Claims against the Debtors and to prosecute or compromise and settle such objections;

(c)    to prosecute, defend, and pursue any causes of action of the Debtors, including but not limited to those actions set forth in Section 5.12 of the Plan;

(d)    to hire attorneys, accountants, and other professionals in his or her discretion, including former professionals of the Debtors;

(e)    to serve as the President and Secretary of the respective Reorganized Debtors; and

(f)     in general, to do and perform all acts, to execute all documents, and to make all payments and disbursements of funds appropriate and necessary to be done, executed, performed, paid, and disbursed by the provisions of the Plan.

5.11    <u>Post-Confirmation Expenses</u>.  All costs, expenses, and obligations incurred by the Chief Restructuring Officer or Reorganized Debtors in administering the Plan, or in any manner connected, incidental, or related thereto, including those of attorneys, accountants, and other persons employed to assist in the administration and distribution of the assets of the Reorganized Debtors, shall be a charge against such assets.

(a)     The Chief Restructuring Officer shall establish adequate reserves for payment of anticipated expenses prior to making distributions hereunder.

(b)     After the Effective Date, attorneys, accountants and other professional persons employed or retained by the Chief Restructuring Officer or Reorganized Debtors shall submit any monthly billing statement that exceeds $25,000 to the Plan Notice Parties, in a manner consistent with the procedures set forth in the Interim Fees Order.

(c)     Unless an objection to a monthly billing statement circulated pursuant to subsection 5.11(b) of the Plan is filed by a party in interest as provided in the Interim Fees Order, such statement may thereafter be paid without further notice or Bankruptcy Court review or approval.

(d)     If an objection to a monthly billing statement circulated pursuant to subsection 5.11(b) of the Plan is filed by a party in interest with the Bankruptcy Court as provided in the Interim Fees Order, such statement shall be promptly scheduled for hearing before the Bankruptcy Court to determine the reasonableness of such statement.

(e)     Any monthly billing statement not required to be circulated pursuant to subsection 5.11(b) of the Plan may be paid in the ordinary course of business, without notice or Bankruptcy Court review or approval.

5.12    <u>Causes of Actions</u>.  Debtors and the Reorganized Debtors shall be the only parties authorized to object to Priority Claims, Claims and Equity Interests.  As of the Effective Date, Reorganized Debtors waive the right to prosecute, on behalf of themselves and their bankruptcy estates, any Avoidance Actions under Bankruptcy Code section 547 that belong to or could have been raised by or on behalf of the Debtors or the Debtors-in-Possession or their respective bankruptcy estates, other than any such actions that (i) pertain to the avoidance of the liens and guaranties created under the Senior Notes Agreement, (ii) pertain to AmTrust Bank or the FDIC, (iii) were commenced on or before the Effective Date, or (iv) are designated by Debtors as actions to be preserved in a pleading filed with the Bankruptcy Court and served on the defendants in such actions not later than 5 business days prior to the deadline for casting ballots to accept or reject this Plan.  Notwithstanding the foregoing, Reorganized Debtors, as the successors to the Debtors, shall retain and may prosecute any such Avoidance Actions, and may, whether or not an Avoidance Action has been commenced prior to the Effective Date, assert the claim or cause of action underlying such Avoidance Action as a defense or counterclaim to any Claim (including the FDIC Capital Claims and any other Priority Claims or other Claims of the FDIC) or action against the

Debtors, including, but not limited to, any rights under section 502(d) of the Bankruptcy Code. Unless Debtors consent, or unless otherwise ordered by the Bankruptcy Court, no other party shall have the right or obligation to pursue any such actions. Notwithstanding confirmation of the Plan and except as otherwise provided in ARTICLE 13 of the Plan, all such actions and any other claims, rights or causes of action in favor of the Debtors shall be preserved and maintained for the benefit of the Reorganized Debtors.

5.13 <u>Continuation of Stays</u>. Unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect pursuant to sections 105 or 362 of the Bankruptcy Code or otherwise and in effect on the Confirmation Date shall remain in full force and effect until the Effective Date.

5.14 <u>Cancellation of Old Notes and Existing Agreements</u>. Notwithstanding Section 9.01 of the Plan, on the Effective Date (i) the Old Notes shall be cancelled as provided in the Plan and (ii) the obligations of the Debtors under the Senior Notes Agreement, the Subordinated Notes Indenture, the Port Authority Bonds Indenture or any and all other agreements, indentures, deeds, guarantees and/or certificates of designations governing, securing, guaranteeing or relating to the Old Notes, as the case may be, shall be released and discharged.

5.15 <u>Sales of Property as Further Source of Capital</u>. In furtherance of the transactions contemplated by this Plan, the Reorganized Debtors are authorized to sell such of their assets as are not required for their business operations.

5.16 <u>Notice and Review of Major Transactions</u>. Subsequent to the Effective Date, if the Reorganized Debtors intend to enter into a Major Transaction, the Reorganized Debtors shall give not less that ten (10) days' notice of the proposed consummation of such Major Transaction to the Plan Notice Parties.

(a) Unless an objection to a proposed Major Transaction is filed by a party in interest in the Bankruptcy Court within ten (10) days of such notice, the Reorganized Debtors may complete the Major Transaction without further notice or Bankruptcy Court review or approval.

(b) If an objection to proposed Major Transaction is filed by a party in interest with ten (10) days of such notice, a hearing to consider approval of such Major Transaction shall be promptly scheduled before the Bankruptcy Court to determine the reasonableness of the business judgment of the Reorganized Debtors in proposing to enter into such Major Transaction.

**ARTICLE 6**
**PROVISIONS FOR TREATMENT OF**
**SUBSEQUENT PLAN DISTRIBUTIONS**

6.01 <u>Objections and Estimation of Claims</u>. The Debtors or the Reorganized Debtors shall object to the allowance of Priority Claims, Claims and Equity Interests with respect to which they dispute liability in whole or in part. All objections shall be litigated to a Final Order; *provided, however,* that the Debtors or the Reorganized Debtors may compromise and settle, withdraw or

resolve by any other method approved by the Bankruptcy Court, any objections to Priority Claims, Claims or Equity Interests. In addition, the Debtors or the Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate any contingent Priority Claim or Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors have previously objected to such Claim. Unless otherwise ordered by the Bankruptcy Court, the Debtors or the Reorganized Debtors shall serve and file any objections to Priority Claims, Claims and Equity Interests as soon as practicable, but in no event later than the date that distributions would otherwise be made to holders of such Priority Claims, Claims or Equity Interests under the Plan.

6.02     Plan Reserves.  On each Distribution Date, in calculating amounts available for distributions to holders of Priority Claims, Claims and Interests under the Plan, the Reorganized Debtors shall retain and set aside as the Reserve Fund an amount in Cash, in one or more accounts maintained by the Reorganized Debtors, such that the aggregate balance of the Reserve Fund (exclusive of any interest earned thereon) shall be sufficient to make all payments and distributions which may be subsequently required by ARTICLE 2 of the Plan and Section 6.04 of the Plan, or such lesser amount as may be approved by the Bankruptcy Court from time to time. Cash held by the Reorganized Debtors in the Reserve Fund shall be invested in accordance with the requirements contained in Section 6.06 of the Plan.

6.03     Tax Refund Account.  In addition to the Reserve Fund established pursuant to Section 6.01 of the Plan, the Reorganized Debtors shall maintain the Tax Refund Account pending determination of the ownership of such tax refund by Final Order of the Bankruptcy Court. Amounts in the Tax Refund Account shall be invested pursuant to the investment guidelines and procedures approved by the Bankruptcy Court.

6.04     Subsequently Allowed Claims.  Subsequent to the initial Distribution Date when any Priority Claim or Claim shall become an Allowed Priority Claim or Allowed Claim, the Reorganized Debtors shall, as soon as practicable, pay to the holder of such Allowed Priority Claim or Allowed Claim, from the Reserve Fund, Cash in an amount equal to the Cash distributions, if any, which would have previously been made to such holder if such Allowed Priority Claim or Allowed Claim had been an Allowed Priority Claim or Allowed Claim eligible for distribution on the initial Distribution Date.

6.05     Disallowed Claims.  Subsequent to the initial Distribution Date, when any Priority Claim or Claim or portion of a Priority Claim or Claim shall become disallowed by a Final Order, the Reorganized Debtors shall transfer from the Reserve Fund to their general funds an amount of Cash equal to the amount which would have been required to be distributed pursuant to Section 6.04 of the Plan had such disallowed Priority Claim or Claim or portion of a Priority Claim or Claim been an Allowed Priority Claim or Claim.

6.06     Investment of Reserve Fund.  Amounts held in the Reserve Fund shall be invested by the Reorganized Debtors in: (i) direct obligations of, or obligations secured by, the United States of America; (ii) obligations of any agency or corporation which is or may hereafter be created by or pursuant to an act of the Congress of the United States as an agency or instrumentality thereof; (iii) certificates of deposit or demand deposits in insurable amounts at any bank or trust company which has, at the time such investment is made, a capital stock and surplus

aggregating at least Twenty Five Million Dollars ($25,000,000) and (iv) other investments expressly approved, in advance, by Order ot the Bankruptcy Court.

6.07   Interest Earnings.   On the last day of each calendar month after the initial Distribution Date, the Reorganized Debtors shall transfer to their general funds all interest earned on the Reserve Fund since the last day of the preceding calendar month.

6.08   Payments and Distributions on Disputed Claims.   No partial payments and no partial distributions shall be made with respect to a disputed Priority Claim or Claim until the resolution of such disputes by settlement or Final Order.   As soon as practicable after a disputed Priority Claim or Claim becomes an Allowed Priority Claim or Claim, the holder of such Allowed Priority Claim or Claim shall receive all payments and distributions to which such holder is then entitled under the Plan.

# ARTICLE 7
# RECORD HOLDERS OF CLAIMS;
# CLAIMS BASED ON INSTRUMENTS OR SECURITIES

7.01   Record Holders of Claims.   Except as otherwise provided herein, the Debtors, the Reorganized Debtors and any transfer or distribution agent shall be entitled to treat, as the sole holder of any Claim, the entity reflected in the Claim records of the Debtors on the Distribution Record Date with respect to each payment or other distribution.   At the close of business on each Distribution Record Date, the claims register (for Claims) and the transfer ledgers (for Old Notes) will be closed, and there will be no further changes in the record holders of any Claims or Old Notes for purposes of such payment or distribution.   AFC, the Reorganized Debtors, and each trustee for the Old Notes will have no obligation to recognize any transfer of any Claim or Old Notes occurring after the close of business on the Distribution Record Date for such payment or distribution.   If there is any dispute regarding the identity of the person entitled to receive notice, payment or distribution in respect of a claim or interest under the Plan, no payment or distribution need be made in respect of such claim or interest until the dispute is resolved by the Bankruptcy Court pursuant to a Final Order.

7.02   Distributions on Claims Based on Subordinated Notes.   Notwithstanding Section 7.01 of the Plan, but subject to Section 4.10 of the Plan, distributions under ARTICLE 4 of the Plan with respect to the Subordinated Notes shall be made to the Subordinated Notes Trustee on account of such aggregate Allowed Claims.   Such amounts shall be further distributed to individual holders of Allowed Claims based on Subordinated Notes as provided in this ARTICLE 7.

7.03   Distributions on Claims Based on Port Authority Bonds.   Notwithstanding Section 7.01 of the Plan, distributions under ARTICLE 4 of the Plan with respect to the Port Authority Bonds shall be made to the Port Authority Bonds Trustee on account of such aggregate Allowed Claims.   Such amounts shall be further distributed to individual holders of Allowed Claims based on Port Authority Bonds as provided in this ARTICLE 7.

7.04   Surrender of Senior Notes.   All holders of Claims based on Senior Notes shall surrender their respective Senior Notes to the Reorganized Debtors in accordance with the written

instructions of the Reorganized Debtors. Upon surrender of such Senior Notes, the Reorganized Debtors shall (i) mark such Senior Notes as cancelled, and (ii) thereafter distribute to the holders of Allowed Claims on such Senior Notes their Pro Rata share of the Cash distributable to them on account of such Allowed Claim as described in ARTICLE 4 of the Plan

     7.05   <u>Surrender of Subordinated Notes</u>. All holders of Claims based on Subordinated Notes shall surrender their respective Subordinated Notes to the Subordinated Notes Trustee in accordance with the written instructions of the Reorganized Debtors and the Subordinated Notes Trustee. Upon surrender of such Subordinated Notes, the Subordinated Notes Trustee shall mark such Subordinated Notes as cancelled and deliver such cancelled Subordinated Notes to the Reorganized Debtors. Failure to surrender any of the Subordinated Notes shall not affect the rights of the holders of Senior Notes to receive distributions with respect to the Subordinated Notes Claims as provided in Section 4.10 of the Plan.

     7.06   <u>Surrender of Port Authority Bonds</u>. All holders of Claims based on Port Authority Bonds shall surrender their respective Port Authority Bonds to the Port Authority Bonds Trustee in accordance with the written instructions of the Reorganized Debtors and the Port Authority Bonds Trustee. Upon surrender of such Port Authority Bonds, the Port Authority Bonds Trustee shall mark such Port Authority Bonds as cancelled and deliver such cancelled Port Authority Bonds to the Reorganized Debtors.

     7.07   <u>No Distributions on Unsurrendered Old Notes</u>. No distribution shall be made to holders of Claims based on Old Notes until such time as such holders shall have surrendered or be deemed to have surrendered their Old Notes in accordance with this ARTICLE 7.

     7.08   <u>Lost Instruments</u>. Any holder of a Claim based on Old Notes that have been lost, stolen, mutilated or destroyed shall, in lieu of surrendering such Old Notes as provided in this ARTICLE 7, deliver (i) evidence reasonably satisfactory to the Reorganized Debtors, of the loss, theft, mutilation or destruction of such Old Notes and (ii) such security or indemnity as may be reasonably required by the Reorganized Debtors, to save them harmless with respect thereto. Upon compliance with this Section 7.08 by a holder of a Claim based on Old Notes, such holder shall, for all purposes under the Plan, be deemed to have surrendered its Old Notes.

     7.09   <u>Unsurrendered Instruments</u>. Any holder of a Claim based on Old Notes, which shall not have surrendered, or be deemed to have surrendered, its Old Notes within two (2) years after the Confirmation Date shall receive no distributions on such Claim under the Plan and shall be forever barred from asserting any claim thereon. The Subordinated Notes Trustee shall return to the Reorganized Debtors the portion of the Cash distributed to it pursuant to ARTICLE 4 of the Plan allocable to such non-surrendering holders of Claims based on Subordinated Notes. Upon the return of such Cash by the Subordinated Notes Trustee, such Subordinated Notes Trustee shall have no further responsibility regarding the distributions to such non-surrendering holders otherwise required to be made by it pursuant to this ARTICLE 7 of the Plan. The Port Authority Bonds Trustee shall return to the Reorganized Debtors the portion of the Cash distributed to it pursuant to ARTICLE 4 of the Plan allocable to such non-surrendering holders of Claims based on Port Authority Bonds. Upon the return of such Cash by the Port Authority Bonds Trustee, such Port Authority Bonds Trustee shall have no further responsibility regarding the distributions to

09-21323-pmc   Doc 1014   FILED 05/20/11   ENTERED 05/20/11 14:42:20   Page 15 of 39

such non-surrendering holders otherwise required to be made by it pursuant to this ARTICLE 7 of the Plan.

7.10    <u>Cancellation of Agreements</u>.  Except for (i) distributions for the benefit of holders of Claims based on Old Notes under the Plan, (ii) any right of the Subordinated Notes Trustee pursuant to the Subordinated Notes Indenture to assert a lien or claim against distributions received by it for the benefit of holders of Claims based on Subordinated Notes, (iii) any right of the Port Authority Bonds Trustee pursuant to the Port Authority Bonds Indenture to assert a lien or claim against distributions received by it for the benefit of holders of Claims based on Port Authority Bonds, (iv) payment or reimbursement of any obligations owed by AFC to the to Subordinated Notes Trustee or the Port Authority Bonds Trustee with respect to actions performed pursuant to the Plan, the rights and obligations of all parties under (a) the Subordinated Notes Indenture and the Subordinated Notes issued thereunder and (b) the Port Authority Bonds Indenture and the Port Authority Bonds issued thereunder shall be deemed automatically terminated and cancelled as of the Effective Date and all holders of Subordinated Notes or Port Authority Bonds shall be deemed automatically to have released all such claims against the Subordinated Notes Trustee, the Port Authority Bonds Trustee, the Debtors, the Reorganized Debtors and all of their respective affiliates.

# ARTICLE 8
# CONDITIONS TO CONFIRMATION
# AND EFFECTIVENESS OF THE PLAN

8.01    <u>Conditions to Confirmation.</u>  The confirmation of the Plan by the Bankruptcy Court shall be subject to, and conditioned upon, (i) the Confirmation Order being entered in form and substance reasonably acceptable to the Debtors and (ii) the Tax Refund Account being established pursuant to terms approved by the Bankruptcy Court.

8.02    <u>Conditions to Effectiveness.</u>  The effectiveness of the Plan shall be subject to, and conditioned upon, (i) the Confirmation Order becoming a Final Order, (ii) no request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code having been made or, if made, remaining pending, (iii) the Debtors retaining sufficient Cash on the Effective Date to make all distributions required on the initial Distribution Date, (iv) the Debtors receiving all regulatory approvals and all other material approvals, permits, authorizations, consents, licenses, and agreements from other third parties necessary or appropriate to permit the transactions contemplated by the Plan and any related agreements and to permit the Debtors to carry on its business after the Effective Date in a manner consistent in all material respects with the manner in which it was carried on before the Effective Date, and (v) all other actions and documents necessary to implement the Plan shall have been effected or executed.

8.03    <u>Effect of Failure of Conditions</u>.  Notwithstanding entry of the Confirmation Order, if each of the conditions set forth in Section 8.02 of the Plan has not been satisfied or duly waived by the Debtors within 60 days after the Confirmation Date, then upon motion by the Debtors or any party in interest made before the time that each of the conditions has been satisfied or duly waived, the order confirming the Plan may be vacated by the Bankruptcy Court; *provided, however,* that notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if each of

the conditions set forth in Section 8.02 of the Plan is either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion. If the Confirmation Order is vacated pursuant to this Section 8.03 of the Plan, the Plan shall be void and of no effect.

8.04    Notice of Effective Date. The Reorganized Debtors shall provide notice of the Effective Date of the Plan in accordance with the Bankruptcy Rules and orders of the Bankruptcy Court.

## ARTICLE 9
## EXECUTORY CONTRACTS

9.01    Assumption of Executory Contracts.  Any and all unexpired leases and executory contracts of the Debtors not expressly rejected by the Debtors pursuant to order of the Bankruptcy Court entered on or before the Confirmation Date, or as to which a motion for rejection is pending but undetermined as of such date and is subsequently approved by order of the Bankruptcy Court, shall be deemed assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code upon the Effective Date.

9.02    Cure of Defaults on Assumed Contracts. The Debtors believe that, except as otherwise specifically set forth on Exhibit D to the Plan, they are current in the performance of the executory contracts and unexpired leases to be assumed under the Plan.  The Debtors have determined that there are no amounts other than those set forth on Exhibit D to be paid as a condition to assumption of the executory contracts and unexpired leases under section 365(b) of the Bankruptcy Code.

(a)    Any objection to the assumption of any executory contract or unexpired lease and any proof of claim asserting that there are amounts or defaults that must be paid or cured as a condition to the assumption of any executory contract or unexpired lease must be filed with the Bankruptcy Court and delivered to the attorneys for the Debtors on or before the date and time set by the Court as the last date and time on which to file and deliver objections to the confirmation of the Plan.

(b)    The holder of any such objections or cure claim shall be forever estopped from asserting such objection or claim if not so timely filed and delivered. The Debtors reserve the right to reject any executory contract or unexpired lease with respect to which any such objection or claim is filed.

(c)    The Bankruptcy Court will resolve any such objection prior to or at the hearing on the confirmation of the Plan.  Any such cure claim shall be treated as a disputed administrative expense under the Plan and shall be reviewed and, where appropriate, objected to by the Debtors and thereafter resolved in accordance with the Bankruptcy Code and the Bankruptcy Rules.

(d)    Any unpaid amounts or uncured defaults that must be paid or cured as a condition of assumption under section 365(b), will be paid by the the Reorganized Debtors promptly after the amount of such claim has been determined by as Final Order.  A determination by the Court of the amount of such a Claim will bar the assertion of any

*Amended Joint Plan of Reorganization*        - 17 -

additional Claim that was or could have been asserted for defaults or unpaid amounts under such executory contract or unexpired lease.

9.03   Executory Contracts Expressly Rejected.  Set forth on Exhibit D to the Plan is a schedule of those executory contracts or unexpired leases that will be deemed rejected upon confirmation of the Plan.

9.04   Approval of Assumption or Rejection.  Entry of the Confirmation Order shall constitute: (i) approval, pursuant to section 365(a) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed pursuant to Section 9.01 of the Plan; and (ii) approval pursuant to section 365(a) of the Bankruptcy Code, of the rejection of executory contracts and unexpired leases rejected in accordance with Section 9.03 of the Plan. Notwithstanding anything contained herein to the contrary, the Debtors hereby retain the right to add or delete any executory contract or unexpired lease that is designated for assumption or rejection at any time prior to the Confirmation Date, upon notice to parties affected by such change.

9.05   Post-Filing Date Contracts and Leases.  Executory contracts and unexpired leases entered into and other obligations incurred after the Filing Date by the Debtors shall be performed by the Reorganized Debtors in the ordinary course of business.

9.06   Bar Date.  All proofs of claim with respect to claims arising from the rejection of any contract or unexpired lease shall be filed with the Bankruptcy Court and served on counsel for the Debtors no later than thirty (30) days after the Confirmation Date.  Any claim not filed within such date shall be forever barred from assertion against the Debtors and their respective estates and Reorganized Debtors.

# ARTICLE 10
## ORGANIZATION OF THE REORGANIZED DEBTORS

10.01   Articles of Incorporation.   The Articles of Incorporation of the Reorganized Company and the Articles of Incorporation of the Reorganized Debtors shall be as set forth in Exhibit E to the Plan.

10.02   Board of Directors.  The initial boards of directors of the Reorganized Company and the Reorganized Debtors shall consist of the five persons described in the Disclosure Statement dated as of the date of the Plan or otherwise identified in materials filed with the Bankruptcy Court not less than ten (10) days prior to the Confirmation Date.

10.03   Actions after the Effective Date. On the Effective Date, the operation of the Reorganized Company and the Reorganized Debtors shall become the general responsibility of their respective Boards of Directors, subject to, and in accordance with, their respective Articles of Incorporation.

# ARTICLE 11
## DISCHARGE

11.01  <u>Discharge</u>.  Unless otherwise provided in the Plan, confirmation of the Plan shall discharge the Debtors from any debt that arose before the Confirmation Date, and any debt of a kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code; (ii) a Claim based upon such debt is allowed under section 502 of the Bankruptcy Code; or (iii) the holder of a Claim based upon such debt has accepted the Plan.

# ARTICLE 12
## RETENTION OF JURISDICTION

12.01  <u>Retention of Jurisdiction</u>.  The Bankruptcy Court shall retain exclusive jurisdiction of these proceedings for the following purposes, <u>inter</u> <u>alia</u>:

(a)  to determine the contested matter with respect to the FDIC Capital Claims and any and all other applications, adversary proceedings and contested matters pending as of the Effective Date;

(b)  to determine any and all objections to the allowance of Priority Claims, Claims and Equity Interests;

(c)  to determine any and all Avoidance Actions;

(d)  to determine any and all applications for allowance of compensation and reimbursement of expenses, including fee statements reviewed to the extent provided in Section 5.11 of the Plan;

(e)  to determine all rights with respect to the Tax Refund;

(f)  to determine any and all controversies and disputes arising under or in connection with the Plan and such other matters as may be provided for in the Confirmation Order;

(g)  to effectuate payments under and performance of the provisions of the Plan;

(h)  to enter such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(i)  to determine the Debtors' or Reorganized Debtors' motion, if any, to modify the Plan in accordance with section 1127 of the Bankruptcy Code;

(j)  to issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(k)     to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the order confirming the Plan;

(l)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan and any related documents;

(m)     to hear and determine any issue for which the Plan or any related document requires a Final Order of the Bankruptcy Court;

(n)     to enter a final decree closing the Bankruptcy Case;

(o)     to hear and determine motions for the sale of all or any part of the Debtors' or Reorganized Debtors' assets, free and clear of all liens, claims and encumbrances in accordance with sections 363 and 1123(a)(5) of the Bankruptcy Code and approval of Major Transactions to the extent provided in Section 5.16 of the Plan; and

(p)     to determine any other matter not inconsistent with Chapter 11 of the Bankruptcy Code.

## ARTICLE 13
## INJUNCTIONS AND RELEASES

13.01   <u>Injunction Against Asserting Claims of Debtors</u>.  On and after the Confirmation Date, subject to the Effective Date, all Persons are permanently enjoined from commencing or continuing in any manner any action or proceeding (whether directly, indirectly, derivatively or otherwise) on account of or respecting any claim, debt, right or cause of action of the Debtors for which the Debtors or Reorganized Debtors, as the case may be, retain sole and exclusive authority to pursue in accordance with Section 5.12 of the Plan.

13.02   <u>Injunction Against Interference with Tax Attributes of Debtors</u>.  On and after the Confirmation Date, subject to the Effective Date, all holders of Class 9 Equity Interests are permanently enjoined from commencing or continuing in any manner any action to claim a worthless stock deduction with respect to their Class 9 Equity Interest pursuant to section 165 of the Internal Revenue Code, provided that such action may be taken upon (i) prior written request to and approval by the Debtors or the Reorganized Debtors, or (ii) Final Order of the Bankruptcy Court authorizing such action.  Such approval or such authorization may be provided by the Debtors or Reorganized Debtors or by the Bankruptcy Court to the extent that they conclude such action does not present a risk of harm to the tax attributes of the Debtors or Reorganized Debtors.

13.03   <u>Injunction Against Interference with Plan</u>.  Upon the entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

13.04   <u>Releases by Holders of Claims and Equity Interests</u>.  As of the Effective Date, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Plan and

other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan and in consideration for the settlements and compromises set forth in ARTICLE 5 of the Plan, (i) each holder of a Claim that votes in favor of the Plan and (ii) to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, each entity that has held, holds or may hold a Claim or Equity Interest or at any time was a creditor or stockholder of any of the Debtors, will be conclusively deemed to forever release, waive and discharge all claims (including derivative claims), obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities (other than the right to enforce the Debtors' or the Reorganized Debtors' obligations under the Plan and the contracts, instruments, releases, agreements and documents delivered thereunder or contracts assumed by the Debtors in connection therewith), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction or other occurrence taking place on or prior to the Effective Date in any way relating to a Debtor, the Bankruptcy Cases, or the Plan that such entity has, had or may have against any Debtor, the Committee and its members, the Holders of Senior Notes, the Subordinated Notes Trustee, the Port Authority Bonds Trustee, the Settling Interest Holders and each of their respective present or former directors, officers, employees, attorneys, accountants, underwriters, investment bankers, financial advisors, representatives and agents, acting in such capacity and their respective successors and assigns (which release will be in addition to the discharge of Claims provided in the Plan and under the Confirmation Order and the Bankruptcy Code).

13.05  Releases by the Debtors.  As of the Effective Date, in consideration for the settlements and compromises set forth in ARTICLE 5 of the Plan and for other good and valuable consideration, each of the Debtors in its individual capacity and as a debtor in possession will be deemed to forever release, waive and discharge any present or former officer, director or employee of any of the Debtors, the Committee and its members, the holders of Senior Notes, the Subordinated Notes Trustee, the Port Authority Bonds Trustee, the Settling Interest Holders and each of their respective present or former directors, officers, employees, attorneys, accountants, underwriters, investment bankers, financial advisors, representatives and agents, acting in such capacity and each of their respective successors and assigns, for and from any and all claims (including derivative claims), obligations, suits, judgments, damages, demands, debts, rights, rights of setoff (except as otherwise expressly provided in Section 13.06 of the Plan), causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date.

13.06  Limitations on Release.  The release set forth in Section 13.04 of the Plan shall not apply to claims (i) based on willful misconduct or fraud, (ii) to enforce the terms of the Plan and the contracts, instruments, releases, agreements and documents delivered thereunder, (iii) for breach of fiduciary liability under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq. ("ERISA"), (iv) asserted by the FDIC, or (v) asserted by the Subordinated Notes Trustee.  The release set forth in Section 13.05 of the Plan shall not apply to claims (i) based on willful misconduct or fraud, (ii) to enforce the terms of the Plan and the contracts, instruments, releases, agreements and documents delivered thereunder (iii) for breach of fiduciary liability

09-21323-pmc    Doc 1014    FILED 05/20/11    ENTERED 05/20/11 14:42:20    Page 21 of 39

under ERISA, (iv) for indebtedness of any released party to any of the Debtors for funds advanced to such released party, (v) which are currently asserted in a case or proceeding brought by any Debtors and currently pending against such released party, (vi) arising in any Avoidance Action against holders of Senior Notes, and (vii) which are asserted solely as a set-off or counterclaim with respect to a Claim asserted by such released party, *provided, however,* that the amount of the set-off or counterclaim that is not released shall not exceed the aggregate amount of such released party's asserted Claim against the Debtors.

13.07  Savings Clause.  If and to the extent that the Bankruptcy Court concludes that the Plan cannot be confirmed with any portion of the releases provided for herein, then except for the releases embodied in settlements set forth in ARTICLE 5 of the Plan, the Plan may be confirmed with such portion excised so as to give effect as much as possible to the foregoing releases without preventing confirmation of the Plan.

# ARTICLE 14
## MISCELLANEOUS

14.01  Headings.  The headings used in the Plan are inserted for convenience only and neither constitute a portion of this Plan nor in any manner affect the construction of the provisions of this Plan.

14.02  Severability.  Should any provision in the Plan be determined to be unenforceable following the Effective Date, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of the Plan.

14.03  Governing Law.  Except to the extent that the Bankruptcy Code or other federal law is applicable, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Ohio.

14.04  Successors and Assigns.  The rights, duties and obligations of any person named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors, heirs and assigns of such person.

14.05  Revocation of the Plan.  The Debtors reserve the right to revoke and withdraw the Plan prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan, then the Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtor.

14.06  Survival of Indemnification Obligations.  The obligations of AFC or the other Debtors to indemnify present or former directors, officers, agents, employees and representatives, pursuant to their certificates of incorporation and bylaws and applicable statutes, in respect of all future actions, suits and proceedings against any of such officers, directors, agents, employees and representatives  and based on any act or omission related to service with or for or on behalf of AFC or the other Debtors after the Filing Date, shall not, with respect to any such party that is bound by or otherwise agrees to the releases contained in Section 13.04 of the Plan, be discharged or impaired by confirmation or consummation of the Plan but shall survive unaffected by the

reorganization contemplated by the Plan and shall be performed and honored by the Reorganized Company and the Reorganized Debtors regardless of such confirmation, consummation and reorganization. Such surviving indemnity obligations shall not include claims by present or former directors, officers, agents, employees and representatives related to service with or for or on behalf of the AFC or the other Debtors prior the Filing Date.

14.07   <u>Effectuating Documents; Further Transactions; Timing</u>. Each of the officers of the Debtors shall be deemed to be authorized as fully as those under resolutions of the respective Debtors' boards of directors or shareholders to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents, and to take such action(s) as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any securities issued pursuant to the Plan. All transactions that are required to occur on the Effective Date under the terms of the Plan shall be deemed to have occurred simultaneously.

14.08   <u>Exemption from Transfer Taxes</u>. Pursuant to section 1146(c) of the Bankruptcy Code, none of (i) the issuance transfer or exchange of any security under, in furtherance of, or in connection with, this Plan, (ii) the assignment or surrender of any lease or sublease, or the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale or assignments executed in connection with any disposition of assets contemplated by this Plan (including real and personal property), or (iii) the disposition and/or encumbrance of assets in connection with any transactions contemplated hereunder (including any subsequent sale of property under Section 5.15 of the Plan), shall be subject to any stamp, real estate transfer, mortgage recording sales, use or other similar tax.

14.09   <u>Exculpation</u>. Neither the Debtors, the Committee, the holders of Senior Notes, the holder of the Subordinated Notes, the holder of the Port Authority Bonds, nor any of their respective former or current directors, officers, employees, advisors, affiliates, attorneys, financial advisors, representatives or agents shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with or arising out of, (i) any act, omission, transaction or other occurrence taking place on or after the Filing Date and in any way relating to a Debtor or the Bankruptcy Cases, (ii) confirmation or consummation of the Plan or (iii) the administration of the Plan or property to be distributed under the Plan, except for willful misconduct or fraud, or to enforce the terms of the Plan and the contracts, instruments, releases, agreements and documents delivered thereunder. Exculpated parties shall, in all respects, be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

14.10   <u>Binding Effect</u>. The Plan shall be binding upon, and shall inure to the benefit of the Debtors, the holders of all Claims and Equity Interests and their respective successors and assigns.

14.11   <u>Modification of Payment Terms</u>. The Debtors reserve the right to modify the treatment of any Allowed Claim in any manner adverse only to the holder of such Claim at any time after the Effective Date upon the prior written consent of the holder whose Allowed Claim treatment is being adversely affected.

14.12   Notices.  Any notice required or permitted to be provided under the Plan shall be in writing and served by: (a) certified mail, return receipt requested, postage prepaid; (b) hand delivery; or (c) reputable overnight carrier service, freight prepaid, to be addressed as follows:

If to the Debtors, to:

AmFin Financial Corporation
c/o GlassRatner Advisory & Capital Group LLC
3391 Peachtree Road, Suite 110
Atlanta, GA  30326
        Attention: Ronald L. Glass
        Fax:  (678) 904-1991
        rglass@glassratner.com

 with copies to:

G. Christopher Meyer
Squire, Sanders & Dempsey (US) L.L.P.
4900 Key Tower
127 Public Square
Cleveland, OH  44114-1304
        Fax: (216) 479-8776
        christopher.meyer@ssd.com

Glenn E. Morrical
Thomas W. Coffey
Tucker Ellis & West LLP
1150 Huntington Building
925 Euclid Ave.
Cleveland, OH 44115
 Fax: (216) 592-5009
 glenn.morrical@tuckerellis.com
 thomas.coffey@tuckerellis.com

Stephen D. Lerner
Squire, Sanders & Dempsey (US) L.L.P.
221 E. Fourth St.,
Suite 2900
Cincinnati, OH 45202
        Fax: (513) 361-1201
        stephen.lerner@ssd.com

14.13   Dissolution of Official Committees.  Except as otherwise provided in any order of the Bankruptcy Court, on the Effective Date, the Committee and any other official committees of holders of Claims or Equity Interests shall be dissolved and the members of the Committee and any such other committees shall thereupon be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Bankruptcy Cases, except for the preparation and filing of applications for payment of professionals.

14.14   Claims by Indenture Trustees.  Consistent with Bankruptcy Rule 3003(c), (i) proofs of claims filed by the Subordinated Notes Trustee shall be recognized as filed on behalf of all holders of Claims of holders of Subordinated Notes and in respect of all Claims under the Subordinated Notes Indenture and (ii) proofs of claims filed by the Port Authority Bonds Trustee

shall be recognized as filed on behalf of all holders of Claims of holders of Port Authority Bonds and in respect of all Claims under the Port Authority Bonds Indenture.  Any proof of claims filed by the registered or beneficial holders of Subordinated Notes or Port Authority Bonds shall be deemed automatically disallowed, without further action of the Bankruptcy Court, as duplicative of the claims filed by the Subordinated Notes Trustee and the Port Authority Bonds Trustee, respectively.

      14.15   <u>Post-Confirmation Fees And Reports</u>.  Unless otherwise ordered by the Bankruptcy Court, the Reorganized Debtors shall be responsible for the timely payment of all fees incurred pursuant to section 1930 of Title 28 to the United States Code.  Unless otherwise ordered by the Bankruptcy Court, the Reorganized Debtors also shall file with the court, and serve on the U.S. Trustee, a quarterly financial report for each quarter (or portion thereof) that the Bankruptcy Cases remain open, in a format prescribed by the U.S. Trustee in accordance with the guidelines of the Office of the U.S. Trustee.

Cleveland, Ohio
May 20, 2011

**AMFIN FINANCIAL CORPORATION**

By:    <u>  /s/ Ronald L. Glass      </u>
          Ronald L. Glass
          Chief Executive Officer and Chief Restructuring Officer

## SUMMARY OF EXHIBITS

| Exhibit | Document | Plan Reference(s) |
|---------|----------|-------------------|
|         |          |                   |
| A | Definitions | 1.01 |
| B | Settling Interest Holders | 5.03 |
| C | Agreement with Chief Restructuring Officer | 5.09 |
| D | Executory Contracts | 9.01, 9.03 |
| E | Organizational Documents for the Reorganized Debtors | 10.01 |

To the extent that any of the forgoing Exhibits are not filed with the Plan, such Exhibits shall be filed with the Plan Supplement.

# EXHIBIT A

## DEFINITIONS

"AFC" shall mean AmFin Financial Corporation (fka AmTrust Financial Corporation), an Ohio corporation and one of the Debtors.

"AIAI" shall mean AmFin Insurance Agency, Inc. (fka AmTrust Insurance Agency, Inc.), an Ohio corporation, a wholly-owned subsidiary of AFC and one of the Debtors.

"AII" shall mean AmFin Investments, Inc. (fka AmTrust Investments, Inc.), an Ohio corporation, a wholly-owned subsidiary of AREI and one of the Debtors.

"AMI" shall mean AmFin Management, Inc. (fka AmTrust Management, Inc.), an Ohio corporation, a wholly-owned subsidiary of AREI and one of the Debtors.

"API" shall mean AmFin Properties, Inc. (fka AmTrust Properties, Inc.), an Ohio corporation, a wholly-owned subsidiary of AREI and one of the Debtors.

"AISI" shall mean AmFin Investment Services, Inc. (fka AmTrust Investment Services, Inc.), an Ohio corporation, a wholly-owned non-Debtor subsidiary of AFC.

"Allowed" shall mean, with respect to (a) any Claim or Equity Interest, (i) a Claim or Equity Interest, proof of which was filed on or before the date, if any, designated by the Bankruptcy Court as the last date for filing proofs of claim with respect to such Claim or Equity Interest, or (ii) a Claim or Equity Interest that has been or hereafter is scheduled by the Debtors as liquidated in amount and not disputed or contingent and, in either case, a Claim or Equity Interest as to which no objections to the allowance thereof has been filed within the applicable period of limitation fixed by the Bankruptcy Code, Bankruptcy Rules or an order of the Bankruptcy Court, or as to which any objection has been determined by a Final Order of the Bankruptcy Court allowing such Claim or Equity Interest in whole or in part, (b) any Claim arising from the recovery of property under sections 550 or 553 of the Bankruptcy Code and allowed in accordance with section 502(h) of the Bankruptcy Code, (c) any Claim allowed under or pursuant to the terms of the Plan, or (d) any Claim to the extent that it has been allowed by a Final Order; provided, however, that Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder. Unless otherwise specified herein or by order of the Bankruptcy Court, "Allowed Claims" shall not, for any purpose under the Plan, include interest, penalties or late charges on such Claims from and after the Filing Date. In addition, "Allowed Claim" shall not include any Claim subject to disallowance in accordance with section 502(d) of the Bankruptcy Code.

"AREI" shall mean AmFin Real Estate Investments, Inc. (fka AmTrust Real Estate Investments, Inc.), an Ohio corporation, a wholly-owned subsidiary of AFC and one of the Debtors.

"Available Cash" shall mean, as of any particular date, all Cash held by the Reorganized Debtors, less the sum of (i) Retained Cash, (ii) amounts reserved for payments of priority claims pursuant

to ARTICLE 2 of the Plan, (iii) amounts reserved for the FDIC Capital Claim, (iv) amounts in the Tax Refund Account and (v) amounts reserved for, or distributed to, holders of Class 5 Claims.

"Avoidance Action" shall mean any avoidance or recovery action under sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code.

"Bankruptcy Cases" shall mean the bankruptcy case(s) commenced in the Bankruptcy Court by any of the Debtors.

"Bankruptcy Code" shall mean the Bankruptcy Reform Act of 1978, as amended, Title 11, United States Code.

"Bankruptcy Court" shall mean the court in the Northern District of Ohio conferred with authority over the Bankruptcy Cases or the court so authorized with respect to any proceedings in connection therewith for the purpose of such proceedings.

"Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure as in effect on the Confirmation Date and as thereafter amended, together with local rules adopted by the Bankruptcy Court, or such similar rules as may be in effect from time to time in the Bankruptcy Court.

"Bondholder Claim" shall mean a Claim arising from ownership of Port Authority Bonds, including without limitation all rights of such holders under the Garage Lease.

"Business Day" shall mean any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

"Cash" shall mean cash, cash equivalents, and other readily marketable securities or instruments.

"Claim" shall mean any claim against the Debtors as defined in section 101(5) of the Bankruptcy Code which has not been disallowed by an order of the Bankruptcy Court or for which an order of disallowance of the Bankruptcy Court has been reversed on appeal by a Final Order of an appellate court.

"Class" shall mean any class of holders of Claims or Equity Interests as specified in ARTICLE 3 of the Plan.

"Committee" shall mean the Official Unsecured Creditors' Committee appointed during the Bankruptcy Cases.

"Common Stock" shall mean the common stock, par value $.01 per share, of AFC.

"Confirmation Date" shall mean the date on which the Confirmation Order is entered.

"Confirmation Order" shall mean the order entered by the Bankruptcy Court confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

"Convenience Claims" shall mean Unsecured Claims of creditors which are for liabilities which would otherwise be Class 8 Claims but which either (a) are for $25,000 or less or (b) which have

been reduced to $25,000 at least ten days prior to the initial Distribution Date by written election of such creditors in form and substance satisfactory to the Debtors or the Reorganized Debtors.

"Debtors" shall mean, collectively, AFC and its affiliates AIAI, AII, AMI, API and AREI, as debtors in the Bankruptcy Cases.

"Distribution Date" shall mean a Business Day, designated by the Reorganized Debtors (a) that is approximately ten (10) Business Days after the Effective Date, and (b) thereafter, promptly following the end of each calendar quarter, provided that no distribution shall occur unless the Available Cash projected by the Reorganized Debtors on such date exceeds One Hundred Thousand Dollars ($100,000).

"Distribution Record Date" shall mean, with respect to any Distribution Date, that date which is ten (10) Business Days prior to the Distribution Date.

"Effective Date" shall mean a Business Day, as determined by the Debtors, that: (a) is as soon as reasonably practicable after the Confirmation Date; and (b) is the day on which (i) all conditions to the Effective Date in Article 8.02 have been met or waived pursuant to Article 8.03 and (ii) no stay of the Confirmation Order is in effect.

"Equity Interest" shall mean any rights of holders of issued and outstanding shares of Common Stock or other equity securities of the Debtors in respect thereof, together with (a) any rights of holders of options, warrants or other rights to acquire such shares of Common Stock or other equity securities of the Debtors as of the Filing Date, and (b) any claim arising from rescission of a purchase or sale of any such security, or for damages arising from the purchase or sale of any such security, or for reimbursement or contribution on account of any such claim.

"FDIC" shall mean the Federal Deposit Insurance Corporation, both in its corporate capacity and as reveiver of AmTrust Bank, a former affiliate of the Debtors.

"FDIC Capital Claims" shall mean any Claims asserted by or through the FDIC with respect to any alleged commitment by any Debtor to maintain the capital of an insured depository institution, whether asserted pursuant to section 365(o) of the Bankruptcy Code, section 507(a)(2) of the Bankruptcy Code, section 507(a)(9) of the Bankruptcy Code, or otherwise.

"Federal Judgment Rate" shall mean, at any date, the rate of interest established pursuant to 28 USCA section 1961(a).

"Filing Date" shall mean the date of the filing by the Debtors of their voluntary petitions commencing the Bankruptcy Cases.

"Final Order" shall mean an order as to which (a) any appeal that has been taken has been finally determined or dismissed, or (b) the time for filing a notice of appeal or petition for certiorari has expired and no notice of appeal or petition for certiorari has been timely filed.

"Garage Lease" shall mean the Lease Agreement dated February 1, 2004 between the Port Authority, as "Lessor", and OSF Properties, Inc. (now known as AREI), as "Lessee".

"Impaired" shall mean, with respect to any Claim, Equity Interest or Class, the condition or effects described in section 1124 of the Bankruptcy Code.

"Intercompany Claims" shall mean Unsecured Claims of one Debtor against any other Debtor and Unsecured Claims of any affilate of any Debtor against any Debtor.

"Interim Fees Order" shall mean the Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and Committee Members, entered by the Bankruptcy Court on January 8, 2010 [Docket No. 139].

"Major Transaction" shall mean (i) a transaction involving the sale or other disposition of assets of the Reorganized Debtors in which the aggregate value of the consideration received by the Reorganized Debtors in such transaction is greater than $3 million, or (ii) a transaction involving the the compromise or settlement of a Claim in which the amount of the Allowed Claim exceeds $3 million.

"Old Notes" shall mean the Senior Notes, the Subordinated Notes and the Port Authority Bonds, collectively.

"Plan" shall mean the Amended Joint Plan of Reorganization dated May 20, 2011, filed by the Debtors, together with the exhibits thereto, either in their present form or as altered, amended or modified from time to time.

"Plan Notice Parties" shall mean (i) those persons designated for service under Section 14.12 of the Plan; (ii) Weil, Gotshal & Manges LLP, counsel to holders of the Senior Notes, 700 Louisiana, Suite 1600, Houston, Texas 77002, Attn: Alfredo R. Perez; (iii) Baker & Hostetler LLP, counsel for the FDIC, 3200 National City Center, 1900 East 9th Street, Cleveland, OH 44114-3485, Attn: Joseph F. Hutchinson; and (iv) the Office of the United States Trustee, 201 Superior Avenue East, Suite 441, Cleveland, OH 44114, Attn: Maria D. Giannirakis.

"Port Authority" shall mean the Cleveland-Cuyahoga County Port Authority, as the lessor under the Garage Lease and the issuer of the Port Authority Bonds.

"Port Authority Bonds" shall mean the Port Authority's Taxable Development Revenue Bond, Series 2004 (OSF Properties, Inc. Project) issued February 27, 2004.

"Port Authority Bonds Indenture" shall mean the Indenture, dated as of February 1, 2004, between the Port Authority and the Port Authority Bonds Trustee, as Trustee.

"Port Authority Bonds Trustee" shall mean US Bank National Association, as the trustee for the holders of the Port Authority Bonds pursuant to the Port Authority Bonds Indenture, or any successor trustee designated pursuant to the Port Authority Bonds Indenture.

"Priority Claims" shall include expenses of administration under Sections 2.01 and 2.02 of the Plan, Priority Tax Claims, other priority claims under Section 2.04 of the Plan and the FDIC Capital Claims, collectively.

"Priority Tax Claim" shall mean an Claim of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code, whether or not such Claim is Secured or Unsecured..

"Pro Rata" shall mean, with respect to an amount of Available Cash to be distributed to the holder of a Class 6 Allowed Claim or Class 8 Allowed Claim on a particular date, the same proportion that such Class 6 Allowed Claim (adjusted pursuant to Section 4.06 of the Plan) or Class 8 Allowed Claim bears to the aggregate of all Class 6 Claims (adjusted pursuant to Section 4.06 of the Plan) and Class 8 Claims on that particular date.

 "Reorganized Debtors" shall mean the Debtors, from and after the Effective Date.

"Reserve Fund" shall mean the reserve fund established pursuant to Section 6.01 of the Plan and the amounts held therein.

"Retained Cash" shall mean the Cash retained by the Reorganized Debtors to carry out the provisions of the Plan, which shall include projected operating disbursements pursuant to the cash forecast of the Reorganized Debtors, plus a contingency reserve equal to the greater of 20% of such projected disbursements or $50,000.

 "Secured" shall mean, with respect to any Claim, a Claim secured by a valid and unavoidable lien on or security interest in property of the Debtors, to the extent of the value of such lien or security interest.

"Senior Notes" shall mean the AFC 11.78% Senior Notes due 2012, issued pursuant to the Senior Notes Agreement.

"Senior Notes Claim"  shall mean a Claim arising from ownership of Senior Notes.

"Senior Notes Agreement" shall mean that certain Note Purchase Agreement dated as of October 20, 2005, and amended by agreement dated June 20, 2009 and September 2, 2009.

"Settling Interest Holders" shall mean those holders of Interests listed on Exhibit B to the Plan.

"Subordinated Notes" shall mean the AFC 9.05% Junior Subordinated Deferrable Interest Debentures  due 2027, issued pursuant to the Subordinated Notes Indenture.

"Subordinated Notes Claim"  shall mean a Claim arising from ownership of Subordinated Notes.

"Subordinated Notes Indenture" shall mean the Indenture, dated as of June 3, 1997, between Ohio Savings Financial Corporation (now known as AFC) and Bank of New York, as Trustee.

"Subordinated Notes Trustee" shall mean Wilmington Trust Company, as the successor trustee for the holders of the Subordinated Notes pursuant to the Subordinated Notes Indenture, or any successor trustee designated pursuant to the Subordinated Notes Indenture.

"Tax Refund" shall mean all amounts received with respect to the refund of income taxes paid by AFC and its affiliates with respect to tax years ending prior to the Petition Date.

"Tax Refund Account" shall mean the segregated account or accounts established by the Debtors and approved by Bankruptcy Court Order to hold the Tax Refund, together with amounts earned on such account from time to time.

"TIF Bonds" shall mean the City of Cleveland, Ohio Economic Development Revenue Bonds, Series 2003A (Lower Euclid Avenue Project).

"TIF Loan Agreements" shall mean the Loan Agreement dated as of November 1, 2003 and the Tax Increment Financing Agreement dated as of December 20, 2002, collectively.

"Unsecured" shall mean, with respect to any Claim, a Claim that is not a Priority Claim, to the extent of the amount of such Claim which (a) is not secured by any valid and unavoidable lien on or security interest in property of the Debtors, or (b) is greater than the value of any valid and unavoidable lien on or security interest in property of the Debtors which secures such Claim.

09-21323-pmc    Doc 1014    FILED 05/20/11    ENTERED 05/20/11 14:42:20    Page 32 of 39

# EXHIBIT B

### Settling Interest Holders

| Holder | Amount of Allowed Class 8 Claim |
|---|---|
| Charlotte Goldberg | N/A |
| David Goldberg | $3,133,919.00 |
| Gerald Goldberg | $3,004,165.00 |
| Peter Goldberg | $448,571.00 |
| Robert Goldberg | $2,461,296.00 |

# EXHIBIT C

## **<u>Agreement with Chief Restructuring Officer</u>**

*Exhibit C – Agreement with CRO*          C-1



Date:    [      ], 2011


To:      AmFin Financial Corporation

         c/o G. Christopher Meyer

         Squire, Sanders & Dempsey LLP

         4900 Key Tower

         Cleveland, OH  44114


From:  Ronald L. Glass

Re:          **Chief Restructuring Officer Agreement**

<u>Introduction</u>

This Agreement confirms our understanding that reorganized AmFin Financial Corporation ("AFC" or the "Company"), along with its debtor affiliates (with AFC, the "Debtors"), is engaging Ronald L. Glass ("Glass") to serve as its Chief Restructuring Officer and Chief Executive Officer ("CRO") from and after the Effective Date of the Debtors' Joint Plan of Reorganization (the "Plan") confirmed in the Chapter 11 cased being jointly administered as Case No. 09-21323 (the "Bankruptcy Case") before the United States Bankruptcy Court for the Northern District of Ohio (the "Bankruptcy Court").  Capitalized terms herein, unless otherwise specifically defined, shall be as defined in the Plan.

Glass will act as CRO of the reorganized Company and will report directly to the reorganized Company's Board of Directors (the "Board"); he will assign appropriate staff from GlassRatner Advisory & Capital Group, LLC ("GlassRatner") to the matter as needed.

<u>CRO and GlassRatner Duties</u>

The CRO will perform the following tasks:
- Monitor preparation and filing of Debtors' tax returns
- Monitor and report upon any open tax issues, including tax claim asserted against the Debtors' bankruptcy estates and any pending tax refund of Debtors

- Manage and coordinate disposition of Debtors' assets
- Monitor FDIC related litigation
- Monitor other litigation matters
- Coordinate and prepare analysis of distributions to creditors
- Perform other duties as requested by the Board

GlassRatner will perform the following tasks:
- Oversee reorganized Debtors' accounting functions
- Manage bookkeeping duties including review and payment of vendor invoices, making deposits and reconciling reorganized Debtors' bank statements
- Prepare Cash Flow and Operating Reports as requested by the Board or required by the Bankruptcy Court
- Prepare regular updates analyzing Debtors' real estate investments as requested by the Board
- Monitor and manage the wind down OS Reinsurance operations and the recovery of reserves
- Assist counsel in the analysis of claims and the prosecution of objections same as appropriate
- Perform other duties as requested by the CRO or the Board

## Compensation

Compensation for the CRO and GlassRatner will be a flat monthly fee of $30,000 to begin the month following the Effective Date of the Plan. The reorganized Debtors shall also reimburse the CRO and GlassRatner reasonable out of pocket expenses. The CRO and GlassRatner shall maintain records of the time expended and expenses incurred under this agreement and shall provide such information to the Board as requested. Payment of fees and reimbursement of expenses are due upon receipt of invoice The monthly fee hereunder shall be subject to renegotiation at the request of either party, at any time.

## Indemnification

The Company agrees to indemnify and hold harmless the CRO and/or GlassRatner (including any employees or affiliated persons) from and against all claims, liabilities, losses and damages arising out of our services performed upon the Company's behalf except to the extent caused by gross negligence or willful misconduct by us. Further, the Company agrees to reimburse the CRO and/or GlassRatner for any legal or other expenses reasonably incurred by us in connection with the defense of such claims; provided, however, that they shall be excluded from such indemnification and reimbursement of any such loss, damage, liability, claim or expense which arises out of or is based upon any action or failure to act by the CRO and/or GlassRatner pursuant to this agreement which constitutes gross negligence, other acts of misconduct or bad faith in performance under this agreement on the part of the CRO and/or GlassRatner. Such indemnification shall survive the completion of the engagement.

## Termination

This agreement may be terminated immediately by either party, in its sole discretion, for any reason whatsoever. Upon termination of this agreement, the CRO and GlassRatner shall be

*Exhibit C – Agreement with CRO*                    C-1

entitled to all unpaid expenses incurred pursuant to this agreement and the remaining unpaid balance of any fee, which is then due and payable pursuant hereto.

## Confidentiality

The CRO and GlassRatner agree not to disclose or permit the disclosure of any of the terms of this agreement or any information relating to the project to be performed hereunder, provided that such disclosure may be made (a) to any person who is an officer, director or employee of GlassRatner solely for their use in the performance of the services hereunder and on a need-to-know basis, (b) with the prior written consent of the Company, or (c) pursuant to a subpoena or order issued by a court, arbitrator or governmental body, agency or official.  In the event that the CRO and/or GlassRatner shall receive a request to disclose any of the terms of this Agreement under a subpoena or order, the CRO an/or GlassRatner shall (i) promptly notify the Company, (ii) consult with the Company on the advisability of taking steps to resist or narrow such request and (iii) if disclosure is required or deemed advisable, cooperate with the Company in any attempt it may make to obtain an order or other assurance that confidential treatment will be accorded those terms of this agreement that are disclosed.

## Conclusion

We look forward to working with you on this matter.  All correspondence should be directed to:

Ronald L. Glass
GlassRatner Advisory & Capital Group, LLC
3391 Peachtree Road, Suite 110
Atlanta, Georgia  30326
(404) 835-8800
rglass@glassratner.com

If you agree with the terms of this agreement, please sign and return one copy to us.

**AGREED:**

**AMFIN FINANCIAL CORPORATION**


By_____          _____
   Signature                                                            Date

_____
Printed Name of Person Authorized to Sign

*Exhibit C – Agreement with CRO*                        C-2

# EXHIBIT D

**Executory Contracts**

# [EXHIBIT TO COME]

# EXHIBIT E

**<u>Organizational Documents</u>**

# [EXHIBIT TO COME]