UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 09-21323 |
| | ) | (Jointly Administered) |
| AMFIN FINANCIAL CORPORATION, | ) | |
| et al., | ) | Chapter 11 |
| | ) | |
| Reorganized Debtors. | ) | Chief Judge Pat E. Morgenstern-Clarren |
| | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |

The Senior Noteholders[1] move to have $950,000.00 of their fees and expenses allowed as an administrative expense under 11 U.S.C. § 503(b) based on their having made a substantial contribution in these chapter 11 cases.[2] The debtors support the motion,[3] while the Federal Deposit Insurance Corporation, as Receiver of AmTrust Bank (FDIC), and the United States trustee (UST) object.[4] For the reasons stated below, despite the outstanding cooperation shown by the Senior Noteholders throughout these cases, their motion must be denied.

---

[1] The motion is brought by the holders and investment advisors or managers for the account holders of the 11.78% Senior Notes issued by the debtor AmFin Financial Corp. and due October 20, 2012, together with the Bank of New York Mellon as collateral agent in connection with the Senior Notes (collectively, the Senior Noteholders).

[2] Docket 1373, 1401.

[3] The debtors agreed, through a settlement incorporated into the confirmed plan, that they would not object to the § 503(b) claim for an amount up to $950,000.00. *See* Docket 1284, 1314. The debtors also filed a comment in support of the motion. Docket 1398.

[4] Docket 1389, 1393.

## I. JURISDICTION

Jurisdiction exists under 28 U.S.C. § 1334 and General Order No. 84 entered by the United States District Court for the Northern District of Ohio. This is a core proceeding under 28 U.S.C. § 157(b)(2)(B) and (O), and it is within the court's constitutional authority as analyzed by the United States Supreme Court in *Stern v. Marshall*, 131 S.Ct. 2594 (2011).

## II. THE MOTION

The Senior Noteholders move under Bankruptcy Code § 503(b)(3) and (4) for the allowance of $950,000.00 as reasonable compensation which they paid or will pay for services rendered by their counsel and for amounts paid or to be paid by collateral agent Bank of New York Mellon to its counsel. They state that they incurred charges greater than $1,154,460.62, of which $1,015,353.62 was incurred in making a substantial contribution to these cases. They limit their application, though, to the $950,000.00 provided for in the confirmed plan.

### A. The Facts [5]

The debtors filed their chapter 11 cases[6] at the point in time when they concluded that the Office of Thrift Supervision (OTS) would likely seize control of AmTrust Bank—the debtor AFC's federal savings bank subsidiary. At filing, the debtor AFC had approximately $100

---

[5] The court heard this matter on February 9, 2012 and took it under submission at that time. Counsel did not request an evidentiary hearing. This factual background is drawn from the disclosure statement and from the factual background stated in the Senior Noteholders' motion and response.

[6] The Reorganized Debtors are AmFin Financial Corporation (AFC) fka AmTrust Financial Corp., and its five subsidiaries: AmFin Real Estate Investments Inc. fka AmTrust Real Estate Investments Inc.; AmFin Insurance Agency Inc. fka AmTrust Insurance Agency, Inc.; AmFin Investments Inc. fka AmTrust Investments Inc.; AmFin Properties Inc. fka AmTrust Properties Inc.; and AmFin Management Inc fka AmTrust Management Inc.

2

million of principal debt attributable to the Senior Notes, with those creditors representing a very substantial portion[7] of the debt in the case. On the day the debtors filed the cases, they also filed an adversary proceeding against the Senior Noteholders seeking to avoid about $12 million in payments, guarantees, and liens as preferential transfers and constructively fraudulent transfers.[8] The debtors dismissed the adversary proceeding one month later, and eventually compromised the issues with the Senior Noteholders.

Early on in the cases, the OTS took control of the bank subsidiary and appointed the FDIC as receiver. The FDIC has two major disputes with the debtors. First, it initially contended that it had a $2 billion plus claim, all or substantially all of which was entitled to priority under the Bankruptcy Code based on AFC's alleged commitment to maintain the capital of the bank subsidiary. The parties filed several contested matters related to that issue (Capital litigation). The District Court tried the matter on withdrawal of the reference, entering judgment in favor of the debtors. The case is on appeal.

The second major dispute stems from a 2009 tax refund of about $194 million; the FDIC claims the refund is its property, while the debtors claim that it is their property. The FDIC filed a complaint for a declaratory judgment on that issue, the District Court withdrew the reference, and the matter is pending (Refund litigation). The debtors' plan, confirmed consensually on November 4, 2011 with the FDIC litigation unresolved, necessarily poses a question as to the debtors' ability to make the contemplated distributions. If the FDIC prevails in the Capital

---

[7] At a hearing held on December 3, 2009, debtors' counsel stated that Senior Noteholders might represent as much as two-thirds of economic interest in the cases and the Senior Noteholders' counsel stated that it exceeded 90%.

[8] *AmFin Fin. Corp., et al. v. Allstate Life Ins. Co., et al.*, Adv. No. 09-1387.

litigation, its priority claim exceeds the projected value of the debtors' assets. The debtors cannot, therefore, make any distribution to unsecured creditors until the Capital litigation is resolved.

From the first hearings in this case forward, the Senior Noteholders took the position that it made economic sense to reach agreement on their disputes, in lieu of heated litigation. This approach was successful. The confirmed plan incorporates the settlement terms, including these: (1) each holder of a Senior Note Claim is treated as the holder of a single unsecured claim in the aggregate amount of $100,763,414.93 against the substantively consolidated debtors; (2) any lien, guarantee, mortgage, or security interest which was granted under the Senior Notes Agreement is disregarded; and (3) a settlement amount of $2 million will not be distributed to the holders of Senior Note claims, but will instead be distributed to holders of other unsecured claims (other than Subordinated Note Claims) on a pro rata basis. This $2 million redistribution resolved the debtors' claim to recover the approximately $12 million paid by the debtors to the holders of the Senior Note Claims in September 2009, and the debtors believed it reasonably approximated the net benefit which the adversary proceeding would have yielded had it been successfully prosecuted. Additionally, the debtors agreed not to object to the Senior Noteholders' claim for substantial contribution up to a total of $950,000.00.

### B. 11 U.S.C. § 503(b)(3) and (4)

Bankruptcy Code § 503(b)(3) and (4) provide in relevant part:

> (b) After notice and a hearing, there shall be allowed administrative expenses . . . including –
>
> \* \* \*

> (3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by–
>
> \* \* \*
>
> (D) a creditor . . . in making a substantial contribution in a case under chapter 9 or 11 of this title . . .
>
> (4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under subparagraph (A), (B), (C), (D), or (E) of paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant[.]

11 U.S.C. § 503(b)(3)(D) and (4).[9] These provisions are an accommodation between the two objectives of encouraging meaningful creditor participation in the reorganization process and keeping administrative expenses and fees at a minimum to maximize the estate for creditors. *Lebron v. Mechem Fin. Inc.*, 27 F.3d 937, 944 (3d Cir. 1994); *Pacificorp Ky. Energy Corp. v. Big Rivers Elec. Corp.(In re Big Rivers Elec. Corp.)*, 233 B.R. 739, 746 (W.D. Ky. 1998). "Accordingly, 'the integrity of section 503(b) can only be maintained by strictly limiting compensation to extraordinary creditor actions which lead directly to tangible benefits to the creditors, debtors, or estate.'" *In re Bayou Grp., LLC,* 431 B.R. 549, 560 (Bankr. S.D.N.Y. 2010) (quoting *In re Best Prods. Co.,* 173 B.R. 862, 866 (Bankr. S.D.N.Y. 1994)); *see also In re Sentinel Mgmt. Grp., Inc.*, 404 B.R. 488, 494 (Bankr. N.D. Ill. 2009) (stating that substantial contribution is narrowly defined and limited to extraordinary creditor actions which lead directly

---

[9] Administrative expenses allowed under these provisions are entitled to priority in payment. *See* 11 U.S.C. § 507(a)(2).

09-21323-pmc    Doc 1423    FILED 02/28/12    ENTERED 02/28/12 14:33:27    Page 5 of 11

to tangible and significant benefits to creditors). This approach is consistent with the Sixth Circuit's position that § 503(b) claims are to be strictly construed. *City of White Plains, New York v. A & S Galleria Real Estate, Inc. (In re Federated Dep't Stores, Inc.)*, 270 F.3d 994, 1000 (6th Cir. 2001).

The issues, then, are whether the creditor made a substantial contribution to the chapter 11 process and, if so, whether the requested fees and expenses are reasonable. *Gorski v. Eisen (In re Henrick's Commerce Park, LLC)*, 347 B.R. 115 at *5 (B.A.P. 6th Cir. 2006) (unpublished opinion), *aff'd* 313 Fed. Appx. 740 (6th Cir. 2007) (unpublished opinion). The moving party has the burden of proof. *Hall Fin. Grp., Inc. v. DP Partners, Ltd. (In re DP Partners, Ltd.)*, 106 F.3d 667, 671 (5th Cir. 1997); *Haskins v. United States (In re Lister)*, 846 F.2d 55, 57 (10th Cir. 1988); *In re Gurley*, 235 B.R. 626, 631 (Bankr. W.D. Tenn. 1999).

"[T]he principal test of substantial contribution is the extent of benefit to the estate." *Cellular 101, Inc. v. Channel Commc'ns, Inc. (In re Cellular 101, Inc.)*, 377 F.3d 1092, 1096 (9th Cir. 2004) (quotation marks and citations omitted). The focus is on "whether the efforts of the applicant resulted in an actual and demonstrable benefit to the debtor's estate and the creditors." *In re Lister,* 846 F.2d at 57. The Bankruptcy Code does not define the term substantial contribution, but there is general agreement that "services which make a substantial contribution are those which 'foster and enhance, rather than retard or interrupt the progress of reorganization.'" *In re DP Partners, Ltd.*, 106 F.3d at 672 (quoting *In re Consol. Bancshares, Inc.*, 785 F.2d 1249, 1259 (5th Cir. 1986)); *see also In re Lebron,* 27 F.3d at 944; *In re Big Rivers Elec. Corp.*, 233 B.R. at 746.

6

More specifically–

> Factors which the courts have considered in determining whether an applicant has made a substantial contribution in a chapter 11 case include: whether the services were provided to benefit the estate itself or all of the parties in the bankruptcy case; whether the services conferred a direct, significant and demonstrably positive benefit upon the estate; and whether the services were duplicative of services performed by others.

*In re Best Prods. Co.*, 173 B. R. at 865. As one court noted, "extensive participation in a case, without more, does not constitute substantial contribution." *In re Alumni Hotel Corp.*, 203 B.R. 624, 631 (Bankr. E.D. Mich. 1996). Courts have found that a creditor made a substantial contribution in a variety of situations. *See, for example, Speights & Runyan v. Celotex Corp. (In re Celotex Corp.)*, 227 F.3d 1336, 1340 (11th Cir. 2000) (finding that claimants' attorney's credibility, special experience, and significant role in negotiating a successful plan supported a finding of substantial contribution); *In re DP Partners, Ltd.*, 106 F.3d at 673 (creditor's discovery of a fraudulent conveyance, termination of exclusivity, and participation in a confirmation fight which resulted in a benefit of at least $3 million to all creditors found to support substantial contribution finding); *In re Serv. Merch. Co.*, 256 B.R. 738, 743 (Bankr. M.D. Tenn. 1999) (approving an award under § 503(b)(3) to professionals of an unofficial creditors committee based on their substantial contribution to the case); *In re Primary Health Servs., Inc.*, 227 B.R. 479, 484-85 (Bankr. N.D. Ohio 1998) (finding that creditor who in essence performed the function of a creditors committee in a small business chapter 11 case was entitled to allowance of his professional fees and expenses under § 503(b)(3)(D) and (b)(4)).

There is disagreement among the Circuits as to what weight, if any, should be given to a creditor's self-interest. *Compare In re Lebron,* 27 F.3d at 944 ("Inherent in the term

7

"substantial" is the concept that the benefit received by the estate must be more than an incidental one arising from activities the applicant has pursued in protecting his or her own interests."), *and In re Lister,* 846 F.2d at 57 ("Efforts undertaken by a creditor solely to further his own self-interest . . . will not be compensable, notwithstanding any incidental benefit accruing to the bankruptcy estate."), *with In re Celotex Corp.,* 227 F.3d at 1339 (holding that a creditor's motive in taking actions which benefit the estate has little relevance to the determination of whether the creditor made a substantial contribution), *and In re DP Partners Ltd.,* 106 F.3d at 673 (same); *see also In re Cellular 101, Inc.),* 377 F.3d at 1097 (noting the divergence of opinion but declining to decide the issue).

  The Sixth Circuit has not spoken on this issue. As other courts have noted, § 503 specifically permits compensation to a creditor's counsel under certain circumstances, and that counsel is by definition always going to be acting in the creditor's best interest. If by doing so the creditor also makes a substantial contribution to the success of the chapter 11 case, there is no reason to bar the creditor from recovering fees otherwise potentially available to it. The applicant's motive for its actions is a factor that may be considered, but this court agrees with the Third Circuit that "the existence of a self-interest cannot in and of itself preclude reimbursement." *In re Lebron*, 27 F.3d at 944; *see also In re Cellular, 101, Inc.,* 377 F.3d at 1097-98 ("Any concern we have about evidence that Channel and Price benefitted from their own efforts is outweighed by the extent of the benefit those efforts conferred on the estate."); *In re Big Rivers Elec. Corp.*, 233 B.R. at 748 ("To recoup costs as an administrative expense, the creditor must prove his or her actions transcended self protection.").

8

09-21323-pmc Doc 1423 FILED 02/28/12 ENTERED 02/28/12 14:33:27 Page 8 of 11

### III. DISCUSSION

The Senior Noteholders argue that they were instrumental in achieving a favorable outcome for creditors and that these cases could have followed a very different path without their cooperative and meaningful participation. As evidence of their substantial contribution, they cite: (1) their decision to settle the adversary proceeding rather than to litigate it, which would have drained funds from the estate to the detriment of creditors; and (2) the assistance they provided in developing a defense strategy against the FDIC in the Capital and Refund litigations, together with their active involvement in responding to discovery in the Capital litigation. They also argue that the settlement which they proposed for their own issues became the blueprint for the distribution scheme used in the confirmed plan and assured a quick plan process. On this point, they argue further that their agreement that the first $2 million would be distributed to general unsecured creditors essentially lowered their own priority to the direct benefit of the estates' other creditors.

The objectors challenge the Senior Noteholders' characterization of their participation in the cases. They argue that the Noteholders did only what was required to protect their self-interest and not more. The FDIC also argues that the claim should be denied because the activities duplicated those of the estate professionals.

On the record before it, this court cannot find that the Senior Noteholders proved that they made a substantial contribution to these cases within the meaning of § 503(b)(3)(D). It is beyond question that the Senior Noteholders recognized at the outset that litigating their position would not preserve value, and so they sensibly chose to focus on reaching a consensus. They did so sooner rather than later, which helped the case to proceed smoothly with respect to the issues

9

involving the Senior Noteholders. It is equally clear that their counsel acted with the utmost professionalism, which approach avoided administrative and litigation costs for the estates. However, the efforts by the Senior Noteholders to settle their own claims are not properly characterized as a substantial contribution to the case. While the settlement spared the estates and other creditors from the expense and inconvenience of litigation, this is true of any settlement reached. The Senior Noteholders also point to the settlement term, incorporated into the plan, which provided for a $2 million distribution to general unsecured creditors. The Senior Noteholders agreed to this term as part of a settlement of the claims raised in the initial adversary proceeding, where the debtors sought to recover about $12 million paid to the noteholders before the chapter 11 filings. Agreeing to compromise that cause of action for $2 million does not establish that the settlement benefitted the estate beyond the benefit that accompanies any settlement; i.e. resolution of issues without expending more time and money.

The claim that the Senior Noteholders made a substantial contribution to the Capital litigation is more promising, but there is insufficient evidence to prove this point. First, there is no evidence that the Senior Noteholders conferred a benefit on the estate by responding to discovery requests posed to them by the FDIC. The Senior Noteholders argue, without opposition, that the FDIC did not use any of the information it obtained from the Senior Noteholders. Rather than showing that participating in this discovery benefitted the debtors, this tends to show that it did not benefit anybody. While the Senior Noteholders' frustration at having to spend this time is understandable, it does not show a substantial contribution to the estates. The second prong is that one of the counsel for the Senior Noteholders had a particular expertise in capital maintenance issues, which allowed him to aid the debtors' counsel in a

10

meaningful way. Again, however, there was little or no evidence as to what exactly this meant. Given that counsel for the debtor had the responsibility to defend the litigation, and ably did so, any assistance provided by the Senior Noteholders must be presumed in the first instance to duplicate those efforts.

## IV. <u>CONCLUSION</u>

For the reasons stated, the UST and the FDIC objections are sustained, and the Senior Noteholders' motion is denied.

IT IS SO ORDERED.

/s/ Pat E. Morgenstern-Clarren
Pat E. Morgenstern-Clarren
Chief Bankruptcy Judge